# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**CHRISTOPHER J. SQUITIERI,**
**JOHN HORNING AND**
**ANTHONY PEARN,**
     **Plaintiffs,**

_____/

**V.**            **Case No. _____**

**PASCO COUNTY SHERIFF, CHRISTOPHER NOCCO;**
 **COLONEL JEFFERY HARRINGTON;**
**MAJOR JEFFERY PEAKE, MAJOR CRIMES UNIT;**
**LARRY KRAUS, DIRECTOR OF INTELLIGENCE LEAD POLICING UNIT;**
**MAJOR KENNETH GREGORY, MAJOR OF PATROL OPERATIONS;**
**CAPTAIN SHARON FOSHEY, DIRECTOR OF PASCO HERNANDO POLICE ACADEMY;**
**SERGEANT JAMES BROWNING;**
**SERGEANT RICHARD JONES;**
**SERGEANT MARC ERICKSON;**
**CORPORAL JENNIE JONES, COORDINATOR OF PASCO HERNANDO POLICE ACADEMY;**
**INSPECTOR JENNIFER CHRISTENSEN;**
**HUMAN RESOURCES DIRECTOR TAFFINI REED;**
**INVESTIGATOR TIMOTHY ROY;**
**HUMAN RESOURCES MANAGER MELISSA HITE;**
**HUMAN RESOURCES SPECAILEST CHRISTOPHER BENNETT;**

     **Defendants.**

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, CHRISTOPHER  J. SQUITIERI (hereinafter "SQUITIERI"),  ANTHONY PEARN

(hereinafter "PEARN") and JOHN HORNING (hereinafter "HORNING"), by and through their

undersigned attorney, files this Complaint and Demand for Jury Trial, individually and on behalf

of a class, bringing this action against Defendants, PASCO COUNTY SHERIFF, CHRISTOPHER

NOCCO (hereinafter "NOCCO"); Colonel JEFFERY HARRINGTON (hereinafter "HARRINGTON");

Major  JEFF PEAKE (hereinafter "PEAKE"), Major of crimes unit; LARRY KRAUS (hereinafter

"KRAUSE"), Director of Intelligence Lead Policing Unit; Major KENNETH GREGORY (hereinafter

"GREGORY"), Major of patrol operations; Captain SHARON FOSHEY (hereinafter "FOSHEY"),

Director of Pasco Hernando Police Academy; Sergeant JAMES BROWNING (hereinafter

"BROWNING"); Sergeant RICHARD JONES (hereinafter " SGT. JONES"); Sergeant MARC

ERICKSON (hereinafter "ERICKSON"); Corporal JENNIE JONES (hereinafter "CORP. JONES"),

Coordinator of Pasco Hernando Police Academy; Inspector JENNIFER CHRISTENSEN (hereinafter

"CHRISTENSON"); Human Resources Director TAFFINI REED (hereinafter "REED"); Investigator

TIMOTHY ROY (hereinafter "ROY"); Human Resources Manager MELISSA HITE (hereinafter

"HITE"); Human Resources Specialist CHRISTOPHER BENNETT (hereinafter "BENNETT"); and

alleges upon facts and belief as follows:

## I.    <u>SUMMARY OF CLAIMS</u>

This is a civil RICO claim which requires Plaintiffs to demonstrate that the defendant has

engaged in a "pattern" of misconduct (called "racketeering" under the RICO statutes). "Pattern

of racketeering activity" requires at least two acts of racketeering activity committed within ten

years of each other.

The civil action for RICO is defined in 18 U.S.C.A. § 1964 (c): "Any person injured in his

business or property by reason of a violation of section 1962 of this chapter may . . . recover

threefold the damages he sustains and the cost of the suit, including a reasonable attorney's

fee . . . ." Section 1962 has four subparts and generally prohibits the use of income obtained

from a pattern of racketeering activity or through collection of an unlawful debt to purchase,

establish, operate, or participate in the affairs of any enterprise in interstate or foreign

commerce. Florida's RICO Act mirrors the federal RICO Act.  To be convicted for a violation of the state RICO Act, the defendant must have been arrested because he or she was associated with an enterprise, he or she directly or indirectly was part of the enterprise as evidenced by participating in a minimum of two acts of racketeering activity and at least two of the acts of racketeering activities had commonalities. Potential commonalities include the same or similar victims, co-conspirators, methods of commission, intent, results or other characteristics that established a pattern.

In this particular case, there are three (3) Plaintiffs and five (5) confidential informants, all of whom civil violations that constitute civil RICO claims against the defendants.  The plaintiffs' individual experiences of intimidation, coercion, extortion and other unethical behavior by their supervisors at the Pasco Sheriff's Department is well documented in the body of the Complaint.

The five confidential informants provide supporting evidence of the patterns of abuse of power, intimidation, and coercion to perform unethical activities at the behest of superiors that are similar to the narratives of the three Plaintiffs.  Taken together, the Plaintiffs and confidential informants provide a picture of the Pasco Sheriff's Department that is criminal, unethical, and a criminal enterprise.  This pattern of behavior reflects an attitude on the part of the Defendant's that they as law enforcement officers are above the law and immune from scrutiny or the most innocuous criticism.

The Plaintiffs and confidential informants demonstrate what life is like when anyone decides to contradict or simply not follow the edicts of the highest officials within the Pasco Sheriff's

Department.  Their stories depict a Sheriff's Department whose leadership is intoxicated with power and will physically abuse, intimidate, incarcerate, extort, and defame in order to ensure their absolute control and ensure a reign of terror both within the Pasco Sheriff's Department and throughout Pasco County.

When the Defendants did not get what they wanted they retaliated against the Plaintiffs and confidential informants with internal departmental investigations intended to ruin their careers and in some instances, prevent them from working for other law enforcement agencies. Some confidential informants were the subject of psychological abuse in order to intimidate them.  They were subject to sexually derogatory comments and demotions.  In some instances, witnesses against the Plaintiffs and confidential informants were encouraged to lie or change fact patterns in order to vilify them.

These behavioral patterns of abuse by top officials of the Pasco Sheriff's Department, including the Sheriff himself, are so commonplace and rampant that they are standard operating procedure presently and for the foreseeable future.  The traditional social compact which ensures the protection of individuals living in a community by a governmental agency as long as that governmental agency acts equitably, justly, and according to the laws of the State, has been irretrievably broken by the actions of the Defendants.

**2.**

The Pasco Sheriff's Office employs about seven hundred fifty (750) sworn members, Sheriff's Deputies and Corrections Deputies, and about six hundred fifty (650) civilians, who carry out the official business of enforcing the laws of the State of Florida, in and for Pasco

County Florida. PSO is the largest law enforcement agency within Pasco County, Florida, and serves as a full service law enforcement and detention agency for more than five hundred twelve thousand (512,000) citizens of Pasco County Florida.

### 3.

Defendants have, through the Pasco Sheriff's Office, engaged in "racketeering activity" through: (A) Acts or threats involving, bribery, and extortion which is chargeable under State law and punishable by imprisonment for more than one year; and, (B) Bribery-Section 201 and Section 664, Mail fraud-section 1341, Wire fraud-Section 1343, Obstruction of Justice-Section 1503, Obstruction of Criminal Investigations-Section 1510, Obstruction of State or Local Law Enforcement-Section 1511, Tampering with a Witness, Victim, or an Informant-Section 1512, Retaliating Against a Witness, Victim, or an Informant-Section 1513, Peonage, Slavery, and Trafficking in Persons-Sections 1581–1592,  and Racketeering-Section 1952.

### 4.

Defendants' conduct violates the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("federal RICO"), and Florida's Racketeering Statute, Chapter 895 et seq. (Florida "RICO"), as more fully set forth below.

### 5.

Defendants'(listed above) conduct violated 42 U.S. Code § 1985.Conspiracy to interfere with civil rights.

### 6.

Defendants Nocco, Harrington, Peake, Christensen, Reed, Roy, Kraus, Hite, and Bennett conduct violated the Trafficking Victims Protection Act, 42 U.S.C. § 7102.

### 7.

Defendants Nocco, Harrington, Peake, Christensen, Reed, Roy, Kraus, Hite, and Bennett conduct violated the Federal whistle Blower Act, Whistleblower Protection Act of 1989, 5 U.S.C. 2302et seq., (federal Whistle Blower), and Fla. Stat. § **112.3187et seq.**

## II   CONFIDENTIAL INFORMANTS

### 8.

**Confidential Informant One:**

Informant was ordered as part of his/her Commander Status duties to donate $1000.00 dollars in his/her name and $1000.00 dollars under the name of his/her spouse at the time. He/she was told this was not a choice but a demand and part of his/her Commander responsibilities. This message was delivered by Executive Staff members. In addition, Major Gregory was used to collect donations throughout the tri-county area during business hours and under the umbrellas of his on-duty status as he is assigned Monday through Friday, 0900-01700 hours.  In addition, donations were picked up during this time frame.

### 9.

**Confidential Informant Two:**

Informant is a prior Pasco K9 Deputy-SRO. Informant is presently in hiding, out of the state, due to fear of retaliation and targeting by the Sheriff's office. Informant was forced to move out of the state to avoid Pasco County Sheriff Office corruption tactics which were carried out by all levels of supervision to include Executive Staff members.

10.

Informant believes they continue to send out subpoenas in an attempt to locate his/her residence. Informant was told by the State Attorney's Office to ignore subpoenas as the Sheriff knows he should not be sending them.

11.

Informant had many triggering events, including, being subjected to daily gender and sexual discriminatory actions by his/her immediate supervisors.

12.

In open roll calls, in front of peers, his/her immediate supervisor, Sergeant Rogers, would use the derogatory Phrase "Hazel Toe", referring to the slang term "Camel Toe" which refers to how clothing fits around the female's vagina. Informant was in the process of getting uniforms that fit properly and was harassed daily until he/she was able to get proper gear.

13.

Informant was subjected to slander, intimidation, and discriminatory abuse via emails. Publicly he/she was targeted in front of his/her peers by means of verbal and electronic emails that were sent throughout the agency.

14.

Informant had a grievance against Sergeant Fricke for harassment and after being demoted to deputy, was assigned to patrol directly under his immediate supervision. The sergeant then would isolate him/her from peers.

15.

On one occasion, informant responded to a violent baker act and called for assistance after he/she was attacked by the baker act subject who tried to get his/her gun from the holster. He/she could be heard fighting and two units stayed on lunch resulting in over 30 minutes before receiving backup deputies. He/she was working in the Hudson, Florida area during this incident which is not considered a rural area of Pasco and easily had units available on his/her squad to respond yet nobody showed up to help this deadly siltation. The supervisor never addressed the lack of response time by his/her peers and only addressed his/her verbal communication with dealing with the violent baker act subject.

16.

During his/her demotion from Corporal to Deputy, the discipline was attached to a retirement email which was sent out department wide attempt to slander and discredit him/her.

17.

The last triggering event was after he/she was involved in an accident with his/her assigned cruiser. (He/she backed into a pole). The department attempted to have Deputy Collier change his statement to fabricate a new statement that could potentially further damage his/her reputation.

18.

Informant was also subjected to a hostile, unrealistic working environment; excessive duties applied to his/her daily work load without notice. Duties and pressure were not applied equally to other similar positions. Informant was made to work long hours and shifts in an attempt to force resignation from the K9-SRO position and eventually his/her employment with the Sheriff's office.

19.

Informant was told to write a General Order pertaining to his/her K9-SRO position which would assist with his/her daily duties which consisted of duties not outlined in the present general order and job description. After the general order was prepared by the informant, they used it against him/her as discipline and to try to paint a picture of defiant and disruptive employee.

20.

Informant was subject to Fair Labor Standard Act (FLSA) violations because he/she was not compensated for his/her time worked and travel time.  He/she was subjected to unrealistic working hours that were both unsafe and hostile.

21.

Informant was subjected to Family Medical Leave Act (FMLA) violation. He/she had undisputable medical records and support to take sick time yet feared retaliation and reported to work in unsafe condition.

22.

These incidents were reported to his/her immediate supervisor on several occasions. It was after this incident that he/she felt his/her life was at risk if he/she remained a Pasco Deputy and left the agency and is presently in hiding.

23.

**Confidential Informant Three:**

Informant was a highly decorated lieutenant who suffered a medical stroke after being assaulted by subjects outside of a bar. Upon his/her return to work, Executive Staff members wanted him/her to retire. He/she received all proper medical clearance and returned to his/her duties.

24.

Informant was targeted and placed in unrealistic span of control of two districts. Informant requested assistance and was provided no help. This hostile work environment was a direct cause of another medical relapse, as documented by his/her physician.

25.

He/she was placed on paid medical leave.  During this medical leave, the Professional Standards Bureau fabricated a false complaint from an alleged confidential informant of 'conduct unbecoming of a deputy'. The Sheriff's office extorted informant by making a promise that they would clear the case as unfounded if he/she resigned. Due to his/her enormous amount of medical bills, the fear of further fabricated retaliation, and his/her ability to take care of his/her family, informant was forced to comply and resign. They further made informant sign a waiver to not file civil suits. This event with the PSO led to irreparable damage to his/her physical and mental health.

26.

**Confidential Informant Four:**

**Informant is a former deputy of Pasco Sheriff's Office**

In December 2018, CPI-Pasco opened a complaint against the spouse of the informant pertaining to her children being left alone while she was drinking. Informant was at work during these incidents. The Investigator was Heather Dubois. This incident was opened by the Pasco Sheriff Office CPI Division.

27.

In the month of January 2019, informant was made aware of two PSO Deputies that were having an affair with his/her spouse.

28.

The two Deputies are Detective Monte Shuler-Gang Unit Detective and Training Analyst Kayhler McPhail-Firearms and Range Master.

29.

Informant had phone records and his/her spouse admitted to the affairs. Informant filed two IA-2019 complaints and was asked by Captain Harnett "Are you sure you want to open up these complaints". This was the first attempt to pressure informant to not go forward with the complaint.

30.

It should be noted that training Analyst Kahler McPhail had a prior incident with a female deputy, who refuses to be named, at which time he choked her with such force that she urinated on herself. This incident was not investigated. McPhail was put into a rehab center for his alcohol abuse. This incident was told to informant by this very female deputy, who didn't pursue charges due to being in fear of retaliation by PSO Executive Staff members.

31.

Shortly after filing the IA complaints, on February 28, 2019 at 01205, PSO report 19008756, informant was approached at his/her home by Lt. Clint Cabbage, Corporal Brooks and Sergeant McCarthy.

32.

The Deputies apprised informant he/she hadn't answered his/her phone and they were worried about him/her. informant was not intoxicated and was fully aware of his/her emotional condition and told the deputies he/she was fine and didn't need to answer anyone on his/her cell phone, including his/her wife. Informant further stated that he/she was not suicidal or trying to hurt himself or anyone else. Informant told the deputies they had no legal grounds to baker act him/her.

33.

Lt. Cabbage informed him/her, "We want you to come with us to talk to someone". Informants asked why and if they were trying to baker act him/her. The Lt. replied "we could make this hard (meaning handcuffs and by force) or easy (meaning voluntarily going). Informant feared some type of retaliation and force was going to take place so he/she felt he/she had no choice but to voluntarily go with the deputies.

34.

Informant was released within 16 hours and immediately went back to his/her patrol duties his/her next work shift.

35.

Shortly after being back at work, in an act of intimidation, Pasco Deputies conducted a traffic stop on informant, walked up to the driver's window, shined the light on informant so as to obscure his/her vision, then stated "Okay, see you later."

36.

On 04-12-2019, McGuire Law offices received an anonymous call from a Pasco Citizen that said she was questioned by PSO a deputy pertaining to a trespass incident in which informant was the responding deputy. When she called a supervisor to follow up on a possible complaint, she was told that informant was recently fired. This supervisor provided her with confidential medical information, by stating that informant had been baker acted by PSO prior to him/her being fired. This information is both damaging and irrelevant to his/her dismissal.

37.

On 4-13-2019, informant discovered his/her wife was out drinking in bars and his/her children were left at his/her mother-in-laws house. Informant said his/her mother-in-law has been known to have substance abuse and felt it was in the best interest of his/her kids to come with him/her. He/she went to the mother-in-laws home where she voluntarily transferred custody of the children and went to a close friends home for the evening. At approx. 0345, Corporal Brooks and approximately ten deputies approached the house for an alleged welfare check of the children.

38.

The home-owner allowed three deputies in to her home, where informant led the deputies in to the children's bedroom, allowing them to observe the children and subsequently asking them to leave the premises.

39.

It should be noted that informant is separated from his/her wife due to above aforementioned Pasco IA complaints of her engaging in two affairs with Pasco Deputies. He/she was a little concerned as to why the deputies were coming to the house with such a show of force.  After a brief conversation, it appeared Corporal Brooks was extremely aggressive. Informant reiterated that he/she wanted them to leave and they have no right to stay in the house.

40.

At this time, unprovoked, Corporal Brooks grabbed informant and threw him/her to the ground. A Lieutenant on scene then intervened and told Corporal Brooks they did not have a right to use force, stating that this call is being handled wrong. Informant was in extreme fear for his/her life and the lives of his/her children, repeatedly asking the deputies to leave and stated, "I hope your cameras are running because this is wrong". Corporal Brooks then stated "we know what you're up to; you can tell your attorney John, he knows where to find me." Corporal Brooks further stated "You're lucky the Lieutenant is here or you would be going to jail". When Informant stated, "you have no charges", Corporal Brooks stated "I'll make one up". Informant's female friend witnessed this incident and was extremely scared and bothered by the miscue of authority and power being exhibited by the deputies.

41.

In addition, the informant's father was listening to the entire incident via an open phone line. The deputies left the house and stayed parked in front for a short period of time. Informant said he/she observed approx. 10 additional deputies in front of the house and felt this was a form of intimidation. Corporal Brooks is the same supervisor that had unlawfully baker acted Informant on February 28, 2019.

42.

It should be noted that Kris had not retained any attorney at the time of this incident. Informant is presently in fear for his/her life and looking to move out of Pasco.

43.

**Confidential Informant Five:**

Informant was targeted and profiled by the Intelligent Lead Policing Unit after he/she posted comments on Facebook during Sheriff Nocco's election campaign. Informant was arrested on numerous false charges. The Sheriff utilizing DCF Investigators to pursue child abuse claims.

44.

In addition, he/she was picked up by Deputies and threatened to be charged with threatening a public official-Sheriff Nocco and then released without being charged. This was strictly an intimidation attempt and misuse of power by the Sheriff.

45.

The State Attorney Office failed to file any charges due to insufficient evidence for prosecution. Informant was forced to relocate out of the state in fear of corruption, retaliation, and fear for his/her own life as well as his/her family's life. The on-going pressure from the Sheriff's Office was overwhelming due to his/her right of free speech and supporting comments that did not support Sheriff Nocco. His/her Attorney told him/her it was in his/her best interest to safely move his/her family out of the area due to the overwhelming corruption and targeting that would continue by the Sheriff's Office.

46.

III.     **PARTIES, JURISDICTION AND VENUE**

**47.**

Plaintiff, CHRISTOPHER J. SQUITIERI is a citizen of Florida and resides in the Middle District of Florida.

**48.**

Plaintiff, JOHN HORNING is a citizen of Florida and resides in the Middle District of Florida.

**49.**

Plaintiff, ANTHONY PEARN is a citizen of Florida and resides in the Middle District of Florida.

**50.**

Defendant, PASCO COUNTY SHERIFF, CHRISTOPHER NOCCO is a citizen of Florida,

resides in the Middle District of Florida and is being sued in his official and individual

capacity.

**51.**

Defendant, PASCO COUNTY SHERIFF COLONEL, JEFFERY HARRINGTON is a citizen of

Florida, resides in the Middle District of Florida and is being sued in his official and

individual capacity.

**52.**

Defendant, PASCO COUNTY SHERIFF MAJOR, JEFF PEAKE is a citizen of Florida, resides in

the Middle District of Florida and is being sued in his official and individual capacity.

**53.**

Defendant, PASCO COUNTY SHERIFF DIRECTOR, LARRY KRAUS is a citizen of Florida,

resides in the Middle District of Florida and is being sued in his official and individual

capacity.

**54.**

Defendant, PASCO COUNTY SHERIFF MAJOR, KENNETH GREGORY is a citizen of Florida, resides in the Middle District of Florida and is being sued in his official and individual capacity.

## 55.

Defendant, PASCO COUNTY SHERIFF CAPTAIN, SHARON FOSHEY is a citizen of Florida, resides in the Middle District of Florida and is being sued in her official and individual capacity.

## 56.

Defendant, PASCO COUNTY SHERIFF SERGEANT, JAMES BROWNING is a citizen of Florida, resides in the Middle District of Florida and is being sued in his official and individual capacity.

## 57.

Defendant, PASCO COUNTY SHERIFF SERGEANT, RICHARD JONES is a citizen of Florida, resides in the Middle District of Florida and is being sued in his official and individual capacity.

## 58.

DEFENDANT, PASCO COUNTY SHERIFF SERGEANT, MARC ERICKSON is a citizen of Florida, resides in the Middle District of Florida and is being sued in his official and individual capacity.

**59.**

Defendant, PASCO COUNTY SHERIFF CORPORAL, JENNIE JONES is a citizen of Florida,

resides in the Middle District of Florida and is being sued in her official and individual

capacity.

**60.**

Defendant, PASCO COUNTY SHERIFF INSPECTOR, JENNIFER CHRISTENSEN is a citizen of

Florida, resides in the Middle District of Florida and is being sued in her official and

individual capacity.

**61.**

Defendant, PASCO COUNTY SHERIFF HUMAN RESOURCES DIRECTOR, TAFFINI REED is a

citizen of Florida, resides in the Middle District of Florida and is being sued in her official and

individual capacity.

**62.**

Defendant, PASCO COUNTY SHERIFF INVESTIGATOR, TIMOTHY ROY is a citizen of Florida,

resides in the Middle District of Florida and is being sued in his official and individual

capacity.

**63.**

Defendant, PASCO COUNTY SHERIFF HUMAN RESOURCES MANAGER, MELISSA HITE is a citizen of Florida, resides in the Middle District of Florida and is being sued in her official and individual capacity.

### 64.

Defendant, PASCO COUNTY SHERIFF HUMAN RESOURCES SPECIALIST, CHRISTOPHER BENNETT is a citizen of Florida, resides in the Middle District of Florida and is being sued in his official and individual capacity.

### 65.

All of the above listed Plaintiffs and Defendants are subject to the personal jurisdiction of the Court.

### 66.

This Court has subject matter jurisdiction over this case pursuant to 18 U.S.C. § 1964(c), 28 U.S.C. § 1332 (federal question), and 28 U.S.C. § 1367 (ancillary jurisdiction).

### 67.

Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), as all Defendants reside in this district and events giving rise to Plaintiffs' claims occurred in this district. Venue is also proper in this district pursuant to 18 U.S.C. § 1965, as all Defendants work for the Pasco County Sheriff's Office, where all the claims occurred, which is located and conducts its affairs in the Middle District of Florida.

IV.    **FACTS OF THE CASE**

A.    **Christopher Squitieri. First Internal Affairs Complaint IA-2018-037.**

**68.**

On or about May or June 2018, Plaintiff, SQUITIERI was the coordinator for new member orientations where he was in charge of training scheduling for all newly hired Deputies.  This coordinating and scheduling of the training disciplines took place at the Pasco Sheriff's Training Unit and the Pasco-Hernando Police Academy.

**69.**

During this time, Plaintiff, SQUITIERI was approached by a female Deputy named Sheryl Johnson-Tandy (herein after "Johnson-Tandy"), who apprised Plaintiff, SQUITIERI that she was not being utilized at the Pasco Hernando Police Academy due to Supervisors' and Defendants, SGT. JONES and ERICKSON, as well as the unit as a whole, discriminating against her and other female trainers because they were women.

**70.**

Johnson-Tandy specifically apprised Plaintiff, SQUITIERI that supervisors and Defendants, SGT. JONES and ERICKSON were intentionally not allowing her or the other women to instruct: (1) firearms training; (2) defensive tactics training; (3) teaser training; and, (4) blocks

of mandatory in service training, and high liability training,[1] because they were women and instead gave all of these training positions to male Deputies.

**71.**

Plaintiff, SQUITIERI went to Defendants, SGT. JONES and ERICKSON and apprised them that Johnson-Tandy advised that she was not being utilized for instructing: (1) firearms training; (2) defensive tactics training; (3) teaser training; and, (4) blocks of mandatory in service training, and high liability training, because she was a woman. Plaintiff, SQUITIERI further apprised Defendants, SGT. JONES and ERICKSON that Johnson-Tandy and other women stated that they have been subjected to this practice of gender discrimination with the Pasco Sheriff's Office's male supervisory staff at the Academy for several years and that Johnson-Tandy called it the "Boys Club".

**72.**

Defendants, SGT. JONES and ERICKSON attempted to discredit Johnson-Tandy by falsely alleging that: (1) she did not know how to speak with people; (2) they did not like the way she instructed cadets; and (3) she did not have confidence in her training abilities.

**73.**

Plaintiff, SQUITIERI apprised Defendants, SGT. JONES and ERICKSON that if they did not have documentation of these alleged deficiencies or were not willing to document these

---

[1] In service training blocks change every month, depending on what level of training a cadet is entering. Meaning, there could be as many as fifteen different training programs in each in service training block.

allegations then he was going to utilize Johnson-Tandy and other women by scheduling them to instruct the disciplines for which they were certified in.

### 74.

Plaintiff, SQUITIERI, from this date forward, scheduled Johnson-Tandy and other women for all disciplines training for which they were certified to instruct. This was at the behest of Defendants, SGT. JONES and Erickson.

### 75.

Defendants, SGT. JONES and ERICKSON, in retaliation, made sure every time that Plaintiff, SQUITIERI was not the lead supervisor for an event that Johnson-Tandy and other women were submitting for consideration, they would intentionally schedule a male Deputy to instruct the class and would allow the other male lead instructors to not use Johnson-Tandy or Christine Dzikonski (hereinafter "Dzikonki").

### 76.

On or about May of 2018, Plaintiff, SQUITIERI was promoted to replace Defendant, ERICKSON, as Supervisor of Training, which gave him the same authority as Defendant, SGT. JONES, in supervising the Pasco Sheriff's Office Training Unit.  Defendant, ERICKSON was reassigned to a patrol Sergeant.

### 77.

From the date Plaintiff, SQUITIERI was promoted to Supervisor of Training with Defendant, SGT. JONES to lead the Pasco Sheriff's Office Training Unit, he witnessed firsthand Defendant, JONES' intentional implicit gender discrimination and intentional actions of not scheduling Johnson-Tandy, Dzikonski and other women for in service training blocks, and instead scheduling male Deputies to instruct the training classes.

**78.**

Plaintiff, SQUIRIERI, from the date he was promoted to Training Supervisor, ensured that he utilized all trainers, male and female, without prejudice or gender discrimination. He made his determination of scheduling based on the trainers availability and qualifications, not their gender, to break up the clear gender bias that he witnessed firsthand once he began working his supervisory position.

**79.**

On or about September of 2018, Dzikonski made a verbal complaint on gender discrimination as she was conducting her exit interview for her retirement.

**80.**

On or about September 2018, Pasco Sheriff's Office initiated an internal affairs investigation on Defendant, SGT. JONES for hostile work environment, at which time they immediately transferred him to road patrol Sergeant.

**81.**

On or about October 11, 2018, Plaintiff, SQUITIERI testified at the Internal Affairs investigation and truthfully testified to paragraphs 26 through 37 above, blowing the whistle on women being discriminated against because of their gender at the Pasco Sheriff's Office Training Unit.

**82.**

Defendants are in violation of: (1) Title VII of the Civil Rights Act of 1964, which prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin; and (2) Florida Civil Rights Act of 1992.

**83.**

On or about October 19, 2018, Plaintiff, SQUITIERI was subjected to intentional retaliation through a knowingly false Internal Affairs discourtesy complaint, IA#2018-037, filed by Defendant, HITE, alleging that he made an inappropriate statement to her as his co-worker. Defendants intentionally conspired to retaliate against Plaintiff, SQUITIERI for his sworn testimony in an attempt to discredit his truthful testimony on October 11, 2018 for blowing the whistle on the gender discrimination at the Pasco Sheriff's Office Training Unit.

**84.**

Defendant, HITE's filing of false Internal Affairs complaint, IA#2018-037, against Plaintiff, SQUITIERI on October 19, 2018, violated federal law, Florida law, Pasco Sheriff's Office policy and Florida and Federal Whistle-Blower Acts for retaliation by: (1) falsifying official documents-Fla. Stat.§ 893.13; (2) filing a false report- Fla. Stat. § 817.49, (3) filing a false report-Fla. Stat. §

837.05; (4) Perjury by contradictory Statements-Fla. Stat. § 837.021; and (5) inaccurate and misleading statement-Pasco Sheriff's Office General Order 26. 1 II. B45; (6) falsifying Official Document-Pasco Sheriff's Office General Order 26. 1. II. B47; (7) Conduct Unbecoming of a member of the Sheriff's Office-Pasco Sheriff's Office General Order 26. 1. § II. B54; (8) Florida Whistle-Blower Act Fla. Stat. Ann § 112.3187; (9) aiding and abetting-Fla. Stat. § 777.011; (10) perjury under oath-Fla. Stat. § 837.012; (11) Perjury by contradictory Statements-Fla. Sta. § 837.021; (12) inaccurate and misleading statement-Pasco Sheriff's Office General Order 26. 1. II. B45; (13) Florida Whistle-Blower Act Fla. Stat. Ann § 112.3187; (14) Whistleblower Protection Act of 1989, 5 U.S.C. 2302(b)(8)-(9); (15) obstruction of justice-Section 1503 (16) obstruction of criminal investigations-Section 1510; (16) obstruction of State or local law enforcement-Section 1511; (17) tampering with a witness, victim, or an informant-Section 1512; (18) retaliating against a witness, victim, or an informant-Section 1513. **See Exhibit A.**

## 85.

Defendants, NOCCO and HARRINGTON knew this was a false Complaint by: (1) the inconsistencies in Defendants, HITE and BENNETT's statements pertaining to what happened and when the alleged incident happened; and (2) the nine (9) other witnesses who stated that Plaintiff, SQUITIERI never said the inappropriate statement, but stated to the investigators that Defendant, HITE was the one they heard swearing while in Defendant, BENNETT's office.

## 86.

Defendants, NOCCO and HARRINGTON encouraged and aided and abetted Defendant, HITE'S false report and illegal actions against Plaintiff, SQUITIERI, for the expressed purpose to

have a reason to suspended and fire him in retaliation for blowing the whistle on the gender

discrimination with women, while under oath in his testimony to Internal Affairs.

**87.**

Defendants, NOCCO, HARRINGTON, HITE and other Defendants are in violation of: (1)

aiding and abetting-Fla. Stat. § 777.011; (2) filing false report-Fla. Stat. § 817.49; (3) filing false

report-Fla. Stat. § 837.05; (4) falsifying official document-Fla. Stat. § 893.13; (5) perjury under

oath-Fla. Stat. § 837.012; (6) Perjury by contradictory Statements-Fla. Stat. § 837.021; (7)

inaccurate and misleading statement-Pasco Sheriff's Office General Order 26. 1. II. B45; (8)

Florida Whistle-blower Act Fla. Stat. Ann § 112.3187; (9) **Whistleblower Protection Act of 1989**,

5 U.S.C. 2302; (10) obstruction of criminal investigations-Section 1510; (11) obstruction of State

or local law enforcement-Section 1511; (12) tampering with a witness, victim, or an informant-

Section 1512; (13) retaliating against a witness, victim, or an informant-Section 1513.

**88.**

On or about October 20, 2018, at 11:45 hours, Defendant, HARRINGTON, on behalf of

and at the request and/or encouragement of Defendant, NOCCO, contacted Plaintiff, PEARN, a

witness on Plaintiff, SQUITIERI's Internal Affairs Investigation #IA-2018-037, attempting to

coerce and pressure him into changing his statement in an open investigation that gave his

truthful statement to the Internal Affairs investigator stating that he never heard Plaintiff,

SQUITIIERI say or direct an inappropriate statement to Defendant, Hite. **See Exhibit B.**

89.

Defendants, Harrington and Nocco did this illegal witness tampering in an attempt to further discredit Plaintiff, Squitieri and illegally attempt to terminate his employment with the Pasco Sheriff's Office-for his sworn testimony on gender discrimination and widespread corruption.

**90.**

Defendants, Harrington and Nocco are in violation of (1) witness tampering-Fla Sta. § 914.22 (2) Interfere with Official Investigation-Pasco Sheriff's Office General Order 26.1 § II, Subsection B. 18; (3) Conduct Unbecoming of a member of the Sheriff's Office-Pasco Sheriff's Office General Order 26. 1. §II. B54; (4) obstruction of justice-section 1503; (5) obstruction of criminal investigations-section 1510; (6) obstruction of State or local law enforcement-section 1511; (7) tampering with a witness, victim, or an informant-section 1512; (8) retaliating against a witness, victim, or an informant-section 1513.

**91.**

On or about October 21, 2018, Plaintiff, SQUITIERI testified at the internal Affairs investigation for the first false Internal Affairs complaint, #IA-2018-037, filed against him for inappropriate statement a coworker by Defendant, HITE.

**92.**

Plaintiff, SQUITIERI, truthfully testified under oath that he never made an inappropriate statement to any coworker, including Defendant, HITE.

**93.**

On October 23, 2018, Pasco Sheriff's Office placed Plaintiff, Squitieri on paid leave to investigate the Complaint against him, which was an uncommon action taken by the Pasco Sheriff's Office for an alleged inappropriate statement to a coworker.

### 94.

On November 6, 2018, Plaintiff, SQUITIERI was subjected to a lie detection test. This test was conducted at the request of the under signed Counsel, to: (1) confirm that he never made any type of inappropriate statement to Defendant, HITE on October 19, 2018, or any other day in an attempt to have Internal Affairs Complaint #IA-2018-037 dismissed as unfounded; and (2) to have Defendant, HITE investigated for violations of Florida law and Pasco Sheriff's Office policy.

### 95.

Plaintiff, SQUITIERI was asked eleven (11) questions by the lie detection examiner: (1) is your name Chris? Yes; (2) is the color of my disk Brown? No; (3) Are you sitting down? Yes; (4) Have you ever been unprofessional in your dealings with Melissa Hite? No; (5) is today Tuesday? Yes; (6) Have you ever used profanity in your dealings with Melissa Hite? No; (7) Am I wearing glasses? Yes; (8) Have you ever driven over the posted speed limit? No; (9) is this the month of November 2018? Yes; (10) did you use profanity of an extreme nature against Melissa Hite on Oct, 19th 2018? No; (11) Are we in the state of FL? Yes.

### 96.

Plaintiff, SQUITIERI passed the lie detector test with NO DECEPTION INDICATED. See

Exhibit D-lie detection test results. **See Exhibit C.**

**97.**

On or about November  6, 2019, Plaintiff, SQUITIERI submitted the results of the lie

detection examination to the Pasco Sheriff's Office, who in turn said they're not considering the

result because; (1) the lie detection test he passed was not the same type the Sheriff uses; and

(2) they're not admissible. **See Exhibit D.**

**98.**

On or about March 1, 2019, Petitioner, SQUITIERI then requested Defendant, Nocco to

allow him to voluntary take a polygraph with which ever examiner he wanted, to prove that he

was truthful and did not make an inappropriate statement to Defendant, HITE. Defendant,

NOCCO denied Plaintiff, SQUITIERI's request to take a Polygraph test with which ever examiner

Defendant, NOCCO wanted. This put Defendant, Nocco on notice that he was obstructing an

investigation by covering up Defendant, HITE's violations under Florida law and violations of

Pasco Sheriff's Office policy for filing a false report, falsifying official Pasco Sheriff's Office

documents, perjury, etc. **See Exhibit E.**

**99.**

Defendants, NOCCO, HARRINGTON, HITE, and other Defendants are in violation of: (1)

aiding and abetting-Fla. Stat. § 777.011; (2) filing false report-Fla. Stat. § 817.49-; (3) filing false

report-Fla. Stat. § 837.05; (4) falsifying official document-Fla. Stat. § 893.13; (5) perjury under

oath-Fla. Stat. § 837.012; (6) Perjury by contradictory Statements-Fla. Stat. § 837.021; (7)

inaccurate and misleading statement- Pasco Sheriff's Office General Order 26. 1. II. B45; (8)

Florida Whistle-Blower Act Fla. Stat. Ann § 112.3187; (9) obstructing justice-Fla. Stat. § 843 et

seq.;,(10) Interfere with Official Investigation-Pasco Sheriff's Office General Order 26.1 § II,

Subsection B. 18; (11) Conduct Unbecoming of a member of the Sheriff's Office-Pasco Sheriff's

Office General Order 26. 1. §II. B54; (12) **Whistleblower Protection Act of 1989**, 5 U.S.C.

2302(b)(8)-(9), (13) obstruction of justice-Section 1503; (14) obstruction of criminal

investigations-Section 1510; (15) obstruction of State or local law enforcement-Section 1511;

(16) tampering with a witness, victim, or an informant-Section 1512; (17) retaliating against a

witness, victim, or an informant-Section 1513.

### 100.

On or about March 12, 2019, Defendant Nocco denied Squitieri's second request for a

lie detection test. **See Exhibit F.**

On or about March 13, 2019, Plaintiff, SQUITIERI's Internal Affairs Complaint, #IA-2018-

037, was sustained. Plaintiff, SQUITIERI was given a two (2) day suspension for false Complaint

that he was not guilty of. This final disposition and Suspension was obtained in violation by

Defendants' intentional conduct under RICO. **See Exhibit G.**

## B. Christopher Squitieri. Second Internal Affairs Complaint IA-2018-045

### 101.

On or about January 24, 2019, Squitieri was served with the second false Internal Affairs Complaint-IA-2018-045-that Christensen knowingly and intentionally filed in retaliation to have Suquitieri fired. The Complaint alleges three (3) violations: (1) falsifying official documents; (2) untruthfulness; and (3) Conduct unbecoming of an employee of the PSO. **See Exhibit H.**

### 102.

Christensen knowingly and intentionally drafted, signed and submitted this second sworn Internal Affairs Complaint under oath. Knowing that the information that she was submitting under oath was patently false. Because she was in possession of the Supplemental report that clearly states that "the presence of criminal intent of knowingly and willingly falsifying official documents could not be established"[2]. Clearly showing there was not funded violation of Fla. Sta. 893.13. **See Exhibit I-Supplement report final case review showing no criminal conduct.**

### 103.

Inspector Christensen's Complaint falsely alleged that Squitieri committed three (3) violations: (1) falsifying official documents; (2) untruthfulness; and (3) Conduct unbecoming of an employee of the PSO.[3] Christensen knowingly and intentionally falsified official documents and perjured herself.

### 104.

---

[2] See Exhibit C-PSO disposition of criminal investigation.
[3] Counts 2 and 3 are derived off of count one: falsifying official documents.

Inspector Christensen did this because she, Sheriff Nocco, and Colonel Harrington wanted Squirieri terminated because he testified[4] at the Internal Affairs investigation hearing that: (1) women were currently being discriminated against because of their gender; and (2) exposing widespread corruption with PSO, where Sheriff Nocco, Colonel Harrington and other Official administrative Staff knew of the gender discrimination, but did nothing to correct it. **See Exhibit J.**

### 105.

In this false Internal Affairs Complaint –IA-2018-045-Christensen  knowingly and intentionally provided a false statement under penalty of perjury by stating that Squitieri was in direct violation of Fla. Sta. 893.13 for falsifying official documents.  This false statement is the bases for these three (3) alleged violations listed in Complaint IA-2018-045. See also Exhibit D, which clearly shows there were no bases to submit an Internal Affairs complaint for falsifying official documents.

### 106.

Inspector Christensen is in violation of: Fla. Sta. § 817.49-filing false report; Fla sta. § 837.05-filing false report; Fla. Sta.§ 893.13-falsifiying official document; Fla Sta. § 837.012-perjury under oath; Fla. Sta. § 837.021-Perjury by contradictory Statements;  ; PSO policy G.O 26. 1. II. B45-inaccurate and misleading statement; Florida Whistle-blower Act Fla. Sta. Ann § 112.3187; Fla. Sta. §  843 et seq., obstructing  justice;. G.O. 26.1 § II, Subsection B. 18 Interfere

---

[4] See paragraphs 26-37 supra.

with Official Investigation; G.O. 26. 1. §II. B54-Coundct Unbecoming of a member of the

Sheriff's Office; **Whistleblower Protection Act of 1989**, 5 U.S.C. 2302(b)(8)-(9), obstruction of

justice-section 1503, obstruction of criminal investigations-section 1510, obstruction of

State or local law enforcement  section 1511, tampering with a witness, victim, or an

informant-section 1512, retaliating against a witness, victim, or an informant-section 1513.

### 107.

Sheriff Nocco and Colonel Harrington refuse to have this Internal Affairs Complaint

dismissed for being false, or have the PSO investigate this false Internal Affairs report-IA-2018-

045-filed against Squitieri, in any manner-for Office of Professional Standards Inspector

Christensen's criminal law violations for submitting a knowingly false Complaint. This is because

they know personally that this complaint is falsely filed against Squitieri and are personally

directing these law violations against Squitieri to suspend and terminate his employment for

blowing the whistle on the female gender discrimination.

### 108.

Sheriff Nocco and Colonel Harrington are in violation of the following criminal, civil and

administrative statutes because the final disposition of the criminal investigation report (Exhibit

D) clearly states that "the presence of criminal intent by Squitieri to knowingly and willfully

falsify the documents could not be established." (Id. at Exhibit D): Fla. Sta. § 777.011 aiding and

abetting; Fla. Sta. § 817.49-filing false report; Fla sta. § 837.05-filing false report; Fla. Sta.§

893.13-falsifiying official document; Fla Sta. § 837.012-perjury under oath; Fla. Sta. § 837.021-

Perjury by contradictory Statements;  ; PSO policy G.O 26. 1. II. B45-inaccurate and misleading

statement; Florida Whistle-blower Act Fla. Sta. Ann § 112.3187; **Whistleblower Protection Act of 1989**, 5 U.S.C. 2302(b)(8)-(9); obstruction of justice-section 1503; obstruction of criminal investigations-section 1510; obstruction of State or local law enforcement  section 1511; tampering with a witness, victim, or an informant-section 1512; retaliating against a witness, victim, or an informant-section 1513.

### 109.

Sheriff Nocco and Colonel Harrington are knowingly and intentionally violating the above listed laws and administrative statutes, committing clear cut predicate offense violations for federal and State RICO Act violations, and Federal and State conspiracy to interfere with civil rights. Proximately causing Squitieri's damages.

### C.    Anthony Pearn.  Internal affairs Report IA-2018-044

### 110.

Pearn, during all times relevant, was employed with the Pasco Sheriff's Office as Manager of the Intelligence Led Policing Division. Pearn received this supervisory position due to this outstanding career with the FBI directing over 600 agents.

### 111.

On October 8, 2018, Peake-Major of Investigations/Criminal intelligence bureau. Which over sees the Intelligence led Policing Division-discovered that a citizen of Pasco County had posted a booking arrest photo of Pasco Sheriff's K-9 Deputy Carmack on Facebook.[5]

### 112.

On or about October 8, 2018, Peake order Pearn to arrest this woman resident of Pasco County by the end of the day because she had posted the prior arrest booking photo on facebook of Pasco Sheriff K-9 Deputy Carmack.

### 113.

Pearn apprised Peake that he was not going to arrest the woman for simply posting a booking arrest photo of Deputy Carmack on Facebook that was public record and not against the law.

### 114.

Peake then order Pearn to lookup the female resident and all family members living in Pasco County and dig up whatever he could. And then target them through the Intelligence Led Policing (ILP) program. See Exhibit K, ILP program Manual.

### 115.

Pearn the went to Harrington and apprised him as to Peake using the intelligence Led policing Division as his personal army to harass and target Pasco citizens illegally for speaking

---

[5] The female citizen was exercising her first amendment right notifying the public that Sheriff Nocco was hiring individuals with arrest records. So, She posted a booking arrest photo of Pasco Sheriff's K-9 Deputy Carmack before he worked for the Pasco Sheriff's Office.

out/exercising their First Amendment free speech right against the Sheriff and the way he's running the Pasco Sheriff's Office.

### 116.

Harrington then apprised Pearn that he would be better off if he would transfer to a different division.

### 117.

Pearn never heard anything back from Harrington on the complaint he verbally submitted, pertaining to Peake's illegal use of the Intelligence Led Policing Division.

### 118.

Defendants Nocco, Harrington, Peake, Kraus, and Gregory are knowingly and intentionally using the Intelligence Led Policing Division to violate Pasco Citizens' rights, And to break the law. **See Exhibit K-ILP Manual.**

On October 19, 2018, Pearn stated to investigators that he did not hear Squitieri direct an inappropriate statement to Hite.

### 119.

On or about October 20, 2018, at 11:45 hours, Defendant, HARRINGTON, on behalf of and at the request and/or encouragement of Defendant, NOCCO, contacted Plaintiff, PEARN, a witness on Plaintiff, SQUITIERI's Internal Affairs Investigation #IA-2018-037, attempting to coerce and pressure him into changing his statement in an open investigation that gave his

truthful statement to the Internal Affairs investigator stating that he never heard Plaintiff, SQUITIIERI say or direct an inappropriate statement to Defendant, Hite. See **Exhibit B**-Pearn's phone record.

### 120.

Defendants, Harrington and Nocco did this illegal witness tampering in an attempt to further discredit Plaintiff, Squitieri and illegally attempt to terminate his employment with the Pasco Sheriff's Office-for his sworn testimony on gender discrimination and widespread corruption.

### 121.

On October 23, 2018, Nocco and Harrington together made the decision to remove Pearn from the Equivalence of Training (hereinafter "EOT") courses that Nocco personally approved Pearn to take. They did this in retaliation for Pearn refusing to suborn perjury by not changing his statement about not hearing Squitieri direct an inappropriate statement to Hite.

### 122.

Defendants, Harrington and Nocco are in violation of (1) witness tampering-Fla Sta. § 914.22 (2) Interfere with Official Investigation-Pasco Sheriff's Office General Order 26.1 § II, Subsection B. 18; (3) Conduct Unbecoming of a member of the Sheriff's Office-Pasco Sheriff's Office General Order 26. 1. §II. B54; (4) obstruction of justice-section 1503; (5) obstruction of criminal investigations-section 1510; (6) obstruction of State or local law enforcement-section

1511; (7) tampering with a witness, victim, or an informant-section 1512; (8) retaliating against a witness, victim, or an informant-section 1513.

### 123.

On October 26, 2018, Pearn was apprised  by Major Peake that he was not under internal affairs investigation and would not be targeted under retaliation for refusing to not change his statement to Nocco's and Harrington's native.

### 124.

On October  26, 2018, Pearn was called into Larry Kraus's office and apprised he was being placed on paid-administrative leave-because he was a witness in Squitieri's Internal Affairs Complaint-IA-2018-037. Pearn's  ID badge, cell phone, and computer were taken from him. Then he was escorted from the building. This is not a common practice that the PSO employs with its witnesses that are not the subject of an investigation.

### 125.

On October 29, 2018, Pearn received a phone call from Larry Kraus. Who, advised that he was asked to call and apprise Pearn that he was ordered by the Sheriff, Harrington, Christensen, and Roy not to attend the public event of his wife's swearing in ceremony. Nocco, Harrington, Christensen, and Roy conspired to violate, and violated Pearn's Civil Rights.

### 126.

On November 6, 2018, Pearn was fired By Nocco and Harrington, in retaliation for not changing his statement that he gave-pertaining to not hearing Squitieri direct an inappropriate statement to Hite.

**127.**

On November 26, 2018, Inspector Christensen in retaliation initiated a false Internal Affairs Complaint on Pearn-20 days after Nocco and Harrington fired him without a reason.

**128.**

Inspector Christensen falsified this Internal Affairs Complaint-an official document-by back dating it to October 26, 2018. She did this to make it appear that this Internal Affairs Complaint was active while Pearn was still employed with the Sheriff's Office.

**129.**

On January 26, 2018, Peake drafted a letter for Pasco Sheriff's Office's records Department, stating that Pearn was guilty of the violations in the IA-2018-044-Complaint that was initiated after he was fired.

**130.**

This Internal Affairs Complaint-IA-2018-044-was knowingly and intentionally falsely filed against Pearn by Nocco, Harrington, Christensen, Peake, Kraus, Roy, Reed, Hite, Bennett to retaliate against Pearn for not changing his statement-to ensure that when he went to obtain employment at a different law enforcement agency, he would not be able to be hired.

**131.**

This false Internal Affairs Complaint has prevented Pearn from obtaining new employment with any law enforcement agencies beginning on October 26, 2018 to present. Causing Pearn's proximate damages.

**132.**

Defendants Nocco, Harrington, Christensen, Peake, Kraus, Roy, Reed, Hite, Bennett violated federal law, Florida law, Pasco Sheriff's Office policy and Florida and Federal Whistle-Blower Acts for retaliation by: (1) falsifying official documents- Fla. Stat.§ 893.13; (2) filing a false report- Fla. Stat. § 817.49, (3) filing a false report-Fla. Stat. § 837.05; (4) Perjury by contradictory Statements-Fla. Stat. § 837.021; and (5) inaccurate and misleading statement-Pasco Sheriff's Office General Order 26. 1 II. B45; (6) falsifying Official Document-Pasco Sheriff's Office General Order 26. 1. II. B47; (7) Conduct Unbecoming of a member of the Sheriff's Office-Pasco Sheriff's Office General Order 26. 1. § II. B54; (8) Florida Whistle-Blower Act Fla. Stat. Ann § 112.3187; (9) aiding and abetting-Fla. Stat. § 777.011; (10) perjury under oath-Fla. Stat. § 837.012; (11) Perjury by contradictory Statements-Fla. Sta. § 837.021; (12) inaccurate and misleading statement-Pasco Sheriff's Office General Order 26. 1. II. B45; (13) Florida Whistle-Blower Act Fla. Stat. Ann § 112.3187; (14) Whistleblower Protection Act of 1989, 5 U.S.C. 2302(b)(8)-(9); (15) obstruction of justice-Section 1503 (16) obstruction of criminal investigations-Section 1510; (16) obstruction of State or local law enforcement-Section 1511; (17) tampering with a witness, victim, or an informant-Section 1512; (18) retaliating against a witness, victim, or an informant-Section 1513; and (19) Aiding Abetting-Fla. Stat. § 777.011.

**132.**

Defendants Nocco, Harrington, Christensen, Peake, Kraus, Roy, Reed, Hite,

Bennett knowingly and intentionally violated the above listed laws and administrative statutes,

committing clear cut predicate offense violations for federal and State RICO Act violations and

Federal and state conspiracy to interfere with civil rights violations . Proximately causing

Pearn's damages.

### D.     John Horning. Internal Affairs Complaint IA-2012-052

**133.**

Plaintiff John Horning was employed with the Pasco Sheriff's Office beginning on

1988 to 1990. And February 2012, until he resigned on July 31, 2012.

**134.**

On or about June 16, 2012, Joseph Horning –Plaintiff Horning's brother-was a suspect

involved in a criminal investigation for an alleged incident involving a vehicle dispute at Jerry's

Auto Sales located at 6622 Land O'Lakes Blvd., Land O'Lakes, FL 24637.

**135.**

Suspect Joseph Horning left Jerry's Auto Sales and immediately began attempting to

make contacting his brother-Plaintiff Horning-who was a patrol Deputy with the Pasco Sheriff's

Office, to report the incident.

**135.**

On or about June 16, 2012, at 1716 hours, suspect Joseph Horning made contact with his Brother-Plaintiff Horning-to report the incident.

### 136.

Plaintiff Horning-pursuant to Florida law and Pasco Sheriff's Office policy-filed a supplemental report due to suspect Joseph Horning and minor witness Charis Horning contacting him and speaking to him about the investigation.

### 137.

Horning, pursuant Florida law and Pasco Sheriff's Office policy, drafted and submitted a supplemental report detailing suspect Joseph Horning statements to him, and minor witness Charis statement to him. **See Exhibit L.**

### 138.

Horning, based on the manner his brother was treated, and the manner the Sherriff's office was being ran by Sheriff Nocco, put his resignation. Which became effective on October 31, 2012.

### 139.

Horning then went to the Tampa Police Department and worked there for approximately one (1) year. 2012 to 2013.

### 140.

On or about August 2015, Horning applied for a position as a Bailiff with the Pinellas County Sheriff's Office.

### 141.

During the final phase of the application process of a three (3) person panel interview Horning was asked about an incident pertaining to "why did he tamper with a witness?"

### 142.

Horning denied knowing of any such incident, and explained that he had never known of any such incident involving him pertaining to witness tampering.

### 143.

The Pinellas County Sheriff's Office apprised Horning that he was being denied the employment position due to a Pasco Sheriff's Office Internal Affairs investigation from 2012-for tampering with a witness and other violations.

### 144.

Horning next contacted Harrington about this newly discovered secret 2012 Internal affairs Complaint.

### 145.

Harrington conceded that it was false and fraudulent because there should not have been anything about a victim in the internal Affairs Complaint. And that he knew that Corporal-

IA investigator Gilote falsified the internal Affairs investigation documents. But, there was nothing that he could do because he intentionally interceded with Manny Garcia of the State Attorney's Office and Robert Green, resulting in the dismissal of the charges against Horning's brother.

### 146.

Horning wages were depressed, between 2013 to 2019, by this false internal affairs Complaint that Nocco, Harrington, and others intentionally falsely filed against Horning in retaliation for his secretly going to Tampa Police Department for employment.

### 147.

Defendants Nocco, Harrington, violated federal law, Florida law, Pasco Sheriff's Office policy and Florida and Federal Whistle-Blower Acts for retaliation by: (1) falsifying official documents- Fla. Stat.§ 893.13; (2) filing a false report- Fla. Stat. § 817.49, (3) filing a false report-Fla. Stat. § 837.05; (4) Perjury by contradictory Statements-Fla. Stat. § 837.021; and (5) inaccurate and misleading statement-Pasco Sheriff's Office General Order 26. 1 II. B45; (6) falsifying Official Document-Pasco Sheriff's Office General Order 26. 1. II. B47; (7) Conduct Unbecoming of a member of the Sheriff's Office-Pasco Sheriff's Office General Order 26. 1. § II. B54; (8) Florida Whistle-Blower Act Fla. Stat. Ann § 112.3187; (9) aiding and abetting-Fla. Stat. § 777.011; (10) perjury under oath-Fla. Stat. § 837.012; (11) Perjury by contradictory Statements-Fla. Sta. § 837.021; (12) inaccurate and misleading statement-Pasco Sheriff's Office General Order 26. 1. II. B45; (13) Florida Whistle-Blower Act Fla. Stat. Ann § 112.3187; (14) Whistleblower Protection Act of 1989, 5 U.S.C. 2302(b)(8)-(9); (15) obstruction of justice-

Section 1503 (16) obstruction of criminal investigations-Section 1510; (16) obstruction of State

or local law enforcement-Section 1511; (17) tampering with a witness, victim, or an informant-

Section 1512; (18) retaliating against a witness, victim, or an informant-Section 1513; and (19)

Aiding Abetting-Fla. Stat. § 777.011.

**148.**

Defendants Nocco and Harrington knowingly and intentionally violated the above listed

laws and administrative statutes, committing clear cut predicate offense violations for federal

and State RICO Act violations and Federal and state conspiracy to interfere with civil rights

violations . Proximately causing Horning's damages.

**II.    CLASS ACTION ALLEGATIONS**

**149.**

Plaintiffs, SQUITIERI, PEARN and HORNING bring this action on behalf of all current

and/or former employees with the Pasco Sheriff's Office who are and/or were subject to the

above criminal violations by Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY,

FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and

BENNETT, which caused Plaintiffs, SQUITIERI, PEARN, HORNING and other employees of the

Pasco Sheriff's Office to be subjected to: (1) work for lower wages; (2) complete loss of wages;

(3) retaliation for resigning and/or notifying the Pasco Sheriff's Office of employment with a

different agency due to the Plaintiffs no longer wanting to work for Pasco Sheriff's Office based

on current management; and (4) retaliation for blowing the whistle after reporting the

violations and/or testifying truthfully in Internal Affairs investigations confirming misconduct, beginning 2011 through present.

## 150.

The Class is so numerous that joinder of all Class members is impracticable. Plaintiffs, SQUITIERI, PEARN and HORNING believe the Class contains hundreds of members, and the actual number of Class members can be ascertained through discovery.

## 151.

There are numerous questions of law and fact common to the Class. Those questions include, but are not limited to:

a.      How many persons who are employed at the Pasco Sheriff's Office have been subject to the illegal conduct of Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and BENNETT's suppressing wages by threat of retaliation during the period of the Class?

b.      How many persons who are employed at the Pasco Sheriff's Office have been subject to the illegal conduct of Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and BENNETT's intentional retaliation for blowing the whistle on Defendants' illegal conduct of intentional female gender discrimination during the period of the Class?

c.      How many persons who are employed at the Pasco Sheriff's Office have been subject to the illegal conduct of Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and

BENNETT's intentional retaliation for testifying truthfully, confirming Defendants' intentional criminal violations for State and Federal law, during the time period of the Class?

      d.      Have Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and BENNETT conspired to retaliate and violate Plaintiffs' civil rights during the period of the Class?

      e.      Have Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and BENNETT knowingly, or with reckless regard, violated Plaintiffs' civil rights, in violation of State and Federal law during the period of the Class?

      f.      Are Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and BENNETT part of an "enterprise" under State and Federal RICO statutes? and,

      g.      Have Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and BENNETT engaged in a pattern of racketeering activity under the State and Federal RICO statutes, or acquired and maintained an interest in, a pattern of racketeering activity under the Florida RICO Statute?

**152.**

The claims of the Plaintiffs, SQUITIERI, PEARN and HORNING are typical of the claims of the Class. Plaintiffs, SQUITIERI, PEARN and HORNING are current and former employees of the Pasco Sheriff's Office who's wages have been depressed by Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES,

CHRISTENSEN, REED, ROY, HITE and BENNETT's retaliation and knowingly and intentionally violated State and Federal laws. Plaintiffs, SQUITIERI, PEARN and HORNING have interests that are antagonistic or adverse to the other Class members.

**153.**

Plaintiffs, SQUITIERI, PEARN and HORNING were injured by direct and proximate reasons of Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and BENNETT's illegal conduct.

**154.**

Plaintiffs, SQUITIERI, PEARN and HORNING will fairly and adequately protect the interests of this Class.

**155.**

Plaintiffs, SQUITIERI, PEARN and HORNING are adequate representatives of the Class. Plaintiffs, SQUITIERI, PEARN and HORNING are each current and former employees of the Pasco Sheriff's Office whose wages have been depressed and civil rights violated by Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and BENNETT's illegal conduct. Plaintiffs, SQUITIERI, PEARN and HORNING have retained experienced counsel to litigate this complex Class action suit. Accordingly, Plaintiffs, SQUITIERI, PEARN and HORNING will fairly and adequately protect and represent the interest of the Class.

**156.**

Plaintiffs, SQUITIERI, PEARN and HORNING seek certification of a class, alternatively, under Fed. R. Civ. P. 23(b)(2) or 23(b)(3), or a combination thereof.

### 157.

Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and BENNETT's harboring of illegal actions has the effect of depressing wages and benefits to the detriment of members of the Class. Accordingly, declaratory and injunctive relief that prevents the Pasco Sheriff's Office and the Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and BENNETT from continuing to subject current employees to the above outlined and illegal conduct is appropriate on a Class basis.

### 158.

The questions of law and fact common to all members of the Class predominate over any questions that may affect only individual members of the Class.

### 159.

A class action is a superior method of adjudicating the Class members' claims because individual actions would unnecessarily burden the Court and create the risk of inconsistent results.

### 160.

Given the significant expense required to prosecute the foregoing claims against Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and BENNETT, the cost of

individual actions would exceed or consume the amount recovered in any individual action. The expense of pursuing individual actions will require individual members of the Class to forego their individual claims against Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and BENNETT if they are not permitted to pursue those claims as a Class.

**161.**

Plaintiffs, SQUITIERI, PEARN and HORNING are not aware of any litigation concerning the controversy that has already been initiated by or against any member of the Class.

**162.**

Because Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and BENNETT and the members of the Class reside in this district and all of the events giving rise to this action took place in this district, it is both desirable and efficient to concentrate the litigation of these claims in this particular forum.

**163.**

This action is manageable because the evidence proving that Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and BENNETT are engaged in alleged illegal conduct is common to the Class. Furthermore, the identities of the Class are known to Defendants, NOCCO, HARRINGTON, PEAKE, KRAUS, GREGORY, FOSHEY, BROWNING, SGT. JONES, ERICKSON, CORP. JONES, CHRISTENSEN, REED, ROY, HITE and BENNETT and Pasco Sheriff's Office.

## V.    DEFENDANTS, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, AND BENNETT HAVE ENGAGED IN A PATTERN OF RACKETEERING ACTIVITY

### 164.

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT are engaged in an ongoing pattern of racketeering activity as defined by Federal Racketeer and Influenced and Corrupt Organizations Act 18 U.S.C. § 1961et seq.

### 165.

The Federal RICO pattern of racketeering activity engaged in by Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT consists of more than two acts of racketeering activity, the most recent of which occurred within ten years after the commission of a prior act of racketeering activity.

### 166.

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT are engaging in an ongoing pattern of racketeering activity as defined by Fla. Stat. § 895(7) and (8).

### 167.

The Florida RICO pattern of racketeering activity engaged in by Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT consists of more than two acts of racketeering activity; the most recent of which occurred within four years after the commission of a prior act of racketeering activity.

### 168.

For the purposes of Federal RICO, the racketeering activity includes an open and ongoing pattern of violations of: (1) falsifying official documents- Fla. Stat. § 893.13; (2) filing a false report- Fla. Stat. § 817.49; (3) filing a false report-Fla. Stat. § 837.05; (4) perjury by contradictory statements-Fla. Stat. § 837.021; (5) inaccurate and misleading statement-Pasco Sheriff's Office General Order 26. 1 II. B45; (6) falsifying official document-Pasco Sheriff's Office General Order 26. 1. II. B47; (7) conduct unbecoming of a member of the Sheriff's Office-Pasco Sheriff's Office General Order 26. 1. § II. B54; (8) Florida Whistle-Blower Act-Fla. Stat. Ann § 112.3187; (9) aiding and abetting-Fla. Stat. § 777.011; (10) perjury under oath-Fla. Stat. § 837.012; (11) perjury by contradictory statements-Fla. Stat. § 837.021; (12) inaccurate and misleading statement-Pasco Sheriff's Office General Order 26. 1. II. B45; (13) Florida Whistle-Blower Act-Fla. Stat. Ann § 112.3187; (14) Whistle-Blower Protection Act of 1989, 5 U.S.C. 2302(b)(8)-(9); (15) obstruction of justice-Section 1503 (16) obstruction of criminal investigations-Section 1510; (16) obstruction of state or local law enforcement-Section 1511; (17) tampering with a witness, victim, or an informant-Section 1512; (18) retaliating against a witness, victim, or an informant-Section 1513; (19) conspiracy to interfere with civil rights-42 U.S. Code § 1985; and (20) Trafficking Victims Protection Act-42 U.S.C. § 7102.

**169.**

Specifically, Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT have violated and continue to violate: (1) falsifying official documents- Fla. Stat.§ 893.13; (2) filing a false report- Fla. Stat. § 817.49; (3) filing a false report-Fla. Stat. § 837.05; (4) perjury by contradictory statements-Fla. Stat. § 837.021; (5) inaccurate and misleading statement-Pasco Sheriff's Office General Order 26. 1 II. B45; (6)

falsifying official document-Pasco Sheriff's Office General Order 26. 1. II. B47; (7) conduct

unbecoming of a member of the Sheriff's Office-Pasco Sheriff's Office General Order 26. 1. § II.

B54; (8) Florida Whistle-Blower Act-Fla. Stat. Ann § 112.3187; (9) aiding and abetting-Fla. Stat. §

777.011; (10) perjury under oath-Fla. Stat. § 837.012; (11) perjury by contradictory statements-

Fla. Stat. § 837.021; (12) inaccurate and misleading statement-Pasco Sheriff's Office General

Order 26. 1. II. B45; (13) Florida Whistle-Blower Act-Fla. Stat. Ann § 112.3187; (14) Whistle-

Blower Protection Act of 1989, 5 U.S.C. 2302(b)(8)-(9); (15) obstruction of justice-Section 1503

(16) obstruction of criminal investigations-Section 1510; (16) obstruction of state or local law

enforcement-Section 1511; (17) tampering with a witness, victim, or an informant-Section

1512; (18) retaliating against a witness, victim, or an informant-Section 1513; (19) conspiracy to

interfere with civil rights-42 U.S. Code § 1985; and (20) Trafficking Victims Protection Act-42

U.S.C. § 7102; as fully set out in ¶¶ 1-169, supra.

**170.**

Each violation of: (1) falsifying official documents- Fla. Stat. § 893.13; (2) filing a false

report- Fla. Stat. § 817.49, (3) filing a false report-Fla. Stat. § 837.05; (4) Perjury by

contradictory Statements-Fla. Stat. § 837.021; and (5) inaccurate and misleading statement-

Pasco Sheriff's Office General Order 26. 1 II. B45; (6) falsifying official document-Pasco Sheriff's

Office General Order 26. 1. II. B47; (7) conduct unbecoming of a member of the Sheriff's Office-

Pasco Sheriff's Office General Order 26. 1. § II. B54; (8) Florida Whistle-Blower Act-Fla. Stat. Ann

§ 112.3187; (9) aiding and abetting-Fla. Stat. § 777.011; (10) perjury under oath-Fla. Stat. §

837.012; (11) perjury by contradictory statements-Fla. Stat. § 837.021; (12) inaccurate and

misleading statement-Pasco Sheriff's Office General Order 26. 1. II. B45; (13) Florida Whistle-

Blower Act-Fla. Stat. Ann § 112.3187; (14) Whistle-Blower Protection Act of 1989, 5 U.S.C.

2302(b)(8)-(9); (15) obstruction of justice-Section 1503 (16) obstruction of criminal

investigations-Section 1510; (16) obstruction of state or local law enforcement-Section 1511;

(17) tampering with a witness, victim, or an informant-Section 1512; (18) retaliating against a

witness, victim, or an informant-Section 1513; (19) conspiracy to interfere with civil rights-42

U.S. Code § 1985; and (20) Trafficking Victims Protection Act-42 U.S.C. § 7102; constitutes as an

act of "racketeering activity" under the Federal Racketeer and Influenced and Corrupt

Organizations Act 18 U.S.C. § 1961 et seq.

**171.**

Each violation of: (1) falsifying official documents- Fla. Stat. § 893.13; (2) filing a false

report- Fla. Stat. § 817.49, (3) filing a false report-Fla. Stat. § 837.05; (4) perjury by

contradictory statements-Fla. Stat. § 837.021; (5) inaccurate and misleading statement-Pasco

Sheriff's Office General Order 26. 1 II. B45; (6) falsifying official document-Pasco Sheriff's Office

General Order 26. 1. II. B47; (7) conduct unbecoming of a member of the Sheriff's Office-Pasco

Sheriff's Office General Order 26. 1. § II. B54; (8) Florida Whistle-Blower Act-Fla. Stat. Ann §

112.3187; (9) aiding and abetting-Fla. Stat. § 777.011; (10) perjury under oath-Fla. Stat. §

837.012; (11) perjury by contradictory statements-Fla. Stat. § 837.021; (12) inaccurate and

misleading statement-Pasco Sheriff's Office General Order 26. 1. II. B45; (13) Florida Whistle-

Blower Act-Fla. Stat. Ann § 112.3187; (14) Whistle-Blower Protection Act of 1989, 5 U.S.C.

2302(b)(8)-(9); (15) obstruction of justice-Section 1503 (16) obstruction of criminal

investigations-Section 1510; (16) obstruction of state or local law enforcement-Section 1511;

(17) tampering with a witness, victim, or an informant-Section 1512; (18) retaliating against a

witness, victim, or an informant-Section 1513; (19) conspiracy to interfere with civil rights-42 U.S. Code § 1985; and (20) Trafficking Victims Protection Act-42 U.S.C. § 7102; constitutes an act of "racketeering activity" under the Florida RICO Act-Fla. Stat. 895 et seq.

### The Acts of Racketeering Activity by Defendants are Related

**172.**

The acts of racketeering activity committed by Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT have the same or similar methods of commission in that they involve the knowing and intentional criminal and civil rights violations to depress wages of Plaintiffs, SQUITIERI, PEARN and HORNING to: (1) prevent them from leaving the Pasco Sheriff's Office to seek employment elsewhere; and (2) retaliate against employees who blow the whistle on the criminal and civil rights violations and corruption, through the acceptance and use of knowingly fraudulent Internal Affairs complaints in connection with known perjured testimony and witness tampering.

**173.**

The acts of racketeering activity committed by Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT have the same or similar objective: the reduction of wages paid to Pasco Sheriff's Office employees; the termination of employment and wages of Pasco Sheriff's Office employee whistle blowers and employee witnesses; and the permanent loss of future wages through Pasco Sheriff's Offices false Internal Affairs complaints generated after the employees have been fired or resigned, to prevent them from obtaining future employment with any law enforcement agencies.

**174.**

The acts of racketeering activity committed by Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT have the same or similar victims, including the Plaintiffs, SQUITIERI, PEARN and HORNING as well as the other members of the Class.

**175.**

The acts of racketeering activity committed by Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT are otherwise related by distinguishing characteristics including, but, not limited to, the involvement of Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, BENNETT and other members of the association-in-fact enterprise identified in paragraphs XXX-XXX.

**The Acts of Racketeering Activity Committed by Nocco, Harrington, Peake, Christensen, Reed, Roy, Kraus, Hite, and Bennett Involve a Distinct Threat of Long-Term Racketeering Activity**

**176.**

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT's acts of racketeering activities involve a distinct threat of long-term racketeering activity.

**177.**

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT's practice of knowingly and intentionally violating the following statutes for years: (1) falsifying official documents- Fla. Stat.§ 893.13; (2) filing a false report- Fla. Stat. § 817.49; (3) filing a false report-Fla. Stat. § 837.05; (4) perjury by contradictory statements-Fla. Stat. § 837.021; (5) inaccurate and misleading statement-Pasco Sheriff's Office General Order 26. 1 II.

B45; (6) falsifying official document-Pasco Sheriff's Office General Order 26. 1. II. B47; (7)

conduct unbecoming of a member of the Sheriff's Office-Pasco Sheriff's Office General Order

26. 1. § II. B54; (8) Florida Whistle-Blower Act-Fla. Stat. Ann § 112.3187; (9) aiding and abetting-

Fla. Stat. § 777.011; (10) perjury under oath-Fla. Stat. § 837.012; (11) perjury by contradictory

statements-Fla. Stat. § 837.021; (12) inaccurate and misleading statement-Pasco Sheriff's Office

General Order 26. 1. II. B45; (13) Florida Whistle-Blower Act-Fla. Stat. Ann § 112.3187; (14)

Whistle-Blower Protection Act of 1989, 5 U.S.C. 2302(b)(8)-(9); (15) obstruction of justice-

Section 1503 (16) obstruction of criminal investigations-Section 1510; (16) obstruction of state

or local law enforcement-Section 1511; (17) tampering with a witness, victim, or an informant-

Section 1512; (18) retaliating against a witness, victim, or an informant-Section 1513; (19)

conspiracy to interfere with civil rights-42 U.S. Code § 1985; and (20) Trafficking Victims

Protection Act-42 U.S.C. § 7102;  constitutes an act of "racketeering activity" under the Florida

RICO Act-Fla. Stat. 895 et seq., which is ongoing at the present time, and will continue into the

future, unless halted by judicial intervention.

**178.**

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and

BENNETT's knowing and intentional criminal violations are part of its regular way of conducting

the Pasco Sheriff's Office's official business.

**179.**

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and

BENNETT have committed hundreds of violations of: (1) falsifying official documents- Fla. Stat.§

893.13; (2) filing a false report- Fla. Stat. § 817.49; (3) filing a false report-Fla. Stat. § 837.05; (4)

perjury by contradictory statements-Fla. Stat. § 837.021; (5) inaccurate and misleading

statement-Pasco Sheriff's Office General Order 26. 1 II. B45; (6) falsifying official document-

Pasco Sheriff's Office General Order 26. 1. II. B47; (7) conduct unbecoming of a member of the

Sheriff's Office-Pasco Sheriff's Office General Order 26. 1. § II. B54; (8) Florida Whistle-Blower

Act-Fla. Stat. Ann § 112.3187; (9) aiding and abetting-Fla. Stat. § 777.011; (10) perjury under

oath-Fla. Stat. § 837.012; (11) perjury by contradictory statements-Fla. Stat. § 837.021; (12)

inaccurate and misleading statement-Pasco Sheriff's Office General Order 26. 1. II. B45; (13)

Florida Whistle-Blower Act-Fla. Stat. Ann § 112.3187; (14) Whistle-Blower Protection Act of

1989, 5 U.S.C. 2302(b)(8)-(9); (15) obstruction of justice-Section 1503 (16) obstruction of

criminal investigations-Section 1510; (16) obstruction of state or local law enforcement-Section

1511; (17) tampering with a witness, victim, or an informant-Section 1512; (18) retaliating

against a witness, victim, or an informant-Section 1513; (19) conspiracy to interfere with civil

rights-42 U.S. Code § 1985; and (20) Trafficking Victims Protection Act-42 U.S.C. § 7102; which

constitutes an act of "racketeering activity" under the Florida RICO Act-Fla. Stat. § 895 et seq.,

as part of its pattern of racketeering activity.

## VI.     THE ENTERPRISE

### 180.

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and

BENNETT used the Pasco Sheriff's Office as an enterprise and vehicle for the commission of two

or more predicate acts to conduct its racketeering activity. See. ¶¶ 1-180.

### 181.

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT are also considered an enterprise under the meaning for RICO; using this enterprise as vehicle for the commission of two or more predicate acts to conduct its racketeering activity. See ¶¶ 1-181.

### 182.

The Pasco Sheriff's Office and Defendants NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT share the common purpose of methods of commission, in that they involve the knowing and intentional criminal and civil rights violations to depress wages of Plaintiffs, to: (1) prevent them from leaving the Pasco Sheriff's Office to seek employment elsewhere; and (2) retaliate against employees who blow the whistle on the criminal and civil rights violations, and corruption, through the acceptance and use of knowingly fraudulent Internal Affairs complaints in connection with known perjured testimony and witness tampering. The enterprise has worked in this fashion continuously since 2011; the last 8 years.

### 183.

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT share the common purpose of methods of commission, in that they involve the knowing and intentional criminal and civil rights violations to depress wages of Plaintiffs, to: (1) prevent them from leaving the Pasco Sheriff's Office to seek employment elsewhere; and (2) retaliate against employees who blow the whistle on the criminal and civil rights violations, and corruption, through the acceptance and use of knowingly fraudulent Internal Affairs complaints

in connection with known perjured testimony and witness tampering. The enterprise has worked in this fashion continuously since 2011; the last 8 years.

**184.**

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT participate in the operation and management of the affairs of these enterprises, which exist for Defendants' (NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT) benefit.

**185.**

This association of Defendants (NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT) and the Pasco Sheriff's Office, constitutes an association-in-fact enterprise pursuant to Federal Racketeer and Influenced and Corrupt Organizations Act 18 U.S.C. §1961 et seq.

**186.**

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT, themselves, constitutes an association-in-fact enterprise pursuant to Federal Racketeer and Influenced and Corrupt Organizations Act 18 U.S.C. §1961 et seq.

**187.**

These enterprises affect interstate commerce in a variety of ways.

These enterprises affect interstate commerce in that they reduce and or terminate the income of employees who are still part of the Pasco Sheriff's Office work force.

**188.**

The enterprise also affects interstate commerce in that the Pasco Sheriff's Office, a member of the enterprise, is directly engaged in the production, distribution and acquisition of goods and services in interstate commerce.

**189.**

The Pasco Sheriff's Office accepted and retained the benefits of the acts of racketeering activity, thereby ratifying the conduct of its managers, employees, and the members of the enterprise who assisted it in committing those acts of racketeering activity.

**190.**

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT accepted and retained the benefits of the acts of racketeering activity, thereby ratifying the conduct of its managers, employees, and the members of the enterprise who assisted it in committing those acts of racketeering activity.

## VII.   DEFENDANTS NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, AND BENNETT HAVE CAUSED PLAINTIFFS' WAGES TO BE DEPRESSED

**191.**

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT's violations of Federal and Florida RICO proximately have caused the wages of Plaintiffs, SQUITIERI, PEARN, HORNING and all other members of the Class to be depressed below what they would have been in a labor market comprised of a lawful Sheriff's Office without their criminal law violations.

**192.**

Plaintiffs, SQUITIERI, PEARN, HORNING and the Class have suffered an injury to their

"business or property." i.e. lost wages, as a direct result of Defendants, NOCCO, HARRINGTON,

PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT's violations of Federal RCIO, and

injury as a result of Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY,

KRAUS, HITE, and BENNETT's violations of Florida RICO.

193.

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and

BENNETT's unlawful conduct has allowed Pasco Sheriff's Office to earn or retain significant

funds which it is not entitled to. For example, Defendants, NOCCO, HARRINGTON, PEAKE,

CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT's illegal criminal actions have forced its

employees to stay working for the Pasco Sheriff's Office for less pay, to prevent the retaliation

of false Internal Affairs complaints, which would prevent them from working with any other law

enforcement agencies in the future. These savings contribute to the Pasco Sheriff's Offices

budget margins and allow Defendant, NOCCO to use these illegally obtained funds for the

expressed purpose to fund other programs and create other positions that Defendant, NOCCO

was not able to obtain budget funds to create, thus providing the financial motive for

Defendant, Nocco's racketeering activities.

VII.   <strong><u>VIOLATIONS FOR CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS</u></strong>

194.

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and

BENNETT's conduct violated 42 U.S. Code § 1985, Conspiracy to Interfere with Civil Rights.

VIII.   <strong><u>VIOLATIONS OF THETRAFFICKING VICTIMS PROTECTION ACT, 42 U.S.C. §7102</u></strong>

**195.**

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and

BENNETT's conduct violated the Trafficking Victims Protection Act, 42 U.S.C. § 7102.

### VIIII.   VIOLATIONS OF THE FEDERAL AND FLORIDA WHISTLE BLOWER ACTS

**196**

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS,

HITE, and BENNETT's conduct violated the Federal Whistle-Blower Act, Whistle-Blower

Protection Act of 1989, 5 U.S.C. 2302et seq., (Federal Whistle-Blower), and Fla. Stat. §

112.3187et seq.

### COUNT  I
### (Violation of 18 U.S.C. § 1962(c))

**197.**

Plaintiffs, SQUITIERI, PEARN and HORNING re-allege and incorporate by reference

herein the allegations set forth in Paragraphs 1-197 as if fully restated hereinafter.

**198.**

The foregoing conduct constitutes a violation of 18 U.S.C. § 1962(c).

**199.**

Plaintiffs, SQUITIERI, PEARN and HORNING have been injured in their property by reason

of Defendants Nocco, Harrington, Peake, Christensen, Reed, Roy, Kraus, Hite, and Bennett's

violations of 18 U.S.C. § 1962(c).

**200.**

The injuries suffered by Plaintiffs, SQUITIERI, PEARN and HORNING were caused by Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT's violations of 18 U.S.C. § 1962(c).

### 201.

Pursuant to 18 U.S.C. § 1964(c), plaintiffs, SQUITIERI, PEARN and HORNING are entitled to recover three times actual damages they have sustained and their costs of suit, including reasonable attorney's fees.

### COUNT  II
### (Violation of Fla. Stat. § 985 et seq.)

### 202.

Plaintiffs, SQUITIERI, PEARN and HORNING re-allege and incorporate by reference herein the allegations set forth in Paragraphs 1-202 as if fully restated hereinafter.

### 203.

The foregoing conduct constitutes a violation of Fla. Stat. § 985 et seq.

### 204.

Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT's have acquired and maintained  an interest in and control of personal property, including money, through a pattern of racketeering activity.

### 205.

Plaintiffs, SQUITIERI, PEARN and HORNING have been injured in their property by reason of Defendants, NOCCO, HARRINGTON, PEAKE, CHRISTENSEN, REED, ROY, KRAUS, HITE, and BENNETT's violation of Fla. Stat. § 985 et seq., and are entitled to three times actual damages sustained.

## PRAYER FOR RELIEF

Plaintiffs, SQUITIERI, PEARN and HORNING demand judgment and other relief as follows:

A.  Certification of a Class pursuant to Fed. R. Civ. P. 23;

B.  Judgment in an amount equal to three times actual damages sustained by the Class, pursuant to 18 U.S.C. § 1964(c);

C.  Reasonable attorney's fees, pursuant to 18 U.S.C. § 1964(c);

D.  Judgment in an amount equal to three times actual damages sustained by the Class, pursuant Fla. Sta. § 895 et seq.;

E.  Attorney's fees in the trial and appellate courts, and costs of investigation and litigation reasonably incurred, pursuant to Fla. Sta. § 772.104 et seq.;

F.  Appropriate orders and judgments prohibiting Defendants from engaging in the violations of law alleged herein;

G.  Judgment in an amount to be proven at trial that requires the Pasco Sheriff's Office to disgorge any unlawful profits or otherwise return the full amount of its unjust enrichment;

H.  Trial by jury; and,

I.  Such relief as this Court deems necessary and appropriate.

Respectfully submitted this 16th day of April, 2019.

John F. McGuire, Esq.
Florida bar No.: 0000401
McGuire Law Offices, P.A.
1173 NE Cleveland Street
Clearwater, Fl 33755
(P) 727-446-7659
(F) 727-446-0905
Mlawoff1@tampabay.rr.com

# EXHIBIT A

PASCO SHERIFF'S OFFICE
Professional Standards

### *CIVILIAN MEMBER NOTICE OF INVESTIGATION*

P.S.#: IA 2018-37

TO: _____ **Christopher Squitieri** _____  RANK/POSITION: **Training Supervisor**

FROM: **Detective Timothy Roy** _____  DATE: **10/22/2018**

The following allegation has been received by the Pasco Sheriff's Office and is currently being investigated.

NAME OF COMPLAINANT: **Melissa Hite**

VIOLATION OF RULES AND REGULATIONS: _____ G.O. 26.1.II.C (1) - Respect Towards Superiors and Subordinate Members

ALLEGATION:

It is alleged on Friday, October 19, 2018, Training Supervisor, Christopher Squitieri was speaking with HR Manager, Melissa Hite on the phone in regards to an upcoming training class for ILP Manager, Anthony Pearn. During the conversation with Manager Hite, Supervisor Squitieri, made a secondary phone call to Manager Pearn while Manager Hite remained on hold. It is alleged that during the phone conversation with Manager Pearn, Supervisor Squitieri, made multiple derogatory comments about Manager Hite in include: "She is a fucking retard, you need to print those fucking papers and walk them over to her and shove them up her twat." This conversation was overheard by more than one witness within the Human Resource Unit.

I, _____  ☐ ADMIT  ☒ DENY  ☐ NEITHER the above allegation.

*(The above statement of Admission/denial is optional for the purpose of this form.)*

MEMBER ACKNOWLEDGMENT: _Chris Squith_  DATE: _10/23/18_

### NOTICE OF A PROFESSIONAL STANDARDS INTERVIEW

This is an administrative investigation, not criminal. You are further advised that statements during this interview cannot be used against you in any subsequent criminal proceedings. As a member of the Pasco Sheriff's Office, you are required to answer questions concerning the above-listed complaint/ allegation. Agency rules and regulations direct you to cooperate with this administrative investigation and to answer all questions completely and truthfully. **Any refusal, or knowingly providing false information may result in disciplinary action, including dismissal.** The interview, including all recess periods, will be recorded and there will be no unrecorded questions or statements. Do you understand?

_____  _10/23/18_  _____ 2755  _10/23/18_

MEMBER SIGNATURE   DATE   SUPERVISOR / INVESTIGATOR   DATE

PSO# 10093C (8/18)

Pasco Sheriff's Office                    *COMPLAINT INVESTIGATIVE REPORT*

## PROFESSIONAL STANDARDS

| | |
|---|---|
| P.S.#: | IA 2018-037 |

P.S. USE ONLY

### ORIGIN OF COMPLAINT

☐ CITIZEN   ☐ ANONYMOUS   ☐ PSO MEMBER   ■ PSO SUPERVISOR   ☐ OTHER

### COMPLAINANT

NAME: __Director William Hanshilwood__   BEST TIME TO CONTACT: _____

DOB: _____   RACE: __White__   SEX: __Male__

ADDRESS: _____

HOME PHONE: _____   BUSINESS PHONE: __(727) 847-5878__   ADDITIONAL PHONE _____

BUSINESS ADDRESS: __8700 Citizens Drive, New Port Richey, Florida 34654__

### SYNOPSIS OF COMPLAINT

DATE OF COMPLAINT: __10/19/2018__   TIME: __1524__   PSO OFFENSE #: _____

DATE OF INCIDENT: __10/19/2018__   TIME: __1512__   LOCATION: __HR Department__

MEMBER INVOLVED: __Christopher Squitieri__   VEHICLE # (If Applicable): _____

RANK: __Supervisor__   CJIS/ID#: __5489__   COMMAND:   ☐ LEO   ■ ADMINISTRATION

BUREAU: __Operational Logistics__   DIVISION: __Training__

ALLEGATION:

It is alleged on Friday, October 19, 2018, Training Supervisor, Christopher Squitieri was speaking with HR Manager, Melissa Hite on the phone in regards to an upcoming training class for ILP Manager, Anthony Pearn. During the conversation with Manager Hite, Supervisor Squitieri, made a secondary phone call to Manager Pearn while Manager Hite remained on hold. It is alleged that during the phone conversation with Manager Pearn, Supervisor Squitieri, made multiple derogatory comments about Manager Hite in include: "She is a fucking retard, you need to print those fucking papers and walk them over to her and shove them up her twat." This conversation was overheard by more than one witness within the Human Resource Unit.

### COMPLAINT RECIPIENT

BY: _____   CJIS/ID#: _____   DATE: _____

FORWARDED TO: _____   CJIS/ID#: _____   DATE: _____

*FORWARD THE ORIGINAL TO THE MEMBER'S BUREAU COMMANDER/COLONEL FOR REVIEW OR ASSIGNMENT.*
*FORWARD A COPY TO THE PROFESSIONAL STANDARDS UNIT WITHIN 24 HOURS OF RECEIPT.*
*IF CORRECTIVE ACTION, COMPLETE THE INVESTIGATION AND FORWARD TO BUREAU COMMANDER/COLONEL.*

### BUREAU COMMANDER REVIEW

☐ FORWARD TO _____ FOR INVESTIGATION.   DATE _____

☐ FORWARD TO PROFESSIONAL STANDARDS FOR INVESTIGATION.   DATE _____

PSO# 10094 (2/07)

(Continued from Page 1)

PERSON RECEIVING COMPLAINT _____ DATE: _10/22/18_

## CIVIL SUITS BROUGHT BY LAW ENFORCEMENT OR CORRECTIONAL OFFICERS

Florida State Statute 112.532(3) provides that "Every law enforcement officer or correctional officer shall have the right to bring civil suit against any person, group of persons, or organization or corporation, or the head of such organization or corporation, for damages, either pecuniary or otherwise, suffered during the performance of the officer's official duties, for the abridgment of the officer's civil rights arising out of the officer's performance of official duties, or for filing a complaint against the officer which the person knew was false when it was filed."

Initial: _____

## STATEMENT OF OATH

Florida State Statute 837.012 defines perjury when not in an official proceeding as a crime and established certain penalties for violation of that section. Accordingly, I advise you that whoever makes a false statement, which he or she does not believe to be true, under oath, not in an official proceeding, in regard to any material matter shall be guilty of a misdemeanor of the first degree, punishable by a term of imprisonment not exceeding 1 year.

Initial: _____

I, _William T. Henshilwood_ , swear or attest that all the information I provide during this administrative investigation will be complete and accurate.

_____        _10/22/18_
Signature of Complainant / Witness        Date

STATE OF FLORIDA, COUNTY OF PASCO

The foregoing instrument was acknowledged before me this _22_ day of _October_ , 20_18_ by _William Henshilwood_ who produced _Known_ as identification, and who did take an oath.

_____        _J. Mollo_
Signature of Notary Public        Print Name of Notary Public

# EXHIBIT B



John F. McGuire, ESQ.
Trial Attorney
Also admitted in the U.S. Supreme Court
Million Dollar Advocates Forum
Licensed in Federal Court

Larry C. Hoffman, ESQ.
Trial Attorney

Gino A. Megna, ESQ.
Trial Attorney
Licensed in Federal Court

# McGUIRE
# L A W
# OFFICES
## A Professional Association

1173 N.E. Cleveland Street
Clearwater, Florida 33755
Phone (727) 446-7659
Toll Free (877) 64-IRISH
Fax (727) 446-0905

March 25, 2019

**Via Email & US Mail**

Pasco Sheriff's Office
Attn: Lindsay Moore, Esq.
8700 Citizen Drive
New Port Richey, FL 34654

lmoore@pascosheriff.org

Re:   **Anthony Pearn (Request for Criminal Investigation)**

Dear Ms. Moore:

I have received your responsive letter dated March 12, 2019 denying our request for criminal investigation. Enclosed you will find Mr. Pearn's phone records which shows he received a call on October 20, 2018 at 11:45am from Colonel Jeff Harrington's personal cell phone number, 727-992-4576. This is evidence of the first instance of witness tampering. I believe that a subpoena of phone records of all calls made and/or received within three (3) hours of that call, between Colonel Jeff Harrington and any Pasco Sheriff's Office personnel will be evidence of the co-conspirators of the criminal activity of witness tampering. If you have any further questions you can call my office.

Sincerely
**McGUIRE LAW OFFICES**

John F. McGuire, Esquire

Email: mlawoff1@tampabay.rr.com      www.mcguirelawoffices.com      Facebook.com/mcguirelawoffices



**verizon**√ Billing period Sep 27, 2018 to Oct 26, 2018 | Account #

Invoice # 7757683127

## Anthony Pearn
479.653.5434 | iPhone 6S

### Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| Oct 20 | 11:45 AM | 727.992.4576 | Hudson, FL | Newptrichey, FL | 3 | | | |

# EXHIBIT C



## 11/06/2018
# REPORT OF EXAMINATION
# RE: Chris Squitieri

**NOTE:** BEFORE USING ANY MATERIALS OBTAINED THROUGH CRIMINAL JUSTICE ASSOCIATES, YOU SHOULD CAREFULLY READ THE TERMS AND CONDITIONS SET FORTH ON THE REVERSE SIDE OF THIS REPORT. USE OF THE MATERIALS PROVIDED CONSTITUTES YOUR ACCEPTANCE OF THESE TERMS AND CONDITIONS.

Exhibit A







## CJA LIE DETECTION SERVICES

# REPORT OF EXAMINATION

P.O. BOX 780328
ORLANDO, FLORIDA 32878
(407)583-4080 (800)224-1320

## Predication

This truth verification examination was predicated upon a request from Chris Squitieri and the MaGuire Law Firm.

## Scope

The scope of this truth verification examination shall be limited to Chris Squitieri's honesty in regards to administrative allegations filed against him in Pasco County FL. The person claiming allegations of misconduct and improper language is **MELISSA HITE (Pasco County Employee)**

## Credibility Assessment Instrument
### CVSA (Computer Voice Stress Analyzer)

Our firm uses more than one credibility assessment instrument to include Computerized Polygraph, CVSA, VIPRE VSA & EyeDetect system. Many LE agencies in Florida are using either the CVSA or VIPRE VSA to include Pinellas County FL Sheriff, Clearwater FL PD, Pinellas Park FL PD as a few local agencies. In terms of legal acceptance the 8th and 12th Circuits in FL approved usage of the CVSA & VIPRE VSA instruments on an equal basis to polygraph in testing sex offenders. In early 2018 the CVSA and VIPRE VSA exam results were accepted into evidence in a final sentencing hearing in the Northern District of FL (Criminal Division). I was the examiner involved in all of the cases referenced.

**\*CONFIDENTIAL\***
**ATTORNEY**
**WORK PRODUCT**

Page (2) of (3)
Report of Examination
Chris Squitieri
11/06/2018

REPORT PROPERTY OF
CJA LIE DETECTION SERVICES
NO 3RD PARTY DISTRIBUTION

*CONFIDENTIAL*
ATTORNEY
WORK PRODUCT

## PRETEST INTERVIEW

On **11/06/2018** Greg Roebuck, Certified Examiner administered this truth verification examination at the Tampa Area Office located at 550 North Reo Street - Suite #300 Tampa FL 33609. The examination was conducted on Chris Squitieri. He identified himself with a FL ID and signed the proper legal release form prior to the examination.  He was briefed on the operation of the CVSA (*Computer Voice Stress Analyzer*) and what was expected of him during the exam process. The purpose of this examination was to address administrative allegations filed by PASCO County FL government that involved a female employee named **MELISSA HITE.** Mr. Squitieri denied any unprofessional conduct or the usage of profanity against **MELISSA HITE** at any time.

## EXAMINATION

I  utilized a **(11) Question General Series Examination** that featured **(3) Relevant** questions. The remaining were Control and Irrelevant questions that were interspersed with the Relevant questions. CVSA, VIPRE VSA, & Polygraph exams all use a combination of Relevant, Irrelevant, & Control questions per exam protocols.

**R4 - Have you ever been unprofessional in your dealings with Melissa Hite? NO**

**R6 - Have you ever used profanity in your dealings with Melissa Hite? NO**

**R10 - Did you use profanity of an extreme nature against Melissa Hite on Oct 19 2018? NO**

Following the initial chart, a second chart was conducted utilizing the same format as the initial examination as well as the same relevant and control questions. **Upon completion of the 2nd chart and final analysis I scored the exam as: NDI - No Deception Indicated (*NDI*)** It should be noted that in R#10 the word extreme was not spelled correctly which has NO Impact on the exam results.  This was input error only.This could not be changed as the system does not allow changes as to maintain exam integrity. All of the questions asked on this truth verification examination are included in this report. I have circled the Relevant questions in RED.

**\*CONFIDENTIAL\***
**ATTORNEY**
**WORK PRODUCT**

 COPY

Page (3) of (3)
Report of Examination
Chris Squitieri
11/06/2018

*CONFIDENTIAL*
ATTORNEY
WORK PRODUCT

## CONCLUSION

**Based upon my training and experience, it is my expert opinion that Chris Squitieri respond truthfully in regards to this examination.** We are maintaining a copy of this report on file for a period of 1-year. There is no legal requirement in terms of record retention for lie detection -truth verification exam results in FL. There is a 3 year requirement to retain exam reports reports if they were conducted under the guidelines of the EPPA (*Employee Polygraph Protection Act*) This exam does not fall under those guidelines.

_Greg Roebuck_ (signature)

**Greg Roebuck**
**Certified CVSA & VIPRE VSA Examiner**
**U.S. District Court Certified Expert**
**Human Resources Specialist (Govt & Corporate)**

American Probation & Parole Association
International Association of Interviewers
International Association of Voice Stress Analysts
SHRM-Society of Human Resource Management
National Homicide Investigators Association
National Association of Internal Affairs Investigators

REPORT PROPERTY OF
CJA LIE DETECTION SERVICES
NO 3RD PARTY DISTRIBUTION

CVSA - VIPRE VSA EXAMINATION

X  NDI - No Deception Indicated ✓
___ DI - Deception Indicated

_Greg Roebuck_ (signature)

CERTIFIED EXAMINER

TAMPA BAY OFFICE
(813) 902-3275

COPY

Date: 06 November 2018
Test Format: GENERAL SERIES
Test Medium: Manual
Time Began: 11:25:04 AM
Requested: JOHN MAGUIRE ESQUIRE
Case Number: NOV2018PSCADM
Verification: *N/A*
Confession: *N/A*
Time Ended: 12:28:04 AM

Examiner: ROEBUCK
Type of Test: Suspect
Offense: ADMIN COMPLAINT
Subject: SQUITIERI
Outside Agency: CJA LIE DETECTION SERVICES
CVSA Unit Number: Tampa Area Office
Cold Call: Concurred
Deception: Not Indicated

---

1. (IR) Is your name Chris? YES
2. (C) Is the color of my desk Brown? NO
3. (IR) Are you sitting down? YES
4. (R) Have you ever been unprofessional in your dealings with Melissa Hite? NO
5. (IR) Is today Tuesday? YES
6. (R) Have you ever used profanity in your dealings with Melissa Hite? NO
7. (IR) Am I wearing glasses? YES
8. (C) Have you ever driven over the posted speed limit? NO
9. (IR) Is this the month of November 2018 YES
10. (R) Did you use profanity of an extreme nature against Mellissa Hite on Oct 19th 2018? NO
11. (IR) Are we in the state of FL? YES

**\*CONFIDENTIAL\***
**ATTORNEY**
**WORK PRODUCT**

**CVSA - VIPRE VSA EXAMINATION**

X  **NDI - No Deception Indicated**
___ **DI - Deception Indicated**



**CERTIFIED EXAMINER**

**REPORT PROPERTY OF**
**CJA LIE DETECTION SERVICES**
**NO 3RD PARTY DISTRIBUTION**

**\*CONFIDENTIAL\***
**ATTORNEY**
**WORK PRODUCT**

**TAMPA BAY OFFICE**
**(813) 902-3275**

COPY

# EXHIBIT D



John F. McGuire, ESQ.
Trial Attorney
Also admitted in the U.S. Supreme Court
Million Dollar Advocates Forum
Licensed in Federal Court

Larry C. Hoffman, ESQ.
Trial Attorney

Gino A. Megna, ESQ.
Trial Attorney
Licensed in Federal Court

# McGUIRE
# L A W
# OFFICES
A Professional Association

1173 N.E. Cleveland Street
Clearwater, Florida 33755
Phone (727) 446-7659
Toll Free (877) 64-IRISH
Fax (727) 446-0905

November 6, 2018

Christopher Nocco
8700 Citizen Drive
New Port Richey, FL 34654

**Re:**          **Supervisor Christopher Squitieri**

Dear Mr. Nocco:

Please be advised that my office represents Mr. Christopher Squitieri in a false allegation of misconduct. Mr. Squitieri has taken a polygraph test which clearly indicates that the accuser Melissa Hite filed a sworn affidavit that is false. We hereby request that Ms. Hite be placed on administrative leave for this false charge until the investigation is completed.

Mr. Squitieri's officer Bill of rights were violated by the investigator Detective Roy, which is a misdemeanor in the State of Florida. The alleged incident occurred while Mr. Squitieri was working under full authority of the Pasco Sheriffs office in uniform as a sworn Deputy Sheriff. Deputy Squitieri was deployed as a Deputy to Lynn Haven, FL during the after math of Hurricane Michael. He is entitled protection under the Officer Bill of Rights.

Deputy Squitieri was put on leave for not turning over his private phone which contains Attorney Client Privilege information due to a forthcoming divorce, as well as his 4th Amendment right. This is a clear act of retaliation by Ms. Hite given the circumstances of her deficient paperwork to FDLE while she was working with Deputy Squitieri. We are requesting Deputy Squitieri be immediately reinstated and all alleged violations be immediately closed out. If you have any questions, please contact my office.

Sincerely,

John F. McGuire, Esquire

Email: mlawoff1@tampabay.rr.com      www.mcguirelawoffices.com   Facebook.com/mcguirelawoffices

CHRIS NOCCO, SHERIFF

# OFFICE OF THE SHERIFF

TEAMWORK ♦ PROFESSIONALISM ♦ SERVICE

November 8, 2018

McGuire Law Offices
ATTN: John F. McGuire, Esq.
1173 N.E. Cleveland Street
Clearwater, FL 33755

RE: Christopher Squitieri

Dear Mr. McGuire,

The Pasco Sheriff's Office is in receipt of your correspondence dated November 6, 2018, regarding your client Christopher Squitieri. Your letter is wholly inaccurate and each false allegation will be addressed.

Your first inaccurate allegation is that Mr. Squitieri is entitled to protection under the Police Officer Bill of Rights (BOR), and that his rights were violated. Please be advised that Mr. Squitieri holds the position of a civilian training supervisor with the Pasco Sheriff's Office. Florida Statute 112.531 defines "law enforcement officer" for purposes of the BOR as a person who is employed full time by any political subdivision of the state, and whose primary responsibility is the prevention and detection of crime or the enforcement of the penal, traffic, or highway laws of this state. Mr. Squitieri is neither employed full-time by the Pasco Sheriff's Office as a law enforcement officer, nor are his primary responsibilities enforcement of the penal or traffic laws of this state. Mr. Squitieri's deployment to the Florida panhandle to provide hurricane-related assistance has no bearing on his status as a civilian non-full time law enforcement officer. Additionally, despite being in the panhandle, Mr. Squitieri was acting in his capacity as a civilian training supervisor at the time of the action in which he engaged that is the subject of the administrative investigation. As such, the BOR does not apply to Mr. Squitieri, and thus no violation of rights has occurred.

Notwithstanding the fact the BOR does not apply to your client, your second false allegation is that a violation of the BOR is a misdemeanor in the State of Florida. Florida Statute 112.534 clearly outlines the recourse for an alleged violation of the BOR, and nowhere in that section does it state a violation is a misdemeanor. In fact, the only mention of a misdemeanor violation in the

**PASCO SHERIFF'S OFFICE**

| Sheriff's Administration | District I | District II | District III | Pasco Detention Center |
|---|---|---|---|---|
| 8700 Citizens Drive | 7432 Little Road | 36409 State Road 52 | 11530 Trinity Blvd | 20101 Central Blvd |
| New Port Richey, FL 34654 | New Port Richey, FL 34654 | Dade City, FL 33525 | Trinity, FL 34655 | Land O' Lakes, FL 34637 |
| 727-847-5878 | 727-847-5878 | 352-518-5000 | 727-372-5920 | 813-996-6982 |

BOR is found in Florida Statute 112.533, which provides in subsection (4) that a violation related to a public records release of an active investigation, not a BOR violation, is a misdemeanor.

Your third false allegation is that Mr. Squitieri was put on administrative leave for not turning over his personal phone as an act of retaliation by Melissa Hite. Ms. Hite did not make the decision to place Mr. Squitieri on administrative leave, nor was it done for the reasons stated in your correspondence. Pasco Sheriff's Office General Order 26.2 Section V (a copy of which is enclosed for your reference) clearly outlines which agency members have authority to place members on administrative leave, and the authorized reasons for doing such. Mr. Squitieri was placed on administrative leave as he is the subject member of an administrative investigation.

Lastly, you indicate the results of a polygraph test taken by Mr. Squitieri, which was not an official part of the administrative investigation, indicate that Ms. Hite filed a false sworn affidavit. First, Ms. Hite did not file a sworn written affidavit in this matter. Additionally, any statements made by Mr. Squitieri about a third party during an unverified polygraph test would be entirely his opinion, and would not factually prove anything related to statements made by Ms. Hite. Lastly, as I am sure you are aware, polygraph tests are inadmissible as evidence.

In the future, I would encourage you to use due diligence in conducting a thorough investigation into matters before making baseless and irresponsible allegations. Mr. Squitieri will remain on administrative leave in relation to his status as a subject member of an administrative investigation.

Sincerely,

Lindsay Moore, Esq.
Chief, Management Services Bureau
General Counsel

enclosure

# EXHIBIT E

March 1, 2019

Sheriff Christopher Nocco
8700 Citizens Drive
New port Richey, FL 34654

Dear Sherriff Nocco,

Please accept this correspondence as my formal notice of violation of my Law Enforcement Officers Bill of Rights and formal written request for the following:

-Request to reopen the investigation of IA 2018-037.

-Request for a compliance review hearing for IA 2018-037.

-Request for a compliance review hearing for IA 2018 -045.

At this time, I request the above mentioned actions due to discovery of new evidence, improper conduct on behalf of Investigator Timothy Roy, Manager Melissa Hite, HR Specialist Christopher Bennett and HR Director Tiffani Reed and the intentional violation of my rights as outlined in the Law Enforcement Officers Bill of Rights, Fla. Stat. § 112.532.

For your review, I have attached a copy of my pre disciplinary hearing statement including the attached Exhibit A, polygraph examination results for IA 2018-037, the original statements of complaints that were filed with the Office of Professional Standards on January 27, 2019 and January 30, 2019 along with the written correspondence I received from Inspector Jennifer Christensen which confirms receipt of said complaints and notification of processing.

Furthermore, pursuant to Pasco Sheriff's Office General Order 26.2, I am formally requesting to voluntarily submit to a device measuring truth responses and the admittance for IA2018-037 as well as the pending IA-2018-045.  Pursuant to IA 2018-037; in the alternative, I request the admittance of the attached polygraph examination results dated November 06, 2018.

Sincerely,
Deputy Christopher Squitieri

**I am filling an official IA complaint against Jeff Harrington for tampering with an internal investigation and intimidating a witness.  Additionally, I will provide information regarding violation of federal whistle blower protection act.  I feel these two are directly related so I will address these in chronological order.**

The week ok Oct. 8th I was in charge of the ILP division while the director was out of town.  I became aware of in incident involving a citizen who made a post on facebook about Deputy Carmack.  The citizen (whose information I have) posted a mug shot picture of the deputy on her facebook.  I received a call from Major Peake asking me questions about the incident.  He asked if she did anything illegal that she could be arrested for.  I stated that the pic was accessed via the Pinellas County site and she had not committed any law violations.  He then asked that I obtain any and all information pertaining to her and all of her family.  Peake went on to state that, "we cannot let someone say bad shit about the sheriff's office, we need to lock her up."  I stated that what she posted was actually true since the deputy was arrested but he was clearly not happy.

Throughout the day he contacted me via cell at least five times asking for updates and if we had anything to arrest her on.  He requested that I notify SIU detectives and have them begin conducting surveillance on her and her family and arrest them all.  I have always prided myself on having the moral courage to stand up for what is right and I informed Peake that I was not comfortable with this activity and targeting citizens for posting derogatorily and true statements seemed like a misuse of power and unethical.  He informed me that he would just deal with the SIU Sgt. Direct "because it would be easier."

Approx. one week later I had an in-person conversation with Col. Jeff Harrington and I informed him of all the details of this incident and stated I was not comfortable having the Intelligence division being used as an unethical tool to abuse the Sheriffs power.  He acted upset about the incident and "said he would look into it."  He then went on to say that maybe I would be happier working in a different division at the agency or maybe the agency was not a good fit for me.  I left feeling that I would be moved and/or punished for addressing these violations.

On Sat. October 20th at 1145 hrs Jeff Harrington called me from his personal cell phone on my cell phone (which I have copies and attached).  He stated that IA was launching an investigation against Chris Squiterie and I needed to make sure I told the truth.  I responded that of course I would.  He then stated, " you better tell the truth and you will be ok and everything should be ok for you."  He went on to state that no matter how painful the truth was that I needed to cooperate and the Sheriff fires people for being dishonest.  I took this as a direct threat from the Colonel of the agency.  This is in direct violation of agency policy.

On 10/22/2018 IA went to the SPC and interviewed me as a witness.  On 10/23/2018 they returned.  When they asked to interview me again I said, I thought we cleared up anything yesterday why are you back, Det. Roy responded, the Colonel sent us back to down to see if your story was the same.  Again, I could only see this as a threat and the Colonel violating policy and interfering with an investigation.

The other facts of this case are readily available. I was terminated on 11/6/2018 without cause. When I asked why I was being terminated Larry Kraus said I did not meet the terms of my probationary employment. I responded that I received a glowing written evaluation one week prior from him and that did not make sense at all. He responded that this did not come from me this came from the Colonel.

It is clear to me that Jeff Harrington tampered with the investigation, tampered with a witness, and terminated me. All of this is directly related to the fact that I was a Whistle Blower and brought unethical and illegal activities of Major Jeff Peake to him. Harrington used this as a fake reason to terminate me. This can be easily proven and has been throughout witness testimony and my evidence of emails and phone conversations.

I am filing an official Whistle Blower violation with the state attorney general's office as well as other legal avenues.

***** It is extremely vital to point out that I could have provided my cell phone records to IA to prove that DID NOT have conversations with Squiterie surrounding the alleged time frame of his alleged comments HOWEVER I did not do so as to protect Harrington. I knew that he called me and his phone is logged in my call logs- clearly tampering with an internal investigation and at that time I still wanted to protect him due to previous associations.

I have attached a screen shot from my call log to prove this to this email.

**I am filing an official IA complaint on the director of Human Resources, Taffany Reed.**

On 10/31/2018 I sent an email (attached) to Reed outlining numerous violations occurring that were all HR related. The email addresses the issues in detail and Reed failed to take action OR RESPOND at all to my issues. This is a gross dereliction of duty.

Additionally, Reed was in direct violation of the federally protected FMLA leave policy. On October 26th, 2018 I placed a vacation leave request on my then supervisor's desk (Larry Kraus) for Nov. 5-9th. I was placed on admin. Leave that day and I was unable to obtain a copy of my request. I could only assume that is was approved because I was already not at work on administrative leave. Additionally, Kraus verbally informed me it was approved when I left on admin. Leave.

I was taking leave for personal reasons relating to FMLA but was going to use vacation leave as to keep it private. On 11/05/2018 Det. Roy contacted me and said he needed me to come into the office with an hour. I informed him I was on vacation leave. He stated that I did not have any leave "on the books." I informed him that my leave was with my supervisor. Det. Roy then called me back approx.. 15 mins later and stated that he spoke with Kraus and Kraus stated that he never got a leave slip from me. This was a blatant lie which will also be addressed. Det. Roy then stated that even if I did have leave that my leave was cancelled and I was ordered to return to the office. I informed him that I would be on FMLA sick leave and not able to return. Prior to

Roy calling me back I emailed the HR director, Reed, and informed her that I was out on sick leave. Federal law states that FMLA leave can be taken intermittently and serve psychological stress and depression is a valid legal reason to use sick time and FMLA. Not only did Reed not pass this information along, I was terminated during my FMLA leave.

**I am making an official IA complaint on Det. Roy for dereliction of duty and ethics violations for misrepresenting findings in an investigation.**

During on interview on 10/23/18 Roy stated, "you already changed your story once, now which one is it." He then stated that in my memo I stated that Chris Squiterie conducted himself professionally then during my interview I stated that he did say swear words during the daytime. Additionally, in the administrative summary Roy makes false statements eluding to the fact that I waivered on my statements. I went into detail in the interviews to explain that saying swear words not related to HR is not unprofessional. I also went on to say that I have heard the Sheriff and the Colonel as well all the command staff swear on a weekly basis. I used this as an example to state that someone can be professional and act professional and still swear. Det. Roy also stated, I have dropped the F-bomb about 17 times during this interview.!!

This is a game a semantics and misrepresentation of facts and a play on words to come to an outcome they wanted. My statement that Squiterie was professional was accurate. My statement that he may have used swear words throughout the day was also accurate, I never waivered on this in the slightest way. This was highly unethical and a blatant lie on behalf of Roy.

My attorney obtained the transcripts and recordings of the interviews and this is 100% false and a misrepresentation of the entire investigation. I then went on clear up that to me swearing was not unprofessional and I meant that. Roy attempted to misrepresent the facts of witness testimony and went far above the scope of an internal investigation in harassing a witness. The harassment I encountered during the investigation is well documented with emails and calls to numerous individuals in the agency. It is not normal to interview a witness to an allegation 3 times, place them on admin. Leave, terminate their training, then terminate them, all without cause.

The executive summary was 100% false and a misrepresentation of what was ACTUALLY said and written. Since someone can be both professional and swear, as highlighted by the example with the Sheriff. It would be like asking me if the Sheriff conducted himself professionally – I would say yes of course. The ask me if I have ever heard him curse and my answer will also be yes! The IA taking those words and twisting it to mean to THEM that – he cannot be professional AND curse- but that was not the question!!!! Roy, made this accusation against me knowing that it was false- all anyone has to do is hear the tapes where I go into great detail to give examples.

# EXHIBIT F



CHRIS NOCCO, SHERIFF

# PASCO SHERIFF'S OFFICE

**TEAMWORK ♦ PROFESSIONALISM ♦ SERVICE**

March 12, 2019

Christopher Squitieri
11813 Trevally Loop #301
New Port Richey, FL 34655

RE:   Notice of Violation of Law Enforcement Officers Bill of Rights:
        IA # 2018-037
        IA # 2018-045

Dear Mr. Squitieri,

Sheriff Nocco has received your notice of violation of law enforcement officers bill of rights for IA # 2018-037 and #2018-045 and request for compliance review hearings; your request to re-open the investigation of IA #2018-037; and your request to voluntarily submit to a truth-measuring device test and admit the results as part of the investigation of IA #2018-037 (or admit your previous CVSA test results) and #2018-045.

With regard to your request to re-open the investigation of IA #2018-037, there is no provision under PSO General Orders nor Florida statutes mandating such.  The investigation is complete and you participated in a Pre-Disciplinary Hearing.  Your request is therefore denied.

With regard to your notice of violation of law enforcement officers bill of rights and request for compliance review hearing in IA #2018-037 and IA #2018-045, please be advised Chapter 112, Florida Statutes, known as the "Law Enforcement Officers Bill of Rights," does not apply to you. Your position with PSO is a civilian Training Supervisor and a part-time Reserve II deputy, and as such, you do not meet the requirements of a "law enforcement officer" under Florida Statute 112.531 (see *Hinn v. Beary*, 701 So.2d 579 (Fla. 5th DCA 1997).  Further, even in the event the LEO Bill of Rights did apply to you, your notice fails to comply with the requirements of Florida Statute 112.534 subsections (1)(a), (b), and (c).  Your request is therefore denied.

| **Sheriff's Administration** | **District I** | **District II** | **District III** | **Pasco Detention Cent** |
|---|---|---|---|---|
| 8700 Citizen Drive | 7432 Little Road | 36409 State Road 52 | 11530 Trinity Boulevard | 20101 Central Bouleva |
| New Port Richey, FL 34654 | New Port Richey, FL 34654 | Dade City, FL 33525 | Trinity, FL 34655 | Land O' Lakes, FL 3463 |
| 727-847-5878 | 727-847-5878 | 352-518-5000 | 727-372-5920 | 813-996-6982 |

With regard to your request to voluntarily submit to a truth-measuring device test and admit the results as part of the investigation of IA #2018-037 (or admit your previous CVSA test results) and #2018-045, your request is denied.

Sincerely,

Lindsay Moore, Esq.
Chief, Management Services Bureau
General Counsel

cc: John McGuire, Esq.

# EXHIBIT G



**CHRIS NOCCO, SHERIFF**

# PASCO SHERIFF'S OFFICE

## TEAMWORK ✦ PROFESSIONALISM ✦ SERVICE

March 13, 2019

Supervisor Christopher Squitieri
8700 Citizens Drive
New Port Richey, FL 34654

RE: IA 2018-037

Supervisor Squitieri:

I have carefully reviewed and considered all the available documents and information regarding the above referenced administrative investigation completed by the Professional Standards Unit. It is my determination the final disposition and level of discipline for this case to be as follows.

This complaint involved an alleged violation of General Order 26.1, Standards of Conduct, Section II, Subsection C., (1), Respect Towards Superiors and Subordinate Members. The charge is sustained. You are hereby suspended for two (2) days (16 hours) without pay. Captain Jared Hill will schedule the dates for you to serve your suspension.

Please be advised a future violation of this General Order may result in further discipline, up to and including termination. Please sign and return a copy of this letter to verify your receipt of same, copy attached.

Respectfully,

George McDonald, Chief
Joint Operations Bureau

GM/sb
attachment

cc:     Professional Standards Unit

\_Member's Signature                                      3/13/19
                                                         Date Received

**Sheriff's Administration**
8700 Citizens Drive
New Port Richey, FL 34654
727-847-5878

**District I**
7432 Little Road
New Port Richey, FL 34654
727-847-5878

**District II**
36409 State Road 52
Dade City, FL 33525
352-518-5000

**District III**
11530 Trinity Boulevard
Trinity, FL 34655
727-372-5920

**Pasco Detention Center**
20101 Central Boulevard
Land O'Lakes, FL 34637
813-996-6982

# EXHIBIT H

Pasco Sheriff's Office                    *COMPLAINT INVESTIGATIVE REPORT*

## PROFESSIONAL STANDARDS

| P.S.#: IA 2018-045 (B) |
| --- |
| P.S. USE ONLY |

### ORIGIN OF COMPLAINT

☐ CITIZEN  ☐ ANONYMOUS  ☐ PSO MEMBER  ☑ PSO SUPERVISOR  ☐ OTHER

### COMPLAINANT

NAME: __Inspector Jennifer Christensen__  BEST TIME TO CONTACT: _____

DOB: _____  RACE: __White__  SEX: __Female__

ADDRESS: _____

HOME PHONE: _____  BUSINESS PHONE: __(727) 815-7117__  ADDITIONAL PHONE _____

BUSINESS ADDRESS: __8700 Citizens Drive, New Port Richey, Florida__

### SYNOPSIS OF COMPLAINT

DATE OF COMPLAINT: __9/12/2018__  TIME: __0900__  PSO OFFENSE #: __2018-37852__

DATE OF INCIDENT: __9/11/2018__  TIME: _____  LOCATION: __PHSC Driving Pad__

MEMBER INVOLVED: __Christopher Squitieri__  VEHICLE # (If Applicable): _____

RANK: __Supervisor__  CJIS/ID#: __5489__  COMMAND: ☐ LEO  ☑ ADMINISTRATION

BUREAU: __Operational Logistics__  DIVISION: __Training__

ALLEGATION:

On Tuesday, September 11, 2018, Training Supervisor, Christopher Squitieri, was assigned as the "Lead Driving Instructor" for the PHSC Law Enforcement Academy, class 107. It is alleged that Supervisor Squitieri knowingly falsified a "CMS Vehicle Operations Performance Evaluation" form on Cadet Kati Cage while testing the cadet on the "Intersection Backing" driving course. Supervisor Squitieri is alleged to have documented that Cadet Cage competed four (4) successful test runs while completing the Intersection Backing course; however, Cadet Cage and a witness stated she only completed three (3) of the required four (4) test runs.

### COMPLAINT RECIPIENT

BY: _____  CJIS/ID#: _____  DATE: _____

FORWARDED TO: _____  CJIS/ID#: _____  DATE: _____

*FORWARD THE ORIGINAL TO THE MEMBER'S BUREAU COMMANDER/COLONEL FOR REVIEW OR ASSIGNMENT.*
*FORWARD A COPY TO THE PROFESSIONAL STANDARDS UNIT WITHIN 24 HOURS OF RECEIPT.*
*IF CORRECTIVE ACTION, COMPLETE THE INVESTIGATION AND FORWARD TO BUREAU COMMANDER/COLONEL.*

### BUREAU COMMANDER REVIEW

☐ FORWARD TO _____ FOR INVESTIGATION.  DATE _____

☐ FORWARD TO PROFESSIONAL STANDARDS FOR INVESTIGATION.  DATE _____

PSO# 10094 (2/07)

## PROFESSIONAL STANDARDS

| P.S.#: IA 2018-045 (A) |
| --- |
| P.S. USE ONLY |

### ORIGIN OF COMPLAINT

☐ CITIZEN  ☐ ANONYMOUS  ☐ PSO MEMBER  ☑ PSO SUPERVISOR  ☐ OTHER

### COMPLAINANT

NAME: **Inspector Jennifer Christensen**    BEST TIME TO CONTACT: _____

DOB: _____    RACE: **White**    SEX: **Female**

ADDRESS: _____

HOME PHONE: _____  BUSINESS PHONE: **(727) 815-7117**  ADDITIONAL PHONE _____

BUSINESS ADDRESS: **8700 Citizens Drive, New Port Richey, Florida**

### SYNOPSIS OF COMPLAINT

DATE OF COMPLAINT: **9/12/2018**  TIME: **0900**    PSO OFFENSE #: **2018-37852**

DATE OF INCIDENT: **9/11/2018**  TIME: _____    LOCATION: **PHSC Driving Pad**

MEMBER INVOLVED: **Christopher Squitieri**    VEHICLE # (If Applicable): _____

RANK: **Supervisor**    CJIS/ID#: **5489**    COMMAND:  ☐ LEO  ☑ ADMINISTRATION

BUREAU: **Operational Logistics**    DIVISION: **Training**

ALLEGATION:

On Tuesday, September 11, 2018, Training Supervisor, Christopher Squitieri, was assigned as the "Lead Driving Instructor" for the PHSC Law Enforcement Academy, class 107. It is alleged that Supervisor Squitieri knowingly falsified a "CMS Vehicle Operations Performance Evaluation" form on Cadet Shannon Conover while testing the cadet on the "Intersection Backing" driving course. Supervisor Squitieri is alleged to have documented that Cadet Conover competed four (4) successful test runs while completing the Intersection Backing course; however, Cadet Conover and a witness statd she only completed two (2) of the required four (4) test runs.

### COMPLAINT RECIPIENT

BY: _____  CJIS/ID#: _____  DATE: _____

FORWARDED TO: _____  CJIS/ID#: _____  DATE: _____

*FORWARD THE ORIGINAL TO THE MEMBER'S BUREAU COMMANDER/COLONEL FOR REVIEW OR ASSIGNMENT.*
*FORWARD A COPY TO THE PROFESSIONAL STANDARDS UNIT WITHIN 24 HOURS OF RECEIPT.*
*IF CORRECTIVE ACTION, COMPLETE THE INVESTIGATION AND FORWARD TO BUREAU COMMANDER/COLONEL.*

### BUREAU COMMANDER REVIEW

☐ FORWARD TO _____ FOR INVESTIGATION.    DATE _____

☐ FORWARD TO PROFESSIONAL STANDARDS FOR INVESTIGATION.    DATE _____

PSO# 10094 (2/07)

Pasco Sheriff's Office

*COMPLAINT INVESTIGATIVE REPORT*

## PROFESSIONAL STANDARDS

| P.S.#: IA 2018-045 (C) |
|---|
| P.S. USE ONLY |

### ORIGIN OF COMPLAINT

☐ CITIZEN   ☐ ANONYMOUS   ☐ PSO MEMBER   ☒ PSO SUPERVISOR   ☐ OTHER

### COMPLAINANT

NAME: **Inspector Jennifer Christensen**   BEST TIME TO CONTACT: _____

DOB: _____   RACE: **White**   SEX: **Female**

ADDRESS: _____

HOME PHONE: _____ BUSINESS PHONE: **(727) 815-7117** ADDITIONAL PHONE _____

BUSINESS ADDRESS: **8700 Citizens Drive, New Port Richey, Florida**

### SYNOPSIS OF COMPLAINT

DATE OF COMPLAINT: **9/12/2018**   TIME: **0900**   PSO OFFENSE #: **2018-37852**

DATE OF INCIDENT: **9/11/2018**   TIME: _____   LOCATION: **PHSC Driving Pad**

MEMBER INVOLVED: **Christopher Squitieri**   VEHICLE # (If Applicable): _____

RANK: **Supervisor**   CJIS/ID#: **5489**   COMMAND: ☐ LEO   ☒ ADMINISTRATION

BUREAU: **Operational Logistics**   DIVISION: **Training**

ALLEGATION:

On September 11, 2018, it is alleged Supervisor Squitieri knowingly falsified at least two "CMS Vehicle Operations Performance Evaluation" FDLE forms on two cadets that completed the "Intersection Backing" driving course, which was witnessed by Sergeant Browning. The following day, Supervisor Squitieri was confronted by Sergeant Browning to correct the issue. Supervisor Squitieri denied the allegations and is alleged to have inappropriately addressed the cadets regarding the conflict. Sergeant Browning and Supervisor Squitieri then became involved in a verbal dispute in front of the academy cadets to the point where another instructor had to intervene. Sergeant Browning then reported the issue to Pasco Hernando State College Law Enforcement Academy administration. These alleged actions initiated a criminal investigation where Supervisor Squitieri was found to have falsified documents on the two cadets.

### COMPLAINT RECIPIENT

BY: _____   CJIS/ID#: _____   DATE: _____

FORWARDED TO: _____   CJIS/ID#: _____   DATE: _____

*FORWARD THE ORIGINAL TO THE MEMBER'S BUREAU COMMANDER/COLONEL FOR REVIEW OR ASSIGNMENT.*
*FORWARD A COPY TO THE PROFESSIONAL STANDARDS UNIT WITHIN 24 HOURS OF RECEIPT.*
*IF CORRECTIVE ACTION, COMPLETE THE INVESTIGATION AND FORWARD TO BUREAU COMMANDER/COLONEL.*

### BUREAU COMMANDER REVIEW

☐ FORWARD TO _____ FOR INVESTIGATION.   DATE _____

☐ FORWARD TO PROFESSIONAL STANDARDS FOR INVESTIGATION.   DATE _____

PSO# 10094 (2/07)

P.S.#: IA 2018-045

(P.S. USE ONLY)

COMPLAINANT / WITNESS NAME: Inspector Jennifer Christensen _____ DOB: _____

HOME ADDRESS: _____

BUSINESS ADDRESS: 8700 Citizens Drive, New Port Richey, Florida 34654

HOME PHONE: (____) _____  BUSINESS PHONE: ( 727 ) 815-7117  ADD'L PHONE: (____) ____

## DETAILS OF INCIDENT
### (Please provide name and contact information for any witnesses.)

On Tuesday, September 11, 2018, Supervisor Squitieri was assigned as the "Lead Driving Instructor" for the Pasco Hernando State College, Law enforcement Academy, class # 107. Thirteen cadets were scheduled to practice and test various driving courses for the day. Supervisor Squitieri provided driving instructions for the "Intersection Backing" course along with Corporal Robert Gartenberg. Tampa Police Department Officer Kris Babino was also providing instruction to various cadets on a separate "Intersection Backing" course, while Sergeant James Browning provided instruction at a "Tactical Backing" course. All the courses were conducted on the same driving pad, and within 100-200 feet of each other.

During the day, Sergeant Browning noticed Cadet Shannon Conover began her testing phase with Supervisor Squitieri and decided to watch her test as she was having trouble with the course and was given extended practice time. Sergeant Browning noted that Cadet Conover completed two (2) of the FDLE required four (4) test runs prior to exiting the vehicle and responding to his course. Sergeant Browning also indicated that Cadet Conover expressed her excitement for only having to complete the course "two times." Sergeant Browning then received a phone call from TPD Officer Babino, who inquired about Supervisor Squitieri getting through his group of cadets so quickly. Sergeant Browning then witnessed three other cadets in Supervisor Squitieri's group complete less than the FDLE required four (4) test runs. Sergeant Browning documented his observations on a notepad. Sergeant Browning stated when the cadets arrived to his driving exercise, the FDLE test forms indicated all four (4) cadets successfully completed all of the required practice/test runs for the "Intersection Backing" course being scored by Supervisor Squitieri and Corporal Gartenberg's group.

On 9/12/2018, Sergeant Browning confronted Supervisor Squitieri about his observations along with the statements made by Cadet Conover from the previous day. After Supervisor Squitieri refused to correct the situation and denied the allegations, Sergeant Browning called for Cadet Conover to join their conversation. Cadet Conover acknowledged that she only completed two (2) of the FDLE required four, (4) FDLE test runs while completing the "Intersection Backing" course. Per Sergeant Browning, Supervisor Squitieri stated, "you did four out of five runs." Sergeant Browning alleged that Supervisor Squitieri then ordered all of the cadets to gather around the bleachers and addressed the class. It is alleged that Supervisor Squitieri provided direction to the cadets by stating, "don't let anybody tell you how many runs you did, you all did four out of five runs."

Supervisor Squitieri and Sergeant Browning then became involved in a verbal argument regarding Sergeant Browning's observations. This argument between Sergeant Browning and Supervisor Squitieri took place in front of multiple cadets, causing Corporal Gartenberg to intervene and separate the two. Sergeant Browning immediately responded to the PHSC administration office and reported his observations to Corporal Jennie Jones and PHSC Coordinator Brian Head.

A criminal investigation was initiated by the PSO Major Crimes Unit. All of the instructors and the 13 cadets were interviewed for the investigation. The Major Crimes investigation concluded by finding Supervisor Squitieri knowingly falsified two (2) CMS Vehicle Operations Performance Evaluation" FDLE forms for Cadet Shannon Conover and Cadet Kati Cage, while scoring the "Intersection Backing" course on 9/11/2018. The case findings by the PSO Major Crimes Unit were a direct violation of Florida State Statue 893.13 (Falsifying Records).

(Continued on reverse side)

# EXHIBIT I

**CASE SUPPLEMENTAL REPORT**

Printed: 10/09/2018 15:25

Pasco Sheriff's Office

OCA: **18037852**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *PENDING/ACTIVE*

Case Mng Status: *INACTIVE*

Offense: *FALSIFYING RECORDS BY PUBLIC OFFICERS/EMPLOYEES*

Occurred: *09/11/2018*

| | | |
|---|---|---|
| Investigator: *MCGAVOCK, BRIAN* (4226) | | |
| Supervisor: *QUINLAN, DEAN T* (0704) | Date / Time: *10/04/2018 18:43:28, Thursday* | |
| Contact: | Supervisor Review Date / Time: *10/08/2018 16:19:27, Monday* | |
| | Reference: *Case Review Conducted* | |

STAT DATA: Change case status from Pending/Active to Inactive. Add witness: Kris Babino. Add witness: James Browning. Add involved other: Folson Etienne. Add involved other: Emin Garcia. Add involved other: Joaquin Gonzalez.

CASE STATUS: Inactive.
SAO INVESTIGATION DATE: N/A.
SUPPORT DOCUMENTS: None.
RELATED CASE(S): None.

INVESTIGATION:

On 10/4/18, a case review was conducted on this alleged Falsifying Official Documents investigation. Cadet Cage and Cadet Conover completed less than the required four (04) test runs for Intersection Backing, but were still marked by Squitieri as having successfully completed four (04) test runs. However, the presence of criminal intent by Squitieri to knowingly and willfully falsify the documents could not be established. Because of this, the case will be moved to an Inactive Status. If new information is obtained to either support or unfound the allegations, this case will be reopened for further investigation. No further action.

BRM
10/4/18
ICR: 1.0 Hours X $26.00 = $ 26.00

# EXHIBIT J

## Statement- PSO Disciplinary Hearing

## Case: #2018-037

## Allegation of General Order 26.1.II.C2

## Respect toward superiors and subordinate members

## October 19, 2018 Alleged Date of Incident

I would like to state on record that my employment title and status is still in the process of a Judicial Court hearing on February 28, 2019 with the Sixth Judicial Circuit Court in Pasco County pertaining to my Law Enforcement Officer Bill of Rights. I am present at this hearing to comply with Pasco Sheriff Office's guidelines pertaining to this disciplinary hearing. I am complying with this hearing without waiving my Law Enforcement Officer Bill of Rights or the continued violations. A copy of this statement and its attachments has been mailed to the Sheriff and is now public record.

The allegations made against me are false and there are inconsistencies in the investigation. Also, the statements made by both Manager Hite and Christopher Bennett are untruthful. I have an outstanding work history and a professional relationship with all Pasco Sheriff's Office members as well as direct contact with Sheriff Nocco and his Command Staff.

In the past three years, I have had no documented instances of formal discipline with the Pasco Sheriff's Office. Furthermore, over a 33 year career in Law Enforcement, I have had no documented instances of formal discipline so to be the subject of this false allegation, it is difficult to not push for justice and defend my character and record. I mean no disrespect to any of the members on this board or the Sheriff office and only wanted to seek a fair process.

I did not get full access to the case file and all recorded interview tapes and logs in a timely matter and I am still having a few issues with audio recording. This has altered my ability to properly prepare for this hearing. In addition, I am presently waiting on numerous public record requests pertaining to equitable discipline and documented finding of this board pertaining to discourtesy investigations.  Attorney Lindsey Moore was spear heading these requests as well as the release of any of the information.

I have repeatedly said I did not make the alleged comments. My testimony was clear when I said I had continues communication with many members of this agency pertaining to the EOT approval process including Manager Pearn. The investigation provided a time line of events showing inconsistencies from Manager Hite.

As noted throughout this investigation, I spoke numerous times with Manager Pearn in regards to the process and updates that needed to be followed up on pertaining to his EOT eligibility with Human Resources Manager Hite. This was reinforced by manager Hite's repeated emails throughout the day that he was approved for the EOT class. I also stated in my testimony that my cells phones were not working properly and the phones were dropping calls and cutting out. I testified it was a very difficult and stressful time for all of us involved. I was working hand in hand with the hurricane deployment all while trying to make numerous calls to Manager Hite and Manager Pearn. Manger Pearn and I both testified we were in communication throughout the day with one another  and I asked him to go see Manger Hite and asked him to conference call FDLE field  specialist Scott Ballard as there was nothing else left for me to do on my end. This directive was earlier in the day on 10-19-2018.

I also informed Manager Hite to meet and deal directly with Pearn and FDLE Scott Ballard. Numerous emails and communications showed Manger Hite was advised in the steps to take to complete her task earlier in the day. I explained to her that Manager Pearn will come by and see her. This took place earlier in the day and not at 3:20 pm as she claims. She sent emails to Sergeant Irizarry earlier in the day stating that all the paperwork was fixed. She made this email statement after Command Staff members' questions Pearn's paperwork still not being approved.  I do not dispute the three of us were in communications throughout the day. I will repeat again that I never made the alleged comments or any disrespectful comments to Manager Hite or any other member or person.  I did not talk to anyone concerning this issue even after I felt Melissa Hite was not responding professionally in her endeavors.

This investigation started on October 19, 2018 and is still on-going. This is an extraordinary amount of time and energy for an alleged discourtesy complaint.

The complainant, Manager Hite and her witness Christopher Bennett have provided statements and a time line of events that have not been supported by a single co-worker within ear shot of this alleged incident. His testimony stated that he heard me say "stick that paperwork up her fucking twat". He said Manager Hite then walked to his office with her phone and walked into his office and closed the door. Once she was in the office, he heard me say "She's a fucking retard".  This testimony directly contradicts Managers Hite's statement that she set her phone down on her desk and heard me say the alleged comments over the phone while she was in her office. She testified she took my call-waiting phone call in front of Christopher Bennett after she walked to his office. IA investigator Roy failed to pick up this very simple contradicting statement. Internal Affairs investigator never interviewed Christopher Bennett a second time to confirm this series of events which was a key piece of evidence and the validity of Christopher Bennett statement.

The testimony of Christopher Bennett is not consistent or supported by any witness. His proximity of the event and his ability to identify my voice through a slight accent is a false statement. I do not have an ascent.

Human Resources Specialist Christopher Bennett testified "I know 100 % the voice I heard was Supervisor Squitieri because of his accent." It should be noted that Christopher Bennet has talked to me one time for approximately 5 minutes. I have never met him in person or had any other verbal communication with him since my employment. His statement of identifying my voice is not believable or the truth. The evidence that was presented through testimony is that other Human Resources employees heard Manager Hite using the fuck word.

Manager Hite's ability to allegedly hear me making derogatory and unprofessional comments over the open line is not true or possible. The background and activity of a hurricane disaster site with 70-80 deputies, tractor trailers, refrigerated and running compressor trucks, generators, workers and a wide range of other activity would make this impossible. I reviewed the Pasco County phone records and do not dispute it appeared to have an open line.

Manager Hite testified that I put her on hold or I thought I hung up. This statement is speculative on her part with no evidence to support such a claim. This includes the fact that there were no other witnesses beside Christopher Bennett and his statements are a false allegation that needed to be investigated.

There are simple logistical facts that Internal Affairs investigators needed to look into more clearly. Subsequently, measurement in the Human Resources office, as to the validly of space and distance, to hear such a conversation with no other witnesses.  The fact that others heard Manger Hite use the fuck work but not me. The ground zero site where I was working and the activity around my immediate space while on the work site should not be ignored.  Locations of my Pasco Sheriff phone in my pocket and its ability to pick up clear identifiable conversation during such a busy environment.  The possibilities of any voice or any profanity being heard would be difficult at best. To clearly identify such an exact phrase would be impossible. The statements Manager Hite and Christopher Bennet are simple no true. I testified that I never said any or any form of the alleged statement.

## [DEMONSTRATION OF ALLEGED PHONE CALL]

Witnesses from the Internal Affairs investigation provided two statements from Human Resources employees' working within the Human Resources office are a vital part of this investigation and should not be ignored. They explained they heard Manager Hite using the fuck word on numerous occasions during this incident. Christopher Bennett's statement, of he never hears this type of language, again is a false statement. Due to his proximity of the incident, he said he heard my statement. If he apparently could hear me, why couldn't he hear Manager Hite using the fuck word? This is inconstant and is a lie and a false statement. Christopher Bennett could not have heard one of use swearing but not the other. I believe he did not hear anything but Manager Hate's profanity.

The report of Human Resources employees hearing this incident lead to all of the Human Resources employees working that day to be interviewed. All witnesses in Human Resources were interviewed and never supported Christopher Bennett claim that "many people heard it". The Human Resources employee's interview only reported Manager Hite's use of the fuck word.

The allegation of General order 26.1.II.C2 –Insubordination Offenses: respect towards superior and subordinates members is false and unfounded. I never made the alleged comments to Manager Hite or any member of this agency.

I voluntarily took a polygraph examination that provided evidence supporting the alleged comments were never said. I did not have to take this exam but offered it anyway. Manger Hite and Christopher Bennett could have voluntarily taken the same exam if they truly wanted to show their truthfulness. Please see attached Exhibit A.

I believe this is fabricated story pushed by Manager Hite and Specialist Christopher Bennett to avoid exposure of their incompetence and Managers Hite's own General order violations of 26.1.II.C2 (using the fuck word) and her untruthfulness. The investigation revealed testimony of her repeated behavior and disparaging remarks, the fuck word, while in the presence of Human Resources employees. Internal Affairs was made aware of this information yet failed to investigate during their investigative actions.

This investigation had a summery that is vague and has only partial information. My transcribed statement is thirty three pages, yet Internal Affairs Investigator Roy summarized my statements in less than two pages.

Manager Pearn's statements are even longer and had the similar summarized shortcuts. I believe anyone that reviews this case should not be relying solo on a very condense summary of this investigation and they should listen to all the recorded audio tapes.

This investigation involved numerous Command Staff members yet none of them were called upon to testify. I believe Colonel Jeffrey Harrington was involved in this investigation on numerous occasions. Manager Pearn claims the Col. contacted him at the start of the investigation after Manager Pearn submitted his memo. Manager Pearn was told by Internal Affairs investigator Roy that Col. Jeffrey Harrington told them to come down a second time to see if he changed his story.

Manager Pearn was contacted five times but the case file only shows three transcribed transcripts.  Five interviews were conducted with Manager Pearn to include numerous interviews at St. Petersburg College Allstate Center and the Manatee Community College campus.

This information should have been made available in this case file. Manager Pearn's testimony shows he felt he was being punished for not hearing a statement that was alleged to have been said during a phone conversation with Supervisor Squitieri. Manager Pearn's voiced concerns should have at least been addressed by Internal Affairs Investigator Roy.

On Saturday, October 20, 2018 Col. Jeffrey Harrington called Manager Pearn from his personal cell phone in attempt at what Manager Pearn thought was to get him to change his testimony following the written memo he had submitted Friday, October 19, 2018. This call would be the first of many attempts to intimidate him into changing his testimony about the events.

Over the next week Manager Pearn was interviewed three times where the investigator repeatedly tried to lead or alter Manager Pearns statement. Each time Manager Pearn corrected them, stating time and again that he never heard me make those statements. At one point after being put on leave, while in an EOT class in Manatee County, the investigators showed up to inform him he was being investigated but would not say what it was for and never served him with any investigation paperwork. Again Pearn believed that this conduct was to intimidate him. Shortly thereafter, Pearn was served with paperwork terminating his employment with Pasco Sheriff's office for failure to meet the terms of his probation; even after having received a glowing review a few days prior to the start of this investigation.

Col. Harrington should not have reach out to Manager Pearn or been briefed of the day to day activity of this case. If Col. Jeffrey Harrington was in contact with Manager Pearn during this investigation, he should have been interviewed as a witness. His involvement should not have played a role in the investigation.

On the date the incident allegedly occurred, Sergeant Christina Irizarry and Chief George McDonald called me in a conference call asking about the status of Manager Pearn's EOT paperwork. I told them both that I believed that Manager Hite was provided with all of the paperwork and that she was confused and did not know how to do it.

Shortly after my phone conference with Sergeant Christina Irizarry and Chief George McDonald I was cc'd on an email from Manager Hite to Sergeant Christina Irizarry stating that the paperwork was taken care of and Manager Pearn was good to go for his EOT class on Monday.

Following the email to Sergeant Christina Irizarry I received multiple emails and missed calls from Manager Hite stating that it was not taken care of, Manager Pearn could not attend the EOT class on Monday and asking me to call her back ASAP.

Chief George McDonald, Captain Jared Hill, Director Sanfa Johnson and Sergeant Christina Irizarry all had first-hand knowledge of Manager Hite's mistakes and inability to complete this very simple task pertaining to Manager Anthony " Tony" Pearn's EOT status. This was revealed through my testimony and supported by emails. The emails are part of this case file. All witnesses should have been interviewed at the start of this incident since it stemmed from Manager Hite's inability to do her job and her false and inconsistent progress pertaining to Manager Pearn's EOT file.

Manager Hite was not forthcoming and honest in her emails which would question her character and ability to remember details and to be honest.

This violation and alleged discourteous comments were said to be made by me about Manager Hite over an open line or when the phone was on hold. I don't even know how to place a caller on hold nor would I have even attempted such a thing. The comments were alleged to be overheard by numerous employees working in HR. It was said by Christopher Bennet "He never hears this type of language in HR" so it got his attention. He said he never hears this type of profanity and it was disgusting. Manager Hite was so upset she had to take a break. Manager's Hite's use of the fuck word clearly shows Christopher Bennett's statement is not accurate.

Eleven witnesses were called in for questioning. This included Manager Hite and Christopher Bennett.

All nine of the Human Resources employees interviewed said they never heard any statement. Not only did they not hear any statements they quoted in their sworn testimony "I never heard any derogatory comments made or made about Manager Melissa Hite by SUPERVISOR SQUITERI."

Roxanne Sterneman testified she heard Melissa Hite using the Fuck word as she was yelling on the phone. Ashlynn Gray testified she heard Manager Melissa Hite using the Fuck word and that she appeared very agitated. Their testimony stated that they think the call was on a speaker.

The fuck word that was broadcasted by Manager Hite was apparently not heard by Christopher Bennett. His testimony said "I never hear this type of language in the office so I remembered it clearly". His statement of never hearing this type of language in the HR office is a false statement and should have been questioned by investigators.

Another employee who was recently fired, Monique Leverrete, was a witness to Manager Hite's behavior in the Human Resources office prior to this incident. She heard Manager Hite referring to me as an asshole and a fucking Moran. She should have been questioned as she was a 14 year veteran within the Pasco County Sheriff's Office. Her statements would have shed some light on this office. This was an employee with a respectful work ethic and history. Why wasn't she questioned after evidence was exposed of Managers Hite's work conduct?

The phone record showing an open Pasco County phone assigned to me is the bases of this finding of guilt. The Internal Affairs investigators speculate and lead the reviewer to believe that there is a 100% assumption of guilt.

Please note, witnesses testified Manager Hite and Christopher Bennett were observed going into Christopher Bennett's office and closing the door.  In addition, they testified Manager Hite was heard yelling and screaming.

The timeline on this incident and its events do not add up across all sworn testimony and emails. Chief Henshilwood documented in an incident report Melissa Hite reported the incident to him at approximately 3:00 pm. He also filled out a disciplinary sheet on 12-5-2018 recommending a founded complaint against me as well as a dismissal. I feel this was early for a finding.

Manager Hite swears I told Manager Pearn to come by and see her and he showed up approximately 15-20 minutes after I spoke to her. This may be why she felt it was my voice she heard after the alleged conservation that took place with Manager Pearn and myself. Manger Hite's claim that there could be no other reason for Manager Pearn to come to her office is untruthful. Absolutely no evidence supported her claim that I told him to walk over at this time.

The Internal Affairs investigators reviewed a file pertaining to Manager Pearn which had a sticky note placed on it by Manager Hite stating Pearn dropped off the files on 10-19-2018 @ 1520 hours. She claims the incident of discourtesy took place between 3:13 and 3:20. This shows that manager Hite is clearly mistaken on the actual time frame. If her notes were accurate, Manager Pearn would have been in the office having this alleged conversation in front of Manager Hite. If her notes were not accurate, then her recollection of events weren't either.

Manager Hite speaks of her dialogue with Manager Pearn as pleasant and caring yet his testimony and the testimonies of her subordinates provided a slightly different view of her. She was rude and unprofessional throughout this process. His testimony provided an insight of an agitated Manager that was slamming doors and spoke rudely to him. On one occasion, she even slammed the door in his face. This behavior was acted out in front of her Human Resources employees. This is another example of her inconsistency and truthfulness in her testimony. The investigator avoided any questioning on Managers Hite's demeanor or follow-up regarding her unprofessional behavior. The testimony shows an extremely unprofessional Manager using the fuck word and aggressively posturing.

Testimony revealed she was using the fuck word that day and not me. This was reported by Human Resources testimony and is not my hunch or guess but it is sworn testimony on file.

The statement I allegedly made was never proven and was unfounded. Furthermore, the fuck word Manager Hite used was offensive and against conduct. Her past behavior of calling me an asshole and moron was heard by an employee prior to this incident which shows Manager Hite already had a demeanor of abuse when dealing with other employees.

If Sheriff Nocco was concerned with corruption, truthfulness, bias or discriminatory behavior, then this investigation would have covered all investigative leads with legitimacy.

Any finding less than unfounded is not a fair and impartial finding. Any discipline associated with this case outside the lines of past practice is a clear indication of an unfair and unequitable punishment towards me. This case is an example of unsupported speculation and an inapt IA investigation. This entire incident was not handled professionally.

Testimony has provided evidence that Manager Hite and Christopher Bennett statements are false and unfounded.

Furthermore, Roy provided false information to me when he stated that Larry Kraus never received a leave slip for me. The IA file states differently that Kraus did have a leave slip from me but claims he did not approve it- which is also a lie.

Roy further misrepresented facts surrounding my leave.

I was taking leave for personal reasons relating to FMLA but was going to use vacation leave as to keep it private. On 11/05/2018 Det. Roy contacted me and said he needed me to come into the office with an hour. I informed him I was on vacation leave. He stated that I did not have any leave "on the books." I informed him that my leave was with my supervisor. Det. Roy then called me back approx.. 15 mins later and stated that he spoke with Kraus and Kraus stated that he never got a leave slip from me. This was a blatant lie which will also be addressed. Det. Roy then stated that even if I did have leave that my leave was cancelled, and I was ordered to return to the office. I informed him that I would be on FMLA sick leave and not able to return. **Prior to Roy calling me back I emailed the HR director, Reed, and informed her that I was out on sick leave. Federal law states that FMLA leave can be taken intermittently and serve psychological stress and depression is a valid legal reason to use sick time and FMLA.** Not only did Reed not pass this information along, I was terminated during my FMLA leave. Roy continued to ask questions why I was on leave and I stated I was helping my mother. In the IA summary he presents this in a false manner and makes it appear as if I was lying.

In fact, I was helping my mother, **and** I was out on sick leave for FMLA reasons psychological stress caused by the constant mistreatment of the agency and witness tampering. Federal guidelines clearly state that psychological stress is a valid reason to use FMLA. Simply because I was on FMLA and attending the EOT is irrelevant. My doctor advised me to attend the class to get out town and away from the psychological stress of the situation and it was even better because it was out of town. So, Roy again misrepresented this in the summary, and I was never interviewed or asked one question pertaining to this issue. I originally put in for vacation as I did not want the agency to be aware of my psychological stress. After Roy claimed he was canceling leave and ordering me to the agency I was legally able to use FMLA. FMLA can serve dual purposes.

Additionally, Roy 100% made up the fact that they obtained contradictory evidence that proved I was provided false testimony in reference to bringing HR paperwork in reference to the EOT class. In my testimony I went into great detail explaining this was on my own accord. Additionally, tapes obtained by my lawyer from Squiterie's testimony also 100% mirror my statements. I never waivered in this at all and was asked about it repeatedly. I also provided additional evidence that I spoke with the director of SPC on that Friday at approx./ 1500 hrs and he returned my call at approx.. 1600 hrs informing me that the college still did not show me approved for the EOT. It was at that time I went to HR. Roy 100% falsified this finding.

Additionally, the executive summary pertaining to the incident I addressed with Capt. Foshey is also 100% false. I have the email evidence which SHE emailed me!!!! I have attached it here for review.

It appears that Roy was asked to provide founded allegations against me no matter what the actual evidence supported. I strongly assert that this is 100% related to Major Peake and his desire to fire me for unearthing and addressing his unethical and unlawful violations pertaining to the proposed illegal targeting of citizens.

**I am filing an official IA complaint against Jeffery Peake for unethical actives and abuse of power.**

The week ok Oct. 8th I was in charge of the ILP division while the director was out of town. I became aware of in incident involving a citizen who made a post on facebook about Deputy Carmack. The citizen (whose information I have) posted a mug shot picture of the deputy on her facebook. I received a call from Major Peake asking me questions about the incident. He asked if she did anything illegal that she could be arrested for. I stated that the pic was accessed via the Pinellas County site and she had not committed any law violations. He then asked that I obtain any and all information pertaining to her and all of her family. Peake went on to state that, "we cannot let someone say bad shit about the sheriff's office, we need to lock her up." I stated that what she posted was actually true since the deputy was arrested but he was clearly not happy.

Throughout the day he contacted me via cell at least five times asking for updates and if we had anything to arrest her on. He requested that I notify SIU detectives and have them begin conducting surveillance on her and her family and arrest them all. I have always prided myself on having the moral courage to stand up for what is right and I informed Peake that I was not comfortable with this activity and targeting citizens for posting derogatorily and true statements seemed like a misuse of power and unethical. He informed me that he would just deal with the SIU Sgt. Direct "because it would be easier."

Approx. one week later I had an in-person conversation with Col. Jeff Harrington and I informed him of all the details of this incident and stated I was not comfortable having the Intelligence division being used as an unethical tool to abuse the Sheriffs power. He acted upset about the incident and "said he would look into it." He then went on to say that maybe I would be happier working in a different division at the agency or maybe the agency was not a good fit for me.

It is clear I was harassed and targeted for addressing and unearthing gross abuse of power by the agency. Peake has set a pattern of abuse of power and misuse of the intelligence division to intentionally harass and target citizens who simply make true statements about the agency.

I firmly assert that I was intentionally targeted to smear my name to offset the potential of whistle blower allegations. I have extensively documented this incident and my attorney has made contact with the individual who was the focus of this harassment. I am 100% certain that this incident was never documented and never investigated by the PCSO

The agency is in direct violation of federal Whistle Blower Protection following this incident.  I was unfairly treated, harassed, and had my statements falsely misrepresented in order to cover up the wrongdoing of the Major.

# EXHIBIT K



# ILP Manual

## Pasco Sheriff's Office

Revised 1/7/2016

# Foreword

"Improvise, Adapt, and Overcome" is a mantra engrained in organizations that constantly address complex situations and then develop solutions to be successful. Since the Pasco Sheriff's Office implemented Intelligence Led Policing (ILP) in 2011, we have continuously been in the process of improvising, adapting, and overcoming to consistently create positive results in our operations.

Early on, we learned that processes in ILP must continuously adapt as the nature of crime and the threats to our community change rapidly. What may have worked yesterday, may not work as well today, and will be ineffective tomorrow. We know that we must consistently look and create best practices to address issues, design guidelines that will allow for innovative and creative solutions, and utilize intelligence and information to help us make the best decisions.

An element of success is innovation. It is the ability of our members and citizens to be able to develop strategies to address emerging issues, formulate a plan, and quickly implement it. Speed is critical to success and bureaucratic processes that delay implementation must be overcome. To allow innovation to flourish, we must be brilliant at the basics and in our operations. There should be standard procedures in place to address the issues we routinely face. Once we instinctively handle common issues, we can flourish in innovation on how to proactively address future concerns before they arise.

Communications between our members and citizens is also a key component to success. Through crime prevention measures or just simple open dialogue of crime in the community, we can work together to find solutions. If we do not provide our citizens information, they will receive it another way that may not be factually accurate. Communication through technology is rapid and our law enforcement agency should be the first to inform the public of emerging issues, how to protect themselves, and how we are serving them. If we do not communicate the message to our citizens, someone else will.

One of the most important elements to success is our members understanding and believing in the mission along with valuing their input. Every member of this agency should be able to answer the question: Why? Why do we operate the way we do? Why do we follow the doctrines of intelligence-led policing? Why am I important to the process? When a member of this organization can answer the "why" they will then proceed with: How can I make us better? Our philosophy is not just a "saying", it is our business model. It is imperative that supervisors understand our model and continuously teach it and allow feedback on how we can improve it.

The process of intelligence-led policing will continue to change as threats emerge, technology advances, and innovation leads to new processes to address issues. We will continue to improve and this living document will continue to transform. When we see a new crime trend developing, a bureaucratic issues getting in the way of progress, or a quality of life issue affecting our citizens, we will find a way to improvise, adapt, and overcome. This is the foundation of continuous process improvement and of how our organization should operate.

Chris Nocco, Sheriff
Pasco Sheriff's Office
We Fight As One

## Section One:  An Overview of Intelligence-Led Policing (ILP)

There are many approaches to law enforcement that have been implemented in various agencies throughout the country. Each law enforcement executive had a reason why he or she chose a particular philosophy. Whether in response to a specific need or to help receive available grant money, each philosophy has its own strengths and weaknesses. One of the benefits of Intelligence-led Policing is that it embraces the best aspects of other philosophies into one business model.

In his book bearing the same name, Dr. Jerry Ratcliffe, one of the foremost authorities on the topic, defines Intelligence-led Policing or ILP as "a business model and managerial philosophy where data analysis and crime intelligence are pivotal to an objective, decision-making framework that facilitates crime and problem reduction, disruption and prevention through both strategic management and effective enforcement strategies that target prolific and serious offenders." (Ratcliffe, 2008)

While ILP represented a paradigm shift in the focus or approach to law enforcement, it is not a complete departure from existing successful practices, as mentioned. Rather, it is a new approach to policing that utilizes the most effective aspects of existing policing models such as the traditional policing model, community oriented policing and problem oriented policing to achieve goals of crime reduction. To gain a better understanding of ILP and how it differs from other established models, Table 1.1 illustrates five well known policing models and their unique characteristics. ILP embraces a "top down" management approach to determine priorities through extensive use of intelligence analysis with additional prioritization on prolific offenders and problem areas. The model depends on analyzing information gathered from a multitude of sources at every level of the agency to create useful and actionable intelligence. ILP embraces a "top down" management approach to determine priorities through extensive use of intelligence analysis with additional prioritization on prolific offenders and problem areas. The model depends on analyzing information gathered from a multitude of sources at every level of the agency to create useful and actionable intelligence.

Table 1.1 (Ratcliffe, 2008)

**Supervisory Expectations:**
The intelligence-led policing philosophy in place in our agency has a proven track record of success. Like any successful initiative, ILP will remain successful only if it remains flexible and adaptable to change and is supported by leaders within the organization. Though by design ILP is

a top-down management philosophy, the most important leaders in this process are our sergeants and lieutenants.

# Section Two:  Core Components of ILP

## Prolific Offender Identification

A small minority of offenders commit significant amounts of crime. Identifying and targeting these "prolific" offenders is a central strategy in ILP and may be the best way to use our scarce police resources. Some studies show 6% of the criminals commit 60% of the crime and others point to 20% of the criminals committing 80% of the crime. Regardless, with limited resources, it is incumbent on us to focus our efforts on those criminals who we have reason to believe are frequent or prolific offenders.

As new information is learned, it is important to share this information with investigators and the analysts in the ILP Section.

While a standardized definition of a "Prolific Offender" helps align our agency's strategy, it is important to recognize that crime and criminals are ever-changing and no definition written can capture every type of situation. Criminal events such a violent crime spree or serial rapist for example may necessitate temporary realignment of focus.

Pasco Sheriff's Office Definition of a Prolific Offender:
*A person of any age who meets or exceeds a threshold calculated by weighting their three year history in Pasco County, Florida of arrests and suspicions for burglary, theft, narcotics violation, robbery, and/or any other forcible felony. A prolific offender must have been arrested at least once.*

Offenders in Pasco will be considered to be "prolific" based on the frequency and types of offenses they have committed or are suspected of having committed.  These offense types include burglaries, thefts, narcotics violations, and forcible felonies. The time since their most recent offense, and the age of the offender are also factored into the definition.

## Limitations:

To maintain a reasonable focus, other crimes such as negligent abuse and fraud are not used to identify prolific offenders.  Some prolific offenders will have only burglary offenses, while others will have mainly robberies or narcotics.

## Offenders:

Offenders often follow trajectories of activity and eventually "age out" due to maturity or personal circumstances.  To account for this, age and time since the most recent offense are factors which diminish the potential for an individual to reoffend.

## Source data:

The definition of a prolific offender will be based solely on information in the Records Management

System (RMS). While offenders may have committed offenses in other jurisdictions, or for which they were not suspected, using RMS data will allow for a quarterly snapshot of verifiable crime. Robberies, burglaries, auto burglaries, and motor vehicle thefts make up the "Big-4" in Pasco. To this definition, all other thefts, narcotics violations, and all other forcible felonies have been added.

**Offenses:**

Being arrested or being entered as a suspect both contribute to the definition of a prolific offender. A prolific offender must, by definition, have been arrested at least once. This requirement is to avoid unjustified identifications such as an irate neighbor causing an individual to be the suspect in numerous cases which never lead to an arrest.

**Predictability:**

Identification as a prolific offender does not guarantee that the individual will reoffend. The relationship is merely a correlation between past and present behavior which may or may not predict future behavior.

**Timeframe:**

In studies of the PSO RMS offense information, three or four years of historical data allowed for the best predictor of future offending. The accuracy was highest for predictions extending out for six or nine months. Three years of history are used in the PSO definition.

**Selection:**

To be selected as a potential prolific offender, the individual must meet at least one of the following criteria:

1. Arrested for at least one forcible felony (due to the potential or inherent violence),
2. Arrested for at least three burglaries, thefts or narcotics violations,
3. Arrested for at least two burglaries, thefts or narcotics violations with at least two additional suspicions, or Offenders are qualified for selection using a minimum set of criteria and then scored and ranked to identify which are prolific offenders.
4. Arrested for at least one burglary, theft or narcotics violation with at least four additional suspicions.

Once selected, individuals are scored and ranked by the number and severity of offenses committed, age, and inactivity since the most recent offense.

**Prolific Offender Scoring:**

The scoring is based on the same types of offenses as is the selection process, but multiple arrests on the same day are compressed into a single arrest. The scoring is totaled as follows:

1. 4 points for each forcible felony arrest,
2. 2 points for each forcible felony suspicion,
3. 2 points for each burglary, theft, or narcotics violation arrest, and

4. 1 point for each burglary, theft or narcotics violation suspicion.

This total score is then reduced for both aging offenders and those who have not offended recently.
The score is reduced by one percent for each year the offender has aged over twenty. The score is further reduced by ten percent for each year since their most recent arrest. Individuals with at least nine points under these conditions are identified as Prolific Offenders according to the PSO definition.

### Examples of Prolific Offender Calculations:
The following four examples show how prolific offenders are identified (the names have been changed):

1. Ari Haswari (11/17/1983) during the past four years was arrested for 19 offenses from the burglaries, thefts, and narcotics violations category (most recently a year ago). His 38 points are reduced by ten percent for the one year of inactivity and by 12% due to his age of 32. His modified score is 30.4, well over the 9.00 needed to identify him as a prolific offender.

2. René Benoit (03/06/1996) was arrested for one forcible felony and eight other considered offenses. His most recent arrest was two and a half years ago and he is under twenty years old. His unmodified score is four points for the robbery and sixteen points for the other offenses for a total of twenty points. This score is reduced by 25% because of his two and a half years of inactivity. His age is under twenty, so there is no age modifier. His modified score is 15.0 (over 9.00) so his is also identified as a prolific offender.

3. Nikki Crawshaw (11/11/1988) had one forcible felony arrest and three other arrests for an unmodified score of 10. Her most recent arrest was the prior month and her score is reduced by six percent due to her age of 26. The resulting modified score is 9.4, so she is identified as a prolific offender.

4. Tiffany Chase (12/27/1974) had six burglary, theft and robbery arrests for an unmodified score of 12. However, due to a year and a half of inactivity and age, her modified score is 7.9. She is not identified as a prolific offender.

### If an individual is NOT considered a Prolific Offender by ILP:
If an individual has not been identified as a Prolific Offender by ILP because of a limitation in criminal history, RMS data, or any other indicator, the following Prolific Offender definition may apply:

A person of any age with 7 or more verifiable instances of criminal activity related to residential burglary, auto burglary, grand theft auto and forcible felonies within a three year period.

### Performance Expectations:

- Learn as much as possible about prolific offenders in their assigned area to include their acquaintances, vehicles, locations frequented, previous M.O. for offenses, documenting accordingly, vehicles owned, etc.
- Maintain knowledge and situational awareness of probationers in the area.
- Develop and maintain rapport with investigative units.
- Provide timely documentation of contact with offenders via reports, tips, etc.
- Strive to identify those people who may be prolific offenders and are not already identified through other means. Draw from calls for service, investigations, information obtained from citizens or informants, reading morning reports and other products disseminated by ILP, and participating in actionable intelligence meetings to identify offenders who you commonly deal with and who are responsible for crime trends within your assigned area and communicate these individuals to ILP.

**Supervisory Expectations:**
- Ensure and reinforce subordinate's knowledge of prolific offenders within area of responsibility through roll call briefings, small group intelligence sharing, etc.
- Manage the process of prolific offender monitoring through effective strategies that do not create unnecessary redundancy. Example: While all deputies within an assigned area should have situational awareness of the prolific offenders in their area, only one deputy per platoon should be specifically responsible to monitor a specific offender. Otherwise, a deputy could knock on the offender's door at 8 am and another deputy could stop by at 9 am. This is not the most effective use of time and it is the supervisor's responsibility to prevent it from happening. By ensuring that all contacts are properly memorialized, this can be prevented.

**Management of Crime and Disorder Hotspots**

The research overall strongly supports the position that hot spots policing can have a meaningful effect on crime without simply displacing crime-control benefits to areas nearby. In Pasco County, areas we have designated as part of the Strategic Targeted Area Response (STAR) are locations where crime is persistently dense over an extended period of time. Generally, each STAR area accounts for 20-25% of the total amount of auto burglaries, burglaries, auto thefts and robberies for that district.

**Performance Expectations:**
- Learn the location of the STAR for your assigned district.
- Strive to gain understanding of the STAR with a focus on whether the problem is due to the location, offender, or victim and the opportunity being seized by the offender.
- Develop knowledge of offenders living or frequenting the area.
- Develop and maintain rapport with deputies assigned to the STAR.
- Use Crimereports.com, One Solution and other available resources to remain abreast of existing and emerging crime trends in your area. If you continuously respond to the same location, try to identify the underlying cause of the problem and what options are available to adequately address the issue to prevent future calls. Think outside of the box and not every solution needs to be a law enforcement solution. There may be other

services or agencies throughout the county that may be able to assist with addressing the issue. Law Enforcement may just need to be the impetus to bring about a solution to the problem.

## SARA Problem Solving

An effective means to assess known problems and problem areas is the use of the SARA model, which stands for scanning, analysis, response and assessment. This is a valuable tool to use when assigned to address a specific issue or problem in the community. To have an impact on crime, it is necessary to *reduce, prevent* or *disrupt* criminal activity. The most effective approach to law enforcement is an integrated strategy that combines some of the benefits of problem-oriented policing with the targeted and objective approach of proactive policing and Intelligence-Led Policing.

**Scanning** is where the problems are identified. This involves looking at data, talking to people, and observing the community in order to identify, define, consolidate and prioritize the problem.

**Analysis** involves studying the problem to determine if it deserves concerted attention and, if so, trying to develop accurate descriptions and explanations. The analysis step is the heart of the SARA Model.  Human nature is to go from the identification of a problem to a response to the problem without knowing everything there is to know about the problem and with even less analysis of this information.

**Response** involves searching for a wide range of solutions and choosing and implementing the ones with the most promise.

**Assessment** involves collecting data after the response to determine if the problem has been eliminated or at least reduced. If success has not been achieved, then further analysis and a different set of responses may be needed. This stage is often forgotten or people get so committed to the solution they designed that they are reluctant to go back to the drawing board.



Figure 1:
**Problem-Solving Triangle www.popcenter.org**

If it is a "place" problem, try to identify what about the place is attracting crime. Try to determine what location and conditions are present at the time of each crime and what threads may connect the incidents? Once these causal factors are determined implement preventative measures that will reduce the potential for crime by adding appropriate "controls" that increase the risk of detection and apprehension. . For example, if there are numerous foreclosed houses in the area in disrepair, work with Code Enforcement to address. Determine if the crimes are occurring along frequently traveled routes that criminal may use and determine if there are opportunities to alter or impact these paths.

If it is a "victim" problem, consider marketing campaigns directed at the residents/businesses outlining what they can do to mitigate their potential for victimization. Examples include flyers, electronic signage, community meetings, newsletters, etc. If a number of cars were burglarized, all of which were unlocked, or illegally parked on a street, consider an educational campaign throughout the community using crime prevention materials, social media, and citizen contacts. Be sure to have a coordinated effort that is approved by your District Commander to guard against duplication of efforts.

**Performance Expectations:**
- Focus on each individual step in the SARA process separately.
- Determine the impact of the problem on society.
- Break down the problem into smaller questions as part of the analysis process such as: "Why is it happening here and not somewhere else?" "How long has it been happening and why did it start?" "Will the problem recur or return once law enforcement leaves?" Will you eliminate, reduce, displace, prevent, or do something else with the problem?
- Be sure to consider all options. Even options that are not plausible as a whole may have aspects that are worth considering.

- Focus on the outcome achieved during your assessment. Do not focus merely on outputs or how much work was put into the problem.

**Supervisory Expectations:**
- Maintain an excellent working knowledge of the STAR within your area that goes beyond the geographic boundaries of the STAR.
- Know which crimes are causing the hotspot to occur within the STAR.
- Know time of day, day of week (TODDOW) and MO patterns that are existing within the STAR and coordinate with the STAR supervisors to address those issues specifically.

## Application of Preventative Measures

Crime prevention is the key to long-term crime control but greater crime prevention can also improve our ability to bring serious and prolific offenders to justice. Prevention is vitally important to any Intelligence-Led Policing agency. Recognizing patterns and working to disrupt those patterns though public awareness efforts can occur in many forms. From increased tactical patrol of high crime areas to community meetings to elaborate community events to social media postings, all members should innovatively and collaboratively focus on preventing future crime from occurring.

Traditionally law enforcement executives (decision makers) have not maintained a great deal of enthusiasm for crime prevention. The majority of law enforcement management policies tend to stress a bias for enforcement action [solely] as a first step in controlling criminal activity and little attention is given to instituting mechanisms that would promote crime prevention or reduction. The Pasco Sheriff's Office embarked on a paradigm shift by utilizing the Intelligence-Led Policing model to achieve a holistic and layered approach to crime control, prevention, and reduction. Ratcliffe cites crime prevention as the key to achieving meaningful long-term crime reduction and when institutionalized, crime prevention can also be a catalyst for improving an agency's ability to bring serious and prolific offenders to justice. Prevention is a vitally important, yet often overlooked, component of the Intelligence-Led Policing management model that must be implemented by any agency desiring to achieve meaningful crime control.

The overwhelming majority of crime occurring in the United States is that of opportunity based offenses in which crime prevention can play a role in reduction and displacement. Recognizing crime patterns and working to disrupt those patterns is a key to crime reduction. Likewise, identifying attractive targets (present or future crime victims) and instituting mechanisms intended to improve the environments capacity to displace opportunistic offenders can also lead to a reduction. The success of these prevention measures may be realized through a variety of means. This may involve the training and education of law enforcement personnel in modern crime prevention techniques and principles such as Crime Prevention Through Environmental Design (CPTED) that address crime control in both the social and built environments. Public awareness efforts can also be helpful and may occur in many forms. This may include the use of business and community meetings, webinars, social media, and community based training initiatives. Other forms may entail increased tactical patrol of high crime areas with a layered approach to crime control that encompasses enforcement, education, and empowerment (prevention). How does this all fit together? While crime prevention is a stated aim of

intelligence led policing, the focus on prolific offenders reduces crime if the correct "four of five offenders that find themselves incarcerated are responsible for a significant portion of the 1,000 crimes committed". Prevention further benefits by disrupting the activities of prolific offenders. (Ratcliffe).

**Performance Expectations:**
- Examine trends in your respective area of assignment and try to determine what opportunity the criminal is exploiting and plan prevention efforts accordingly. Crime patterns will relate to an "offender, place, or victim" problem.
- If it is an offender problem and there are no commonalities among the victims, pursue opportunities to strategically patrol the area during opportune times, visit prolific offenders in area, etc.
- If it is a place problem, try to identify what about the place is attracting crime and take appropriate measures. For example, if there are numerous foreclosed houses in the area in disrepair, work with Code Enforcement to address. Determine if the crimes are occurring along frequently traveled routes that criminal may use and determine if there are opportunities to alter or impact these paths.
- If it is a victim problem, consider marketing campaigns directed at the residents/businesses outlining what they can do to mitigate their potential for victimization. Examples include flyers, electronic signage, community meetings, newsletters, etc.
- Be sure to have a coordinated effort that is approved by your District Commander to guard against duplication of efforts.

**Supervisory Expectations:**
- Look for opportunities to be proactive and lead. This is a tremendous opportunity for supervisors to provide lasting problem solving options beyond merely arresting people. Supervisors should recognize this is historically an area where deputies have limited experience and expertise. The results may not be immediately apparent or even effective.
- It is incumbent on supervisors to look at a problem holistically and not limit the focus solely on enforcement. Recognize as a problem solver it is possible to make many arrests and be unsuccessful and it is possible to make no arrests and be entirely successful. The goal is to reduce crime and fear.
- Seek to determine the root cause of each issue and how to prevent it from recurring.
- Remain resourceful and make evidence-based decisions after referring to successful options as found in popcenter.org or other internal agency initiatives.
- Track the successes or failures of each initiative for which you are responsible through statistical comparative analysis. The ILP Section can be of tremendous value in this area.

**Effective Communication**

Inter-agency and intra-agency communication is a crucial component of the Pasco Sheriff's Office ILP Model. The elimination of "information silos" is an important first step and is in lock step with the *Intelligence Reform and Terrorism Prevention Act of 2004* (National Counter Terrorism Center, 2004) and the National Criminal Intelligence Sharing Plan (US Department of

Justice, 2003). "Information silo" is a term used throughout many business and governmental settings that refers to management systems incapable of reciprocal operation with other, related information systems.

Moreover, it is an attitude found in some organizations that occurs when several departments or groups do not want to share information or knowledge with other individuals in the same company.

Information silos are counter-productive to ILP and in stark contrast to our operational approach of "We fight as one." Therefore, it is incumbent on every member to make a concerted effort to share information regularly with members of other units as part of a formal and informal process.

Example #1:  Property crimes detectives should seek and share narcotics information with Narcotics detectives and vice versa. Patrol deputies should seek additional information from contacts on unrelated crimes. Example #2:  After completing an investigation on a loud music call, deputies should use the opportunity to ask the complainant about crimes occurring in that area.

While sharing information is important, there are certain types of information that are sensitive and should remain confidential for officer safety and to protect the integrity of an investigation.

**Performance Expectations:**
- On every call for service, investigate and document thoroughly. Once complete, prior to leaving ask the persons interviewed if they have information about any other crime they may want to share about offenders or offenses occurring in the area. (Use judgment when pursuing this opportunity. Victims/witnesses of many crimes may be too emotional to offer information or may feel you are being dismissive of their original complaint.)
- While transporting arrestees to jail, develop a rapport with the arrestee. If he or she has invoked Miranda, do not ask any questions about their crime whatsoever. However, you may ask them if they know of other crimes committed by other people. Document accordingly. Small pieces of information gathered this way has proven to be helpful toward solving crimes.
- Maintain situational awareness of your assigned area. Know the offenders, crime prone places and trends. As you gain information share it on a wide platform with your district and with ILP Analysts. While sharing with one detective is a good start, look for opportunities to share on a broader scale.

**Supervisory Expectations:**
- Time is not on your side! Once a crime of great significance or a trend, pattern or spree has been identified, supervisors are responsible for ensuring the proper stakeholders have the pertinent and necessary information to act accordingly. The swift, intentional notification of oncoming shifts, opposite sides of the schedule, neighboring agencies are crucial to effective communication.
- Sharing the results of successful (or unsuccessful) initiatives can lead to dramatically enhanced efficiency within the agency.
- Supervisors must maintain and must ensure deputies maintain effective situational awareness of crime trends and offenders within their area of responsibility.



## Section Three:  The Intelligence Cycle

The intelligence cycle is the process of developing unrefined data into polished intelligence for the use of command staff. While there are many versions of the intelligence cycle, the cycle articulated by the FBI best matches the philosophy and model of the Pasco Sheriff's Office. The

intelligence cycle consists of the six steps, described below. The above graph shows the circular nature of this process, although movement between the steps is fluid. Intelligence uncovered at one step may require going back to an earlier step before moving forward.

## Requirements

Requirements are identified information needs—what we must know to apprehend criminals, disrupt criminal patterns and prevent crime. Intelligence collection requirements are derived from many sources such as a detective requesting more information from a neighborhood experiencing daytime burglaries or a deputy requesting FIRs on any person riding a blue bicycle in a certain location on a certain day of week.

### Performance Expectations:
- Relative to the "Offender, Place, Victim" try to determine what is causing problems and what we do not know that we need to know. Go beyond just "Who is doing the crime."

### Supervisory Expectations:
- Supervisors must lead this process.
- Determine what you don't know that you need to know work closely with the ILP Section to observe year over year, month over month trends and patterns.
- Through enhanced communications, ensure that a duplication of efforts do not occur such as two platoons working on obtaining the same information.

## Planning and Direction

Planning and Direction is management of the entire effort, from identifying the need for information to delivering an intelligence product to a consumer. This step also is responsive to the end of the cycle because current and finished intelligence, which supports decision-making, generates new requirements. In the Pasco Sheriff's Office ILP environment, planning and direction is the responsibility of command staff acting on the needs of the county, crime trends and data provided by the ILP Section.

### Supervisory Expectations:
- Though a top-down approach, supervisors below the command staff ranks must still plan accordingly.
- Supervisors should regularly provide command staff with ideas to address emerging and existing threats.
- Supervisors must remain abreast and knowledgeable of successful former initiatives and response plans for a variety of crime situations to help operationalize current command staff initiatives.

**Collection**

Collection is the gathering of raw information based on requirements. Activities such as interviews, technical and physical surveillances, tip submissions, FIRs, and developing positive work relationships with community groups are examples of collection of intelligence.

**Performance Expectations:**
- Review the collection requirements and develop a strategy and tactics to gather and submit the information.
- Gathering information goes beyond generating large volumes of tip submissions and FIRs. One high quality tip or FIR is more valuable than hundreds of tips of limited value.
- Focus on developing rapport with citizens in crime prone areas.
- Solicit information from inmates during booking and classification processes.
- Solicit information from Pasco County residents who call into the jail by asking if they are aware of any illegal activities going on in their neighborhoods.
- Document and photograph scars, marks, and tattoos into RMS for use in investigative purposes.
- Document as much information as possible into RMS during arrest and booking while assuring a master name record that is unique without any duplication.
- Use ILO and IPS to regularly solicit information.
- Awareness of detention deputies to listen for discussions between inmates that may spur additional conversations and information.

**Supervisory Expectations:**
- Supervisors need to play a leading role in the collection process by placing a great emphasis on quality of information gathered.
- Develop a strategy for deputies to access and develop rapport with community members in the areas they serve.
- Ensure deputies are always seeking new sources of information to support the intelligence cycle.

**Processing and Exploitation**

Processing and Exploitation involves converting the vast amount of information collected into a form usable by analysts. Processing includes the entering of raw data into databases where it can be exploited for use in the analysis process.

**Analysis and Production**

Analysis and Production is the conversion of raw information into intelligence. It includes integrating, evaluating, and analyzing available data for the production of intelligence products. The information's reliability, validity, and relevance is evaluated and weighed. The information is logically integrated, put in context, and used to produce intelligence. This includes both "raw" and finished intelligence. Raw intelligence is often referred to as "the dots"--individual pieces of

information disseminated individually. Finished intelligence reports "connect the dots" by putting information in context and drawing conclusions about its implications.

**Dissemination**

Dissemination is the last step and involves the distribution of raw or finished intelligence to the consumers. It takes the form of intelligence bulletins, BOLOs, situational awareness bulletins, etc. This also includes presentations to the command staff. The command staff makes decisions—operational, strategic, and policy—based on the information. These decisions may lead to more intelligence requirements, thus continuing the intelligence cycle.

**Legal Considerations: 28 CFR 23**

Collecting quality information is a key component of ILP. However, it must be collected and maintained in strict compliance of federal law as outlined in 28 CFR 23:

- All projects shall adopt procedures to assure that all information which is retained by a project has relevancy and importance.
- Such procedures shall provide for the periodic review of information and the destruction of any information which is misleading, obsolete or otherwise unreliable.
- Information retained in the system must be reviewed and validated for continuing compliance with system submission criteria before the expiration of its retention period, which in no event shall be longer than five (5) years.
- (a) A project shall collect and maintain criminal intelligence information concerning an individual only if there is reasonable suspicion that the individual is involved in criminal conduct or activity and the information is relevant to that criminal conduct or activity.
- (b) A project shall not collect or maintain criminal intelligence information about the political, religious or social views, associations, or activities of any individual or any group, association, corporation, business, partnership, or other organization unless such information directly relates to criminal conduct or activity and there is reasonable suspicion that the subject of the information is or may be involved in criminal conduct or activity.

**Supervisory Expectations:**

- Supervisors must ensure deputies are compliant with 28 CFR 23 by governing their actions and focusing only on those people and activities for which there is criminal predicate.

## Section Four:  Roles and Functions of Key Players in Intelligence-Led Policing



For the purposes of this manual, the operational aspects of ILP will focus on three distinct groups: 1) command staff directing the priorities; 2) intelligence analysts interpreting data to influence decision makers, and 3) deputies, detectives and line supervisors actively carrying out priorities and gathering information and intelligence.

(Ratcliffe, 2008)

### Command Staff

The Pasco Sheriff's Office utilizes a "top down "approach to ILP as previously articulated. However, this should not be implied to mean that input, ideas and strategies at every level of the agency are not welcomed and encouraged. "Top down" in this context simply means that command staff members are actively receiving relevant, analyzed data from analysts and other members throughout the agency to help develop a thorough understanding of the criminal environment, and existing or emerging trends as a means of allocating resources and determining priorities.

### Criminal Intelligence Analysts

Understanding the "where, when, why and who" of crime is a fundamental step before deciding what to do to reduce it. Criminal intelligence analysts are tasked with gathering, analyzing, and interpreting this data from a wide array of internal and external sources to create tactical, strategic and operational intelligence products that meet both current and long term planning needs. Each district is assigned at least one criminal intelligence analyst and members are

encouraged to communicate, share pertinent information and develop a dialogue directly with them to gain and provide situational awareness for an area or existing problem.

**Deputies, Detectives and Line Supervisors**
There can be no ILP success without the full understanding and support of the mission by front line deputies and detectives and informed first line supervisors leading their efforts. Gathering data such as quality FIRs and tips in response to collection requests is a crucial role in helping us understand the criminal environment and solve crimes. Deputies can also engage the process by maintaining situational awareness about their respective area of assignment and learning the prolific offenders in that area.

# Section Five:  Intelligence-Led Policing Practices and Tactics

### Active Crime Enforcement (ACE)
ACE squads are a multi-disciplinary group of detectives responsible for aiding the agency in reducing UCR reportable crime; increasing the number of arrests of prolific offenders; increasing the number of clearances of Part 1 crimes; reviewing crime data provided by ILP and administering prevention measures to reduce specific crimes; and enhancing the communication of intelligence amongst all areas of the agency, notably within the Law Enforcement Bureau and the ICIB.

ACE will accomplish these tasks collaboratively with District Captains, STAR units, members of all investigative units and patrol deputies. The mission(s) may include a uniformed or plain clothes response to just occurred reported crimes and when necessary will assume a primary role in latent investigations. Additionally, they will be called upon to co-investigate crimes against property and crimes of violence when a prominent drug nexus is evident.

ACE is maintained within the Special Investigations Division and each ACE Team is assigned specifically to assist a district and supports District Objectives, STAR , Property Crimes and CID.  ACE. is the focal clearing house of intelligence and one member on each A.C.E. Team will have intelligence duties assigned.

The effort to collaborate on latent investigations and support other agency members is at the heart of this initiative. While overall global responsibility of ACE remains with the Special Investigations Division Captain, the District Captains shall determine the day to day operational activities of ACE. The District Captains define and develop the district's desired outcomes through scanning their respective district for significant crime-reduction opportunities that can best be impacted by and is consistent with s ACE's stated mission.

In collaboration with each platoon and ACE, District Captains are responsible for requesting additional resources when ACE Teams are unable to unilaterally complete and/or sustain desired outcomes. Priority is generally given to desired outcomes that are offender-focused.

Once each desired outcome is met, summary meetings with Patrol/ Special Investigations Division Captain are held to discuss recommendations to sustain efforts and/or to prevent the recurrences.

ACE Teams assist VICE Detectives with tactical operations when additional manpower is needed, however the inherent mission of ACE is to complement but not replace VICE functions

**Specific ACE Duties and Responsibilities:**
- Reduce UCR Reported Crimes, with specific focus on Part 1 crimes (Big 4)

- Increase Arrests of Violent and Prolific Offenders

- Increase Intelligence Communication

- Active Crime Enforcement (ACE) Objectives

- Mission-oriented tips that cannot be worked by Patrol and/or linked to a District Outcome (not drug related tips unrelated to UCR crimes)


ACE Teams facilitate Intelligence Gathering/Sharing through a variety of means to include:

- Weekly AIM meetings, Read-Off attendance, and continual dialogue with ILP

- Weekly sharing of informal and documented information for intelligence vetting by ILP and awareness to all members in the District. One member of each ACE team will also pass along any relevant information to STAR/District when ending each work week.

ACE Teams support Patrol/CID Investigations (Part 1) through tactical and strategic operations to include:

- Rapid Identification and Apprehension of Violent and Prolific offenders (including calls-in- progress)

- Responding to all Home Invasions with MCU, assisting with the location of offender(s), and conducting a parallel investigation when a narcotics nexus is determined. (Should not simply act as an arrest team)

- Participating in large-scale joint operations (Warrant Round-Ups, EAPs)

- Being On–call for home invasions and violent crime trends

- Assisting Patrol/CID Units with all real-time leads to identify offenders during call-outs.


**Actionable Intelligence Meetings**
The weekly Actionable Intelligence Meeting (AIM) is comprised of at least one representative from every section in the agency in order to include areas that might not on the surface seem to have a role in such a meeting such as Court Services, Court Process, Child Protective

Investigations and School Resource. These areas can contribute a wealth of valuable information generated from their unique area of operation. Also in attendance are our media relations members and those members whose duties are primarily prevention based. Department of Juvenile Justice, Probation and Parole, other state agencies, and law enforcement agencies within and surrounding Pasco County also attend.

The focus of AIM is on hot spots, trends, prolific offenders, and information sharing. It also serves as de-confliction between units who unknowingly may be working the same target. Each meeting is based on crimes affecting each of our geographic districts. The intelligence analysts begin each meeting with offender and trend data for the area in question. Detectives, patrol deputies and all others weigh in on the information presented. While this meeting is moderated by a lieutenant or sergeant, it is not a roll call style meeting. It is a free flow of information by attendees who sit at a table in a large circle.

In addition to the inherent information sharing, the meetings also serve to eliminate the aforementioned "information silos." With obvious exceptions, all units are required to share the persons and areas of focus to allow for a holistic approach to solving their problems. In other words, we seek to integrate an "all crimes" approach to every case. For example, rather than working a drug dealer for drugs only, we would seek to integrate Economic Crimes, Property Crimes and Major Crimes when possible to explore other crimes that may be related to the suspect's drug involvement.

Although most types of cases investigated by Major Crimes are not UCR offenses, Major Crimes Detectives can contribute information on high-profile investigations that may affect other sections within the agency. In addition, many of the cases have a drug nexus so the meetings serve as a forum for Major Crimes Detectives to be able to communicate with Vice & Narcotics Detectives and the deputies who work the zone of the offense who may have valuable information to provide. Major Crimes Detectives should look to identify patterned offenses (typically robberies and sexual assaults) and communicate those patterns during Actionable Intelligence Meetings for dissemination to the rest of the agency.

While this meeting is moderated by the District Captain who will begin and end the meeting, the meeting should be used to exchange information with other district members, so it is vital that all sections within the district, as well as outside agencies, are represented.

**Performance Expectations:**
- When scheduled to attend the AIM Meeting, please bring information to share with the group on cases or persons of interest.

**Supervisory Expectations:**
- The information that goes into these meetings, as well as the products and initiatives that arise from these meetings are key components of a successful ILP program.
- Supervisors should ensure their deputies are prepared to share meaningful, actionable information when attending these meetings.

- Supervisors must provide a mechanism for the deputies attending these meetings to disseminate the information learned to the appropriate stakeholders within their area.
- Supervisors must coordinate with the chain of command to ensure a strategic operational plan is orchestrated from applicable information.

**Crime Prevention**

A key component of ILP is our agency's effort to reduce and prevent crime from occurring. A key component of preventing crime is to provide information to citizens and businesses through a variety of means to create awareness. The goal is to cause self-induced behavior modification to make them less likely to become victims of crime, thus effectively reducing incidents of crime.

Law enforcement agencies have long known the benefits of keeping the public informed about the state of crime in their community, and what the agencies are doing about it. This has historically been conducted via face-to-face meetings with individual citizens or citizens groups. Modern technology has also increased the capabilities available to law enforcement agencies in the ways that this awareness can be created in citizens.

The Pasco Sheriff's Office currently conducts information dissemination for the goal of creating awareness in citizens via the following techniques:

- Online resources such as websites, email distribution groups, social media accounts such as Facebook, Twitter, and YouTube; cell phone apps.
- Handouts, flyers, magnets, DNA kits, other giveaway items.
- Publicity campaigns such as Keep What's Yours, Lock Your Doors, Shoplifting PSAs, Don't Drink and Drive.

Forming sustained relationships with the public serves to reduce crime, inform the public and foster better relationships between law enforcement and the citizens we serve. Examples include:

- Neighborhood Watch Programs/Security Patrols/Business Watch Programs;
- Speaker's Bureau;
- Financial and other Industry-based programs;
- Pasco Police Athletic League, and Faith-based initiatives such as Celebrate Recovery and Renew Pasco.

**Supervisory Expectations:**

- Prevention is a crucial key component requiring supervisory input and direction. Many, if not most, deputies do not have backgrounds or experience in this area and may not know when and how to successfully engage in prevention activities.

- Not every crime trend or incident requires action. Similarly, not every crime trend or incident requires substantial action. Each prevention activity must be tailored to the unique situation.

- Supervisors need to be cognizant of and always searching for opportunities to inform and form alliances with the public.

- Supervisors need to lead with a mindset of, "If we did not have the power to arrest anyone, how could we solve this problem?" as this will force other options to be engaged or at least considered.
- A supervisor's goal is to reinforce the agency's mission to reduce crime and fear. Prevention are two very important tools in this arsenal.

## Community Meetings

Developing rapport with, and informing, the public is a valuable tool in an intelligence-led policing environment. An effective way to accomplish this is to meet with the public in both formal and informal settings. Community meetings can be large, pre-planned organized gatherings of hundreds of people or can be as simple as a handful of concerned residents meeting in a living room.

Traditionally, members have viewed this as an activity to be coordinated by personnel assigned exclusively to a crime prevention function and, in many instances; we have waited to be invited to such events. However, informal and formal community meetings are a quick and effective way for patrol deputies and detectives to communicate messages to the public about their communities and to receive information and feedback from the citizens based on how they perceive their community.

When a member determines a community meeting may be warranted, he or she should coordinate with their supervisor as well as the Community Relations Section to arrange the most appropriate venue, format and overall value before committing to such an effort.

## Performance Expectations:
- Look for crime patterns and trends that are impacting certain specific areas or a particular demographic component of our community. Once identified, look for civic associations, professional groups, etc., that are comprised of those members who would at least be open to hosting a meeting. Coordinate with your supervisor to include the district commander.

## Supervisory Expectations:
- Informing the public and reducing fear are responsibilities supervisors must consider or paramount importance.
- Supervisors should not wait to be assigned community meetings. Rather, supervisors should seek opportunities to engage the public in meaningful and relevant dialogue.
- Meetings can be elaborate agency-wide events or can simply be a handful of tenants in a shopping center or residents in an affected neighborhood. Often, the public is reluctant to request such meetings. Therefore, it is incumbent on deputies and supervisors to be assertive toward this goal.

## Cultivating Informants

Informants are persons who wish to share information on crimes and offenders. Confidential informants (CI's) are vital to many types of investigations. The motives for becoming an

informant can include financial gain, revenge, fear, reform, or expectation of a lighter sentence. The development and use of informants are largely discretionary, but the agency member must exercise the utmost care in the control of the informant. Informants are cultivated by several methods: telephone interviews, tips, arrests, intra and interagency employees. The informant process is vitally important to areas such as the Narcotics Section who oversee the confidential informant program. To determine the usefulness and reliability of an informant, the informant has to be fully debriefed to determine what criminal information he or she is able to provide. After attempting to verify the validity of their information in order to help solidify their credibility, they have to be assessed in light of everything the detective knows, to include their motivation for wanting to be an informant; they have to be appropriately documented; and a complete background check needs to be completed. The confidential informant process is very valuable to the intelligence process and is a highly sensitive aspect of law enforcement. However, there are significant liabilities and legal guidelines associated with the use of Confidential Informants.  Prior to taking any action regarding cultivating informants, members should consult their supervisor and be fully knowledgeable of and compliant with Directive LED 680.2, Informants in Criminal Investigations.

**Performance Expectations:**
- Not every person providing helpful information or acting as a confidential source is a confidential informant.
- Routinely seek information from and encourage the public to provide information on crimes and criminals.
- Members of the public wishing to be compensated should be referred to the appropriate investigative unit.
- No promises should be made as to compensation.

**Customer Service Unit**
The Customer Service Unit reads and reviews reports generated by Patrol to ensure proper classification, status type, follow up investigative unit, accuracy, overlooked details, and any discernable leads.  The unit also calls the victims of all "inactive" cases checking for new or updated information. Supplemental reports are completed on all cases to help develop leads, ensure each case is properly classified and prevent cases from "falling through the cracks." Additionally, the Customer Service Unit is responsible for handling complaints to include those generated through social media such as Facebook or Twitter as well as other non-traditional sources.

**Drug / Nuisance Location**

An integral component of the sheriff's mission in the reduction of fear and quality of life issues brought to our attention by citizens who often suspect illegal activity relating to drug transactions are occurring there.

**Performance Expectations:**
- Communicate with likely complainants, when possible, in order to determine and or confirm exactly what type of problem exists; is it a nuisance location or a drug location, or both.
- Research location to identify occupants and their associates.
- Employ covert surveillance techniques to confirm complaint and or obtain additional information concerning the location (ie: the utilization of unmarked, undercover type of vehicles).
- Complete directed patrols to conduct traffic stops for the purpose of evidence and/or intelligence gathering and potentially generating an informant.
- Assess the location for the existence of county code violations, and when applicable, cite the owner/tenant.
- Consider the employment of the Knock and Talk tactic.
- Consider the utilization of Parole and Probation, when applicable.
- Consider the sharing of intelligence to other members in order that enforcement can occur at all hours of the day and all days of the week.
- Commit to the utilization of these resources and tactics for an extended period of time or until the location is no longer a nuisance.

**Supervisory Expectations:**
- Supervisors must assume control and responsibility over this process.
- Ensure proper notifications to appropriate units and the chain of command.
- Enact safeguards to prevent redundant efforts and to ensure proper de-confliction protocol are followed.

**Enhanced Interviews**

When engaging victims, witnesses and suspects, members should make every opportunity to explore learning about the criminal environment. For example: when transporting a subject to jail on a drug charge, the deputy should ask the subject about other crimes they may be aware of and willing to discuss. A part of the interview process with offenders should also include questioning the offender about victim selection. For example, "Why did you choose 123 Elm Street to burglarize instead of 125 Elm Street?" or "Why did you choose this particular neighborhood?" As always, deputies should be mindful of Miranda concerns and not engage suspects about the crime for which they are suspected of committing once the suspect has invoked his or her rights.

**Enhanced Neighborhood Checks**

Traditionally, neighborhood checks have been used as a means to determine if any neighbor in the immediate area might have valuable information regarding a particular crime a deputy is investigating. These contacts can have additional value as they can serve to not only elicit

information from the public but they can also serve to inform the public. Through maintaining good situational awareness about crime patterns in their assigned zone, deputies can determine when an area is experiencing a crime trend and seek ways to inform other potential victims in the area. For example, if a deputy is investigating an auto burglary on Elm Street and knows there have been multiple burglaries in the area, the deputy can extend and expand the neighborhood check by distributing available crime prevention literature focusing on burglary prevention and awareness.

**Performance Expectations:**
- Approach the neighborhood check process as an opportunity to share information with the public in near real time about crimes in their area instead of merely a necessary component of an incident report.
- Identify "attractive targets" (potential future crime victims)
- Gather neighborhood intelligence; "Who do you know?" "What has been going on?"
- Share information and resources that are available to the community i.e. Pasco Sheriff's Office website (Community Resources)
- Educate the public on the Tip Submission link
- Look for opportunities to discover unreported crimes and potential evidence or valuable witnesses to possible trends.
- Access Crime Reports online to determine if there have been other similar crimes reported in the same general area and look for any similarities, possible leads, or property/evidence that may increase the solvability factors for the crime(s) being investigated.
- Identify location and environmental elements that are consistently present at crime scenes and make recommendations to victims to alter or remove elements that are attractive to criminal activity.

**Supervisory Expectations:**
- Supervisors must manage and direct this process to ensure efficient and proper utilization of this valuable tool. This may often mean returning to an area for follow up after the initial investigation is complete.

**Field Interview Reports (FIR)**
An integral part of solving crime is determining persons of interest in a particular area. An effective tool in doing so is the FIR. Often deputies use the FIR to document suspicious persons or vehicles. However, there is also value in using an FIR to document contact with nonsuspicious persons in a particular area at a particular time as a means of later contacting those persons as potential witnesses.

FIRs are different from tips and should be used in situations that have a closer relationship to crimes.

FIR Example: A neighborhood has been experiencing a high number of auto burglaries from 0100-0300 hours. While on patrol in that neighborhood during those times, you locate a male

walking down the street who lives a few streets away. He states he is merely out for a walk. A quick criminal history indicates he has prior arrests for auto burglary. An FIR should be completed.

Tip Example: Using the same scenario, while on patrol in the same neighborhood at the same time a resident exits her house and flags you down to tell you she has seen a white male on a red bike riding through the neighborhood every night between 0100-0300. A tip should be completed. (And possibly an Area Watch.)

**Performance Expectations:**
- Quality is far more important than quantity.
- Document the basis of the FIR. In other words, articulate why it was worthy of documentation and/or relate it to recent crimes in the area.


**Forensics**

Information collection is absolutely crucial to successful Intelligence-Led Policing and information can take many forms. A key form of information is the information and intelligence derived from crime scene evidence collection. Data gleaned from evidence such as tool pry marks, paint transfers, cloth marking, shoe/tire impressions and DNA is invaluable. When using the applied theory that a small percentage of criminals commit the majority of crime in the affected neighborhoods – the modus operandi of those criminals becomes extremely valuable information. Using other data such as Point of Entry (POE) patterns may further develop the probable "profile" of the offender. Successfully targeting known offenders may be enhanced by identifying certain trends and mannerisms used by those offenders. This is further confirmed through the proper collection and thorough analysis of physical evidence connected to the offenders.

Matching Forensic Investigators and Latent Print Examiners as liaisons with detectives and STAR affords our agency the opportunity to work proactively to reduce crime. Case reviews and AIM discussions allow Forensic Investigators to gain better understanding and cross dissemination of the physical evidence collected at previous crime scenes. This proactive dialogue better enables deputies and detectives to be mindful of what to specifically look for when targeting the suspected offenders in the targeted crime area.

**Inner Perimeter Security Team**

The Inner Perimeter Security Team (IPS) is maintained within the Court Services Division and each IPS Team is assigned to a schedule to assist as needed for intelligence gathering. IPS is the focal point of intelligence and each member of the IPS Team has intelligence duties assigned. IPS Teams also lead the bureau's gang initiatives, coordinating all comprehensive gang-related missions, and serving as liaisons to the Patrol Gang Intelligence Detectives. The Inner Perimeter Security Team facilitates intelligence gathering/sharing through a variety of means to include:

- Weekly AIM meetings, Read-Off attendance, and continual dialogue with ILP

- Collaborate with Detectives and Investigators to assist with any intelligence gathering required.

- Weekly sharing of informal and documented information for intelligence vetting by ILP and awareness to all members in the Detention Center.

- Remain proactive while in housing areas looking for information and intelligence.

- Closely follow the requests from inmates.

- Interview inmates to forward the information to the proper channels.

**Intelligence Liaison Officers- Court Services**

Intelligence Liaison Officers (ILO) are assigned to each area of the jail to include Intake and Release (Booking), Security Services (Inmate Housing), Bailiffs (East and West court) and every member of the Inner Perimeter Security (IPS) team. When a newly arrested individual is processed, an ILO assigned to the area will complete an initial interview. The Intake and Release ILO will review the arrestee's charges and location of arrest prior to the interview to tailor their line of questioning in accordance to the inmate's site of arrest and geographic location. An individual, who lives and commits their crimes on one side of the county, is not likely to have relevant information about the opposite side. Upon the completion of the interview, the ILO will conduct some research in reference to police reports generated to corroborate the information. Inmates are not questioned about the charge for which they are arrested. They are only questioned about other crimes in the community.

Security Services ILO's conduct interviews with inmates wishing to speak with detectives or wanting to give information. In many cases, inmates requesting to talk with a detective don't have detailed information. In this instance, the ILO is able to improve efficiency as it prevents the detective from making a wasted trip. Similar to Intake and Release ILO's, Security Services ILO's will conduct research prior to making contact with the inmate. ILO's primary focus is on the "Big 4" crimes: robbery, burglary auto burglary and auto theft. Though not the primary focus, most information offered by inmates pertains to drug activity.

One of the more important roles of the ILO's is to be the liaison for their platoons or squads. Other deputies are able to approach the ILO's for assistance and guidance when interviewing inmates. It is preferred deputies coordinate with their respective ILO prior to submitting a tip to ensure duplicate information is not being submitted.

**Intelligence Liaison Officers- Law Enforcement**

Each district is assigned an Intelligence Liaison Officer as part of an Intelligence Liaison Officer (ILO) Network. This network provides a better understanding of the crime picture for our deputies. It further expands our intelligence collection capability and allows for more informed decision making by our commanders to prioritize responses to crime problems, more effectively deploy personnel, and allow us to be more adaptable and responsive in preventing, disrupting, and dismantling emerging crime and terrorism threats to Pasco County.

Each ILO detective reports to the Property Crime lieutenant in their respective district, but works independently to collect crime-related and homeland security information from all the deputies, detectives, SROs and field sources within the assigned district.

The ILO detectives work closely with assigned ILP analysts to develop and evaluate actionable intelligence products for operational, tactical, and strategic decision making.  The ILO detective also attends Actionable Intelligence Meetings (AIM) and is the conduit for information and intelligence sharing within the district. Duties include but are not limited to:

- Promoting awareness and collecting information on active offenders, criminal networks, crime locations, and assist with the coordinated and collaborative response of actionable intelligence.
- Managing confidential informants, debriefing offenders, identifying and developing intelligence gaps, and collecting information pertaining to prolific offenders and STAR areas.
- Working closely with state and federal intelligence officers to manage intelligence information within the region or any other location that may impact Pasco County, while operating within the guidelines of the National Intelligence Model (NIM).
- Engaging with fusion centers, serve as liaisons to help facilitate our agency's participation in regional information exchanges
- Ensuring our agency is a full partner in all information-sharing processes, such as the Nationwide Suspicious Activity Reporting Initiative.

**Jail Call Monitoring**

The monitoring of jail calls is a very time consuming, tedious task; however, it can have great value. Our inmate telephone system is currently contracted by Inmate Calling Solutions (ICS). The platform provided enables the facility to monitor and record all outgoing calls from the facility. Approved users of the ICS platform have access to the following facets of the systems: monitor live calls, search for past calls, record calls to CD, call forward inmate calls to their office or agency phone, and identify the called party and their home address. Often times, after a detective has spoken with a subject, the subject makes telephone calls that include discussion on the topic(s) for which the detective and the subject were discussing.

**Performance Expectations:**

- Usually this function is used by detectives, however all deputies have access to this service. Deputies who see investigative significance in monitoring a particular inmate's calls can contact an intelligence analyst in the ILP Section to coordinate.
- Prior to using this service it is incumbent on deputies to ensure efforts do not conflict with those of other investigative units.

**Jail Interviews**
Review the jail logs for those who have recently been arrested. Based on a predetermined formula that should include charges for, or a history of, the "Big Four", respond to the jail to debrief the subject(s) on crimes aside from those for which he or she was arrested, unless they are willing to discuss the crimes they have committed. Approach the interview from an intelligence gathering mindset, not necessarily an attempt to enhance the case for which the subject is arrested.

**Jail Email**
The Smart JailMail system is an inmate e-mail platform which will provide the inmate population an electronic means to communicate with friends and family. Investigative units now have the capability to monitor all incoming and outgoing correspondence by many electronic search parameters, such as: Inmate name, nicknames, code words, date range, etc. Mail can also be flagged by keywords used in the email. Examples of some keywords: court, crazy, kill, escape, murder, gun, beat, drugs, etc. This list can be changed or updated.
Investigators may also request to receive a copy of all inmate email correspondence.
The information and intelligence the investigators are able to obtain will be extremely beneficial to the investigative process as it may lead to solving a crime or preventing a future crime from occurring. In addition to the e-mail platform this system is capable of displaying agency caught on camera photos and most wanted photos in an attempt to solicit information from the inmate population relevant to these documents. The investigators can also link an email address to the inmates account in order to receive an immediate blind copy of all the inmates email communications.

**Performance Expectations:**
- Usually this function is used by detectives, however all deputies have access to this service. Deputies who see investigative significance in monitoring a particular inmate's emails can contact an intelligence analyst in the ILP Section to coordinate.
- Prior to using this service it is incumbent on deputies to ensure efforts do not conflict with those of other investigative units.

**Jail Inmate Money Deposit System**
This system allows individuals to deposit funds into inmate accounts via various means, such as telephone, web-site, kiosks and Money Gram locations. These transactions are recorded electronically which provides our investigators a database to utilize when conducting investigations. Money transactions can be searched by inmate, depositor, type of deposit, amount of deposit, date range, etc. Correlations can be identified and are displayed in a map format to show depositors that are depositing monies into various accounts. All web-site deposits are tracked by I.P. address which helps in locating depositors that may be subject to investigation.

**Jail Video Visitation**
This system serves as the sole means of visitation for the inmate population. All visits are conducted through a video camera and monitor in lieu of face to face visits. All of these video

visits are recorded and stored for a minimum of 30 days on a recording server and are available for playback at any time. All of our investigative units have access to this system for the purposes of monitoring a live or previous visitation. The investigators are able to utilize various search parameters to assist them in locating the visit they would like to view. The investigators can also flag individual visitors or inmates so they can be alerted prior to the visit occurring.

**Juvenile Direct File**
When a member identifies a juvenile who they believe is a prolific offender, they should forward the juvenile's name to their respective analyst to conduct a review of F.S. 985.557(1)(b). The analyst will compare the juvenile's criminal history to determine if the juvenile meets the criteria to be direct filed as an adult.
If the analyst determines the criteria appears to be met, the analyst should then forward the juvenile's name to the respective Captain. The Captain will then send the following letter to the SAO, via fax, and maintain a copy of the fax transmittal page to verify receipt and promote accountability.


The letter faxed over to the SAO should be on official PSO letterhead and contain the following narrative:
EXAMPLE OF SAO LETTER
My team and I have identified a chronic juvenile offenders which I respectfully request the SAO Direct File as an adult in reference to any and all pending and future criminal charges.
A Pasco Sheriff's Office analyst has conducted a review of the criteria listed in F.S. 985.557(1)(b) and determined this juvenile appears to meet the requirements to direct file as an adult. The names of the juvenile is:
1.)     Name of juvenile, DOB, SS #
I am making this request due to the offender's extensive criminal history and in response to the adverse impact this individual has on the community when he/she is released from JDC.
If you have any questions or concerns about this request, please contact me.

**Knock and Talks**
Knock and Talks are employed in instances where there are allegations, preferably supported by other credible information, that a location, usually a residence, houses contraband. Typically, these are locations that detectives do not have informants available to purchase contraband, and the only logical method to determine if the contraband exists is to knock on the door and attempt to talk to those inside. The goal is to obtain consent to search from a resident with staying in the residence in order to find the contraband.

**Performance Expectations:**
- Deputies seeking to utilize a knock and talk should coordinate with the respective investigative unit as a means of de-confliction.
- Identify target residence and corroborate location with potential offenders.
- Conduct wants and warrants check on people suspected of living / being at the residence.

- Requires two deputies at a minimum: one deputy to search and the other to monitor for officer safety.
- Although most deputies will have operational BWCs, consider the necessity of obtaining written consent along with the verbal consent that should be captured by the BWC.
- Considerations need to be made with reference to a person's authority to authorize consent, the time of day/night, number of deputies present when consent is authorized, and offenders' ability to withdraw consent, the restricting of offender movements and when limited consent is given.  For these consideration, reference the various case laws associated with the circumstance.

**Supervisory Expectations:**
- Supervisors must assume control and responsibility over this process.
- Ensure proper notifications to appropriate units and the chain of command.
- Enact safeguards to prevent redundant efforts and to ensure proper de-confliction protocol are followed.


**Rapid Deployment**

Rapid deployment is a simple, yet effective crime fighting technique rooted in three simple goals: preventing crime; reducing the public's fear of crime; and solving crime.
Rapid deployment of resources is designed to address existing and emerging crime patterns, sprees or trends.   Studies have shown that a rapid, strategic and comprehensive response will significantly increase our ability to fight crime.

**Supervisory Expectations:**
Listed below is a scenario that explains and contrasts rapid deployment to how our agency has traditionally approach the same scenario:

Scenario:
Day shift deputies respond to six auto burglaries in the Forest Lakes subdivision.  It appears all the vehicles were left unlocked and there were no signs of forced entry.  The burglaries did not all occur on one street, however, they were in relative close proximity to one another.

Traditional Response:
In the past, we would conduct our normal neighborhood check and then contact night shift and said, "Hey…we were hit pretty bad in Forest Lakes last night, keep an eye out."  As we all know, this response is ineffective and inefficient.  We must, and will learn a better response.

New Expectation:
The Platoon Commander needs to know about these crimes as soon as more than one auto burglary is reported within a close geographic area so as to begin to consider the need for a rapid, strategic response.  If, in fact, it does appear to warrant a rapid response, the Platoon Commander will develop an Operational Plan. Listed below is an example of an Operational Plan using the same scenario:

- On duty lieutenant (or affected zone sergeant) develops an operational plan and starts an email thread to the other lieutenants, zone sergeants, STAR, ACE, appropriate detective sergeant, specialized units, SRO, ILP Analyst and district captain. The plan will contain the following:
  - A synopsis of the event, such as "multiple auto burglaries in Forest Lakes between the hours of 0330 and 0500 hours."
  - A list of the units that responded out to the initial scene, such as Patrol, Forensics, K9, Air, etc.
  - Any potential evidence, such as video surveillance, fingerprints, etc.
  - Items stolen (i.e. GPS, keys), if any, during the event or other important MO data.
  - List of any potential suspects, persons-of-interest information

- Each shift lieutenant, or anyone who has updated information on the operational plan, will add that information to the email thread, and send that email thread out via "reply all" so everyone in the email thread is aware of the update.
  Suggested actions to be completed by the Lieutenant include, but are not limited to:
  - Providing the ILP Section with BOLO information, to include videos or photos to be placed on Caught on Camera.
  - Contacting PIO with information to be placed on the Sheriff's Office Facebook page to include          photos or video footage, if available.
  - Contacting ILP Analyst to provide a list of warrants, juvenile pick up orders, potential subjects, etc. in the affected area so we can be begin to target criminal offenders who may be involved, or have information on who was involved in the criminal activity.
  - Contacting CSU to have a message board put in the affected area requesting citizens provide information, lock their cars, etc
  - Arranging for neighborhood canvassing, enhanced neighborhood checks, distributing "lock your door" hangers in affected area.  Any additional information on additional criminal activity should be submitted via a tip submission to Tipsoft.
  - Check for homes with video surveillance.  Ask to see video if there is any possibility the suspects may have passed by to and from the location of occurrence.
  - Contacting the SRO's to help develop intelligence and leads from students.
  - Contacting Classification section at jail to identify associates of people being sought, through things like visitor's lists, inmate mail, etc.
  - Consider contacting other agencies (if appropriate), such as Code Enforcement for assistance, or other nearby agencies (i.e. NPRPD, Pinellas S.O., TSPD to determine if they have experienced similar problems and if they have developed any leads).
  - Contacting that subdivision's HOA/CDD board member, if applicable, to provide and solicit information.
  - Contacting that subdivision's private contract security, if applicable, to provide and solicit information.

- Arranging for specialized units to assist with random patrols and to blanket the area, such as:
  - Warrants
  - Motors/Step
  - ACE
  - STAR
  - CSU (can help with neighborhood canvass)
  - SRO (after school hours)
  - Sex Offender Unit
  - DOC (Probation and Parole) for probation checks

Many of these task can and should be implemented immediately. Rapid deployment of resources is the key. Delaying implementation allows the possibility for the criminal element to continue unabated.

It is understood that all the listed tasks will not be completed by the day shift Lieutenant. Effective collaboration and communication is the key to seamlessly integrating these strategies and preventing redundant efforts. For instance, the dayshift Lieutenant may develop a list of warrants in and around the target area, however, they may not have had the time or the resources necessary to begin serving them. Any incomplete tasks are documented in the operational plan and passed to the night shift Lieutenant for completion. The night shift Lieutenant will then work on completing the tasks and adding new ones, if appropriate. This process continues until all necessary tasks are completed.

It is also understood that as new information arises, the plan may change. Therefore, it is crucial that the plan remain fluid and flexible to adjust accordingly. For this approach to be effective, all lieutenants must focus on the following:

- Know what crimes your people are responding to.
- Determine if the crimes are isolated or part of an emerging crime spree, pattern or trend.
- If determined to be an emerging crime trend, you will need to develop a strategic and comprehensive response.
- Immediately implement this plan and prepare to pass this plan on to the next shift Lieutenant for completion.

**School Resource Officers (SRO)**

SROs interact with middle school and high school students from within their school's geographic boundaries on a daily basis and are in a unique position to augment the agency's ILP efforts in several ways. SROs can offer valuable assistance in areas such as offender identification and intelligence gathering. Often SROs will hear about past, present or future crimes well before others in the law enforcement community.

**Performance Expectations:**

- Patrol deputies and detectives should become acquainted with the SRO(s) assigned to their area as they can serve as a very valuable source of intelligence.

- The SRO Section can serve as a quick reference point for all recent juvenile arrests including documents case number, arresting deputy/officer, and school attended by youth, charge.
- SROs are available to distribute "Caught on Camera" photos to staff at their school by email in an attempt to identify suspects.

**Social Network Analysis**

The Pasco Sheriff's Office recognizes the value of identifying criminal networks and formulating crime prevention strategies by focusing on the relationships and connections within the networks. Just as we have learned a small minority of offenders commit the majority of the crimes in our community, we have also come to understand these same prolific and chronic offenders are socially connected and their actions are often influenced or facilitated through various members of their networks. By understanding these relationships, we will be much more effective with our ILP crime reduction and prevention strategies. According to Dr. Fox, Mc Hale and Novak (2015), "accurately identifying and controlling deviant social networks can not only effectively reduce crime rates, but would also guide allocation of scarce resources to effectively accomplish crime prevention."

Social network analysis offers a unique analytical strategy for crime analysts to explore the social relationships between individuals and groups, and visually represent the relationships using sociograms. These visual maps allow analysts to examine complex data sets to discover the social structures of the network and identify members with the most influence or importance within the group. Unlike link analysis, SNA allows us to impact these human networks in the way we strategically engage members based on the group dynamics. For example, link analysis simply helps us take out the bad guy, but every time we take out the bad guy another one is waiting in the wings. SNA goes further to offer an understanding of the trusted offender network and consider the best strategies to disrupt, dismantle, or influence the group. If we can visually map out the relationship types, affiliations, business ties, and other connections, we begin to identify strategic opportunities to control the behavior of the network. Using RMS data, field intelligence, and feedback from our deputies on each sociogram, analysts and law enforcement can work together to illuminate these offender groups and plan effective interdiction strategies to prevent crime.

**Strategic Targeted Area Response (STAR)**

For a variety of reasons, crime tends to generate hotspots of activity. Some hotspot locations are short term (acute) problems while some are long term (persistent) problems. The key to effective hotspot policing is to identify areas that are acute *and* persistent and to disrupt the crime patterns, trends, etc.

The purpose of the STAR program and the related STAR teams, therefore, is to reduce and disrupt crime in each respective STAR area through utilizing a wide array of tactics.

Each STAR area is created by analyzing acute and persistent crime trends and patterns. In most instances, the STAR will represent an area that comprises both acute and persistent crime. The effort will focus on a particular area for a minimum of 90 days unless compelling data suggests

the underlying crime problem is no longer present. This defined area is also referred to as "The Box."

The STAR team primarily focuses on reduction of the patrol suppressible crimes referred to as the "Big 4" which are Robbery, Burglary, Auto burglary and Vehicle Theft. This is accomplished through working closely with patrol units, investigative units and community groups to identify and focus on prolific offenders impacting the area.

**Performance Expectations:**
Know where the STAR is in your district.
Know prolific offenders/persons of interest impacting the STAR.
Seek opportunities to innovatively impact crime, especially "Big 4" crimes in the STAR.
As a high crime area, develop and maintain rapport with STAR deputies and ACE detectives.

**Surveillance**
Surveillance may come in the form of mobile, stationary, electronic, aerial or foot surveillance. A pre-operative briefing should be conducted with all deputies involved to inform them of their expected duties and the goals of the operation. During this time, the lead deputy will communicate what the specified radio channel will be, who the target of the surveillance is and any other information pertinent to the target as well as the location or destination to be surveilled.  Consider the utilization of the unmarked /undercover vehicle assigned to each district.


**Tip Submissions**
 Often members receive information that does not necessarily warrant an actual offense incident report. Examples include information received from a citizen about potential offenders of certain crimes in an area, etc.

Once tips are submitted, the ILP Section will analyze the tip and the data will be stored in a database for future use. If the tip has current investigative value or relates to a specific investigation, it will be forwarded to the appropriate unit for follow up. The district secretaries, the ILP Section Tip Manager and the Narcotics Section Tip Manager all have access rights to close tips and it is important that each tip is properly closed when it is no longer immediately actionable.

Members have access to the tip management database for investigative purposes. Deputies may request a search on tips based on any key word that is listed in the original tip. For example, a search can be performed on the keyword "Spider" and the system will populate all tips where the word spider was mentioned in any way.

**Tip submissions are only one way to become engaged in Intelligence-Led Policing and the emphasis should remain on quality, not quantity.** Tips should not be submitted in place of an incident report or in addition to an FIR and when possible should contain actionable information

that can be analyzed to make arrests or prevent crimes. Deputies should not use the tip program as a replacement for taking immediate action or completing an offense incident report.

Example of a Good Tip:
*"While investigating a noise complaint at 123 Elm Street, the resident, James Smith, told me that his neighbor at 125 Elm Street, John Jones, approx age 35, has been bragging about all the stolen Ipads he has. Smith said Jones has even offered to sell him some Ipads a few months ago."*

Example of a tip with little value:
*"An anonymous subject approached me at 7-11 at Moog and US 19 and told me that a guy named Tommy is dealing drugs in the area."*

Narcotics Tip Criteria
For a tip to be assigned to Special Investigations, the tip needs to meet at least one of the following criteria. Detectives can be assigned tips not meeting these criteria as dictated by Supervisors. In no way do these criteria restrict a Narcotics Detective from working tips not meeting these criteria.

Prolific Drug Offenders (those with extensive long term history)
- Violent drug tips
- Methamphetamine Labs
- Marijuana Grow Operations
- Related to Confidential Informants
- Tips that provide information on open/pending cases
- Doctor shopping cases
- Specific drug information when there is a history present
- Gambling
- Gang Activity

Tips not meeting these criteria will either be closed out as information only, assigned to a patrol district, or placed on the District Quickr site for deputies to work.

# Section Six:  Available Tools/Resources

**Actionable Intelligence**
Each week, the ILP Section publishes an Actionable Intelligence product which also list intelligence gaps and requirements. As the name implies, this document lists areas where crime patterns are happening and additional information is needed to help improve solvability and gain situational awareness. Members are encouraged to use community contacts and enhanced patrol techniques to collect and submit information for analysis. Deputies should also consider the information contained in Collection Requirements as an opportunity to prevent crime through engaging proven crime prevention practices Deputies should also consider the information contained in the Actionable Intelligence weekly product as an opportunity to prevent crime through engaging proven crime prevention practices. It is important that deputies use this document as a source of situational awareness for their respective zone as it relates to critical intelligence gaps.

**Performance Expectations:**
- Review the Actionable Intelligence thoroughly upon receipt and seek opportunities to gather information/intelligence needed.
- Develop credible sources in and affecting your respective zone.
- Submit valuable tips and FIRs.

## Crimereports.com

Crimereports.com is an external vendor of the sheriff's office. All records management data is sent to this vendor on an hourly basis who then converts the information into a wide range of usable data such as offense mapping, hotspots, etc. Its CommandCentral feature starts with a real-time, customizable crime dashboard that gives deputies more than 1,000 ways to analyze and view crime data and information. Deputies can choose their preferred layout, what they want to see, and how they want to see it - including maps, area breakdowns, crime-type analysis, time of day/day of week analysis, and more. Each district ILP Analyst is available to provide training and to help customize each members "dashboard."

## Crime Stoppers

Crime Stoppers of Tampa Bay is a community based program, which is designed to bring law enforcement, the news media and the citizens closer together in an effort to combat crime and make the community a safer place to live.   Crime Stoppers acts as a clearing house for information... and encourages people who know about crimes or about people who have committed crimes to call and give Crime Stoppers details.  Crime Stoppers offers rewards to people who call. People remain anonymous when they call. They do not know the identity of people submitting tips or receiving payment/rewards.

On occasion, deputies will be assigned a Crime Stoppers tip to investigate. These tips are unique and come with a disposition form that needs to be completed for administrative purposes. Rarely, deputies will coordinate directly with Crime Stoppers. Tips received from Crime Stoppers will be processed by the ILP Section. On those instances when our agency desires to enlist the aid of Crime Stoppers, Major Crimes or the ILP Section will serve as the point of contact.

## Electronic Signage

An effective means to prevent crime, solicit tips to help solve crime, and inform the public about crime occurring in their area is usage of the electronic roadway signs. These signs are maintained by the Citizen Support Services Section. The most effective messages are those that are no more than three successive screens informing and directing the citizens.

## BWI

BWI is the pawn database to which all pawn transactions that occur within Pasco County are reported. BWI is the replacement for "FINDER" which was previously used by PSO. Authorized users can query transactions by several different search parameters, including Name/Seller, Vehicle/License Plate Number, and Article(s) pawned. To request a new user account, BWI can be accessed through the agency intranet page under Links.

Once a possible suspect is identified, for example, users can access BWI to determine if the subject has any recently pawned items that matches stolen property. A reverse search may also be performed and users can match unique pieces of property against items reported stolen. The Article Query Advanced Search Section of BWI is a valuable tool that can help aid in the apprehension of suspects. Another use of BWI is the Frequent Pawner and Scrapper Top Pawner option which has been utilized to help aid in the identification of potential suspects. This option may bring to light subjects that have been making frequent pawn transactions, but have not yet been identified as persons of interest in local criminal activity. For additional assistance, please contact an ILP Analyst.

## Mapping

One of the biggest innovations in law enforcement in recent years is the implementation of geographic information systems (GIS) or mapping. GIS integrates hardware, software, and data for capturing, managing, analyzing, and displaying all forms of information related to a specific geographic place of interest.

GIS allows us to view, understand, question, interpret, and visualize data in many ways that reveal relationships, patterns, and trends in the form of maps, globes, reports, and charts. Our mapping capabilities allow us to accomplish such tasks as defining where things are, quantities, densities, what's nearby and how conditions are changing. Common uses within our agency includes maps illustrating locations of crimes, offender addresses, persons of interest, hotspots, crime density changes and geographic profiling which examines the relationship of crime to offender locations.

## Social Media Analysis

Geofeedia is a social media management platform that lets members search, engage with, and analyze real-time social media content by location, from anywhere in the world, with a single click. Starting the search is as easy as drawing on a map. Members may search for any location in the world, from an entire city to a specific address, and visualize real-time, location-based social media content in a matter of seconds. This service allows members to discover and aggregate geolocation social media posts from any user-defined worldwide location, monitor multiple locations in real-time, archive, curate and share social media content, and analyze patterns and trends from location-based social media data.

## Surveillance Camera Registration

Security cameras are a valuable component to identifying criminals. As part of this effort, our agency uses the Crimereports.com camera registration program. Deputies can encourage willing citizens to assist our crime fighting efforts by securely identifying and registering the location of their residential or commercial security cameras. As users sign up, providing their contact information, camera information, and location, the information will automatically be available to you. Whenever there is a crime, you can access the list of registered cameras and contact the owners, saving you time and effort during emergency responses and investigations.

**Top 5 and Target of the Month**
The TOP-5 and Target of the Month are produced by ILP and are individuals identified as being the "worst of the worst." For an individual to be placed on this product, the question must be answered about him/her "if this person is removed from the area, will it result in a significant impact by decreasing crime in the area?" Along with this product will be tied the "spider chart" which will identify all the known associates of the target. The ILP district analysts will determine the appropriate targets for both products and present those name(s) to the district commanders. Both products will be presented by the analyst at the weekly district AIMs and at the quarterly AIMs. The TOP-5 product will be used for long term targets and the Target of the Month will be utilized for short term targets. Both targets will be on the ILP Intranet site and available 24/7 to all PSO members.

**TLO**
TLO is a web-based research tool allowing users to search for information on persons or places of interest. The search can be based on incomplete source information such as partial tags or vehicle information and is used to identify people and determine possible addresses, phone numbers, family members, and associates, among others. Deputies have full access to this program.

**Unified Report**
The Uniform report is a summary of the "morning report" with additional entries from the cities in Pasco County. Each report begins with a list of the "Big Four" patrol suppressible crimes, namely burglary, auto burglary, vehicle theft and robbery that occurred in the county during the previous time period.

Each daily report contains a list of the previous day's occurrences and the Monday report will contain the weekend data. In addition to this information being emailed, it is also available in the ILP Quickr site under the heading "Uniform Daily Report."

# Section 7:  Best Practices and Activities/ Operational Plan Examples

# Law Enforcement

- Learn as much as possible about prolific offenders, probationers and other persons of interest in your assigned area to include known acquaintances, vehicles, locations frequented, and previous M.O. for prior offenses, etc. Share this information via tips, emails, and other forms of communication with other stakeholders.

- Learn the location of the STAR and strive to gain a full understanding of the nature of the problems occurring. Develop and maintain rapport with deputies assigned to the STAR.

- Use Crimereports.com, One Solution and other available resources to remain abreast of existing and emerging crime trends in your area. Sign on daily to see where and when crimes are occurring.

- On every call for service, investigate thoroughly and look beyond the call for service. Once complete, prior to leaving ask the persons interviewed if they have information about any other crime they may want to share regarding possible offenders or offenses occurring in the area. (Use judgment when pursuing this opportunity.) Document accordingly via tip or offense incident report.

- While transporting arrestees to jail, develop a rapport with the arrestee. If he or she has invoked Miranda, do not ask any questions about their crime whatsoever. However, you may ask them if they know of other unrelated crimes committed by other people. Document accordingly.

- Approach the neighborhood check process as an opportunity to share information with the public in near real time about crimes in their area instead of merely a necessary component of an incident report.

- Seek opportunities to generate tips and FIRs as a means of gathering information and intelligence. Document the basis of the FIR or tip. In other words, articulate why it was worthy of documentation and/or relate it to recent crimes in the area. Quality is far more important than quantity.

- Review the collection requirement thoroughly upon receipt and seek opportunities to gather information/intelligence needed.

# Detention

- Interview inmates processed in booking for potential intelligence and tips. If TOP-5 is processed, interview and make mandatory notifications.

- Review email in Smart JailMail for potential information that can be used against the inmate or lead to additional tips.

- Take quality mugshots. Document scars, marks, and tattoos with good photos and descriptions.

- Enter as much information in JMS as possible during processing.

- Be cognizant of conversations amongst other inmates that may allow for investigation opportunities. Reach out to ILO and IPS if needed. Allow these interviews to occur in an environment that is away from other inmates to help protect the inmate and make him feel more comfortable.

- RapidID inmates to identify potential aliases. Query these additional names for potential warrants and add them to the master name record in RMS.

**Operational Plan-Rapid Deployment**
- On duty lieutenant (or affected zone sergeant) develops an operational plan, and starts an email thread to the other lieutenants, zone sergeants, STAR, ACE, appropriate detective sergeant, specialized units, SRO, ILP Analyst and district captain with the following:
    - A synopsis of the event, such as "multiple auto burglaries in Bridgewater between the hours of 0330 and 0500 hours."
    - What units responded out to the initial scene, such as Patrol, Forensics, K9, Air, etc.
    - Any potential evidence, such as video surveillance, fingerprints, etc.
    - Items the suspects took (i.e. GPS, keys), if any during the event
    - Any potential suspects, persons-of-interest information

- Each shift lieutenant, or anyone who has updated information on the operational plan, will add that information to the email thread, and send that email thread out via "reply all" so everyone in the email thread is aware of the update. The following are suggested activities to be completed by the Lieutenant (or affected zone sergeant):
    - Providing ILP (and possibly Crime Stoppers) with BOLO information, to include videos or photos to be placed on Caught on Camera
    - Contacting PIO with information so it can be placed on the Sheriff's Office Facebook page.  If video or photos are available, they should be provided to the PIO
    - Contacting ILP Analyst to provide a list of warrants, juvenile pick up orders, potential subjects, etc. in that affected area.
    - Contacting CSU to have a sign board put in the affected area requesting citizens provide information, lock their cars, etc.
    - Arranging for neighborhood canvassing, enhanced neighborhood checks, distributing "lock your door" hangars in affected area.  Any additional information on additional criminal activity should be submitted via a tip submission to Tipsoft
    - Contacting the SRO's to help develop intelligence and leads from students.

- Giving high school SRO's suspect vehicle information so they can check their student parking lot for similar vehicles.
- Contacting Classification section at jail to identify associates of people being sought, through things like visitor's lists, inmate mail, etc.
- Contacting other agencies, such as Code Enforcement
- Contacting that subdivision's HOA/CDD board member, if applicable, to provide and solicit information
- Contacting that subdivision's private contract security, if applicable, to provide and solicit information
- Contacting newspaper delivery persons, post office delivery people, mosquito control, etc. to give them information about suspects/vehicle description.
- Arranging for specialized units to assist with random patrols, to blanket the area, such as:
  - Warrants
  - Motors/Step
  - ACE
  - STAR
  - CSU (can help with neighborhood canvass)
  - SRO (after school hours)
  - Sex Offender Unit
  - DOC (Probation and Parole) for probation checks


**Operational Plan Outcome Examples**
**Auto Burglaries in Bridgewater Subdivision – Y3**
On 5/12/15 between 0400 and 0500 hours, eight delayed auto burglaries to unlocked vehicles occurred in the Bridgewater subdivision. During a neighborhood canvass, surveillance video from several residences was obtained and two suspects were seen committing the burglaries. Forensics and Property Crimes responded to the scene. An operational plan was put into place which led to the following results:

- An email thread was started by the dayshift lieutenant, with the details of the cases, to include MO, property stolen, investigation completed, and results of neighborhood check (surveillance video).
- The email thread was sent to all of the other D2 lieutenants, zone sergeants, property crimes sergeant, district captain, STAR, SRO, and ILP. The email thread continued from shift to shift with any updates to the investigation.
- An enhanced neighborhood check was completed which resulted in videos being obtained at 3 residences showing the suspects.
- Directed patrols were performed in the neighborhood by each shift.
- The video was submitted to Pasco SO PIO, and placed on the Pasco SO Facebook page.
- An electronic sign board was placed on Curley Road, at the request of the lieutenant, requesting citizens lock their cars, remove valuables, and report suspicious activity.
- Information about the crimes was sent to the Bridgewater HOA/CDD president to send out to residents.

- An anonymous tipster identified one of the suspects (juvenile) from the Pasco SO Facebook page.
- PCU detectives went to Wesley Chapel High and obtained the identity of the suspects, from school staff.  The suspects now attend James Irvin Educational Center.
- PCU detectives went to James Irvin Educational Center and confirmed the suspect identity with SRO.
- On 05/19/15, PCU detectives search and locate both suspects, and recover stolen property at their residences.  Both suspects arrested on 7 auto burglaries, as well as possession of a controlled substance.

**Armed Robberies/Attempted Armed Robberies to CVS/Mobil Gas/Taco Bell – Y4/Y6**
On 09/23/2015 at approximately 0158 hours and 0753 hours in Land O' Lakes and Wesley Chapel, there was an attempted armed robbery at Taco Bell, and two armed robberies at CVS and a Mobil gas station.  All three incidents have similar suspect descriptions.  During the Taco Bell attempted armed robbery, the suspect pointed a gun at the employees, but was unable to gain entry into the business and he fled on foot.  A perimeter was set, and K9 responded along with Hillsborough County Sheriff's air unit but the suspect was not found. Forensic responded to process the scene.  Hillsborough County Sheriff's Office advised they had a Robbery with a similar MO off Bruce B Downs at a pizza restaurant.

At approximately 0630 hours, day shift and night shift Yankee responded to CVS for a robbery call.  A masked suspect came into the store and demanded money from the cash register.  The suspect had what appeared to be a short barrel revolver.  After receiving money from the register, the suspect departed in a west bound direction on foot.  A perimeter was established and K9 and the air unit were called out. Other units from the agency also responded, to include D1 and D3 patrol and detectives, Warrants, Ag Unit, Motors, and Major Crimes.  Prior to K9, Air, and some of the other units arriving on scene, another armed robbery (see below at Circle K/Mobile) with the same suspect description occurred west of the CVS, so resources were deployed to that location.
At approximately 0753 hours, multiple units mentioned above were deployed to Circle K/Mobil for a robbery call with the same suspect description/MO as above incident at CVS.  The suspect ran out of the store in an east bound direction and got into a small blue vehicle and fled the scene.  The multiple units were deployed to various intersections to BOLO for the vehicle, but the vehicle was not observed.  The multiple units were then deployed to conduct extensive neighborhood/business checks in order to locate potential witnesses and video.  The FBI responded to the scene.

MCU arrested four suspects the night of the robberies due to the concentrated/coordinated efforts of all the units who responded to the scene.  This includes members from other districts. Responding supervisors should remember there is no longer a restriction on who they request to be deployed to assist in emerging crimes.  If units need to be pulled from other districts to assist, it should be done without resistance.


**Auto Burglaries/Grand Theft Autos - Y5**

On 10/07/15 the District 2 STAR Team conducted proactive surveillance in the Wesley Chapel area in reference to an emerging crime trend of auto burglaries and auto thefts from the area. At approximately 0235 hours, STAR Team members observed people in three vehicles committing burglaries in the Northwood Palms subdivision. When STAR attempted to conduct a traffic stop on the vehicles, they fled, so STAR pursued them. Eventually, STAR was only able to stay with one of the vehicles as they began to separate. The vehicle was pursued into Hillsborough and Pinellas Counties where the vehicle eventually wrecked and the driver was arrested unharmed. The D2 lieutenant monitored the entire pursuit and responded to St. Petersburg to help coordinate efforts. A subject was arrested on multiple burglary charges, vehicle theft, aggravated fleeing to elude, and aggravated assault on a law enforcement officer as he attempted to strike a deputy with his vehicle while fleeing. Through this case, the STAR Team was able to clear at least 10 cases with this arrest.

**Auto Burglaries – Y5**
On 10/07/15 at approximately 0515 hours, third and first shift along with K-9 and Air responded to Lexington Oaks after a citizen reported a burglary in progress. The first unit arriving went to the reporting person's location to obtain suspect information, while the next unit went to the Lexington Oaks exit, to stop all traffic leaving the subdivision. While each vehicle was checked leaving Lexington Oaks for the suspects, other responding units set up perimeter, awaiting K9's arrival. K9 Deputy Lennox was able to establish a track and apprehended three black males who were all from East Tampa.
Multiple PCU2 units responded to assist, and the three suspects were arrested for 18 auto burglaries and one grand theft auto, as the vehicle the suspects had arrived on scene in was stolen from Tampa.

## Section 8:  ILP: In Their Own Words

The information below is presented from the perspective of an actual patrol deputy who has proven to effectively utilize the practices, tactics and tools of Intelligence-Led Policing.

- *Make contact with convenience store clerks. They are a great source of Intel and the bad guys talk freely in front of them. If you have a good rapport with the clerks, they give you good info. They tell me what vehicles bad guys are riding in and who they are hanging with.*
- *Treat everyone you come in contact with respect, especially the ones you're arresting. I have numerous subjects I have arrested multiple times, that still give me good Intel, because I treat them with respect and don't demean them. I treat them the way I would like to be treated if I was being arrested, unless they are giving me a reason to treat them differently, at which point I let them know who's in control of the situation.*
- *Work people that hang out together. When you find there is a riff between subjects, especially subjects dating, use that time to your advantage. Angry girlfriends or boyfriends will give all kinds of info about what the other is doing when they're fighting.*
- *Talk with residents in problem areas, they see all that goes on but rarely call in the info. I provide my S.O. email address and ask them to send me tag numbers of vehicles and updates of issues they see going on. I also provide them the S.O. website info and how to send in tips. Taking a few minutes to go back and talk with neighbors afterwards goes a long way with them, and shows you care about what they are telling you, which usually results in better info from them.*
- *During traffic stops, if it's not a criminal citation, I use verbal or written warnings whenever feasible. If it is an arrestable offense, I'll let them sweat the thought of going to jail, and when they ask if they're going to jail, I tell them there's a good possibility, but let me see what I can do. I'll then try getting a conversation going with them to see what kind of Intel I can pull from them, I find that if you are vague with what info you're looking for at first, they'll usually start providing detailed info, and then let them run with it. Listening to them is key, if you interrupt too much, you'll lose the conversation. I'll then tell them that due to them being so helpful, I'm just going to write them a citation with a court date instead of taking them to jail.*
- *Run tags! I'll sit across from the convenience stores where I know my offenders in the area tend to hang out. I run tag numbers to see who is driving and if they're legal. It also lets me know who the subjects are, so when I have contact with them elsewhere, I call them by name. I find knowing subjects before you have contact with them, and then calling them by name when you have contact, confuses them, but gives me the upper hand. Then when I start conversing with them, they don't know what I already know, and during the conversation, I let them run on. I find the less I talk with them and just listen and acknowledge them, the more info they end up giving me without even knowing they're giving it.*
- *As with any dealings with offenders, they're going to lie. I let them lie to me, even when I know they are, and let them think they're getting one over on me. When I talk with other subjects about the same dealings, I pull the good Intel and do my best to separate the lies from the truth. I'll keep the lies they tell me in mind, and use it against them when it helps my cause, which then usually results in better Intel.*
- *Finally, the main thing I tell subjects, especially the offenders providing info, is that I will never put their name in a report or tell anyone they gave me info, unless I am ordered by court. I don't tell zone partners who gave me the info or tell other offenders that so and so told me this or that. I continue to get good info because the subjects know they are going to remain anonymous. It takes some time to develop that kind of rapport, especially with offenders, but once they know you're*

*not telling where the info came from, they'll start calling and giving info on their own. I get a lot of phone messages with subjects wanting to tell me things that are going on.*

# Section 9: Key Terms and Definitions

**Hot Spot**
A group of similar crimes committed by one or more individuals at locations within close proximity to one another.
Examples: Eight daytime burglaries over the past four weeks at a suburban residential subdivision, with no notable similarities in method of entry or known suspects; ten commercial burglaries over the course of three weeks at businesses located within a half-mile radius during overnight hours.

**Information**
Information is raw data; it could be an item obtained from a newspaper report, a statement made by a confidential informant, or simply an observation made by a deputy during a traffic stop. In and of itself, it is rare that action can or should be taken on raw, unevaluated information on its own.

**Intelligence**
Information that has been analyzed becomes intelligence. The process that turns raw information into something useful is analysis; the product is intelligence. Information+Analysis = Intelligence.

**Pattern**
A crime pattern is a group of two or more crimes reported to or discovered by law enforcement that are unique because they meet each of the following conditions:
- They share at least one commonality in the type of crime; behavior of the offenders or victims; characteristics of the offender(s), victims, or targets; property taken; or the locations of occurrence;
- There is no known relationship between victim(s) and offender(s) (i.e., stranger-on-stranger crime);
- The shared commonalities make the set of crimes notable and distinct from other criminal activity occurring within the same general date range;
- The criminal activity is typically of limited duration, ranging from weeks to months in length; and
- The set of related crimes is treated as one unit of analysis and is addressed through focused police efforts and tactics."

**Series**
A group of similar crimes thought to be committed by the same individual or group of individuals acting in concert.
Examples: Four commercial arsons citywide in which a black male, between the ages of 45-50, wearing yellow sweatpants, a black hooded sweatshirt and a yellow "Yankees" cap, was

observed leaving the commercial structures immediately after the fire alarm was triggered; five home invasion-style robberies involving two to three white males in their 20s wearing stockings over their faces, displaying a silver, double-barreled shotgun, and driving a red 1980s Pontiac Trans Am.

**Spree**

A specific type of series characterized by high frequency of criminal activity within a remarkably short time frame, to the extent that the activity appears almost continuous.

Examples: A rash of thefts from auto at a parking garage over the course of one hour; multiple apartments in a high-rise building burglarized during daytime hours on a single day.

**Trend**

A trend is a persistent, long-term rise or fall in data based on time and indicates a direction. Crime trend information can be useful in alerting us to increases and decreases in levels of activity. However, since crime trend analysis does not examine shared similarities between specific crime incidents, a crime trend is not a crime pattern.

# References

Boba, R. (2009). Crime analysis with crime mapping. Thousand Oaks, CA: Sage.

Boba, R., & Crank, J. (2008). Institutionalizing problem-oriented policing: Rethinking problem identification, analysis, and accountability. Police Practice and Research, 9 (5), 379-393.

Carter, P. (2009). Law enforcement intelligence: A guide for state, local, and tribal law enforcement agencies, second edition. Washington DC: U.S. Department of Justice, Office of Community Oriented Policing Services.

Center for Problem-Oriented Policing. A Theory of Crime Problems. 1994. 22 September 2015 <http://www.popcenter.org/learning/pam/help/theory.cfm#banner>.

Center for Problem Crowe, Timothy D. Crime Prevention Through Environmental Design (CPTED). Woburn, MA: Buttterworth-Heinemann, 1999.
Oriented Policing (www.popcenter.org)

Eck, J., Chainey, S., Cameron, J., Leitner, M., & Wilson, R. (2005). Mapping crime: Understanding hotspots. Washington, DC: U.S. Department of Justice, National Institute of Justice.

Federal Bureau of Investigation. (2013). Intelligence Cycle. Retrieved 2013, from FBI.Gov: http://www.fbi.gov/about-us/intelligence/intelligence-cycle

Fox, A., Novak, K., McHale, J. (2015). Using Social Network Analysis to Guide Law Enforcement Strategies. Translational Criminology, Fall 2015, 6-8.

"Having an Impact on Crime." Ratcliffe, Jerry. Intelligence Led Policing. NY: Routledge, 2008. 166-172.

National Counter Terrorism Center. (2004). *Intelligence Reform and Terrorism Prevention Act of 2004.* Retrieved 2013, from nctc.gov/docs/pl108_458.pdf: nctc.gov/docs/pl108_458.pdf

Ratcliffe, J. (2008). *Intelligence-Led Policing.* Portland: Willan Publishing.

US Department of Justice. (2003). *National Criminal Intelligence Sharing Plan.* Washington, DC: Government Printing Office.

## Additional Readings

Reducing Crimes through Intelligence Led Policing by Bureau of Justice Assistance
https://www.ncirc.gov/documents/public/reducing_crime_through_ilp.pdf

Policing Problem Places: Crime Hot Spots and Effective Prevention by Anthony Braga and David Weisburg.

Implementing Responses to Problems (USDOJ COPS publication http://ric-zai-inc.com/ric.php?page=detail&id=COPS-P131)

Crime Prevention Research Review Police Enforcement Strategies to Prevent Crime in Hot Spot Areas (USDOJ COPS publication http://ric-zai-inc.com/ric.php?page=detail&id=COPS-P140)

Problem-Solving Tips: A Guide to Reducing Crime and Disorder through Problem-Solving Partnerships (USDOJ COPS publication http://ric-zai-inc.com/ric.php?page=detail&id=COPS-P019)

**Addendum**

**Strategic Targeted Area Response (STAR) Team Manual**

**Introduction**

The Strategic Targeted Area Response (STAR) Team was created as an important part of the agency's crime fighting strategy. For the STAR Team to be successful, the principles that guide the STAR Team's thinking and actions must be clear. This manual was developed to eliminate any confusion regarding the STAR Team's mission, objectives, strategies, expectations and overall philosophy.

**Mission, Objectives and Expectations**

The Strategic Targeted Area Response Team is dedicated to reducing the top 4 UCR crimes in the district, with particular emphasis inside the STAR box and the immediate surrounding area.

As a result, there is an expectation that the STAR Team will spend 50% of their time working inside the STAR box (and the immediate surrounding area). The team will utilize various strategies while operating within the STAR box. All strategies must be centered on the following three objectives:

- Prevent crime (with particular emphasis on the Big 4)
- Reduce the public's fear of crime (with particular emphasis on the Big 4)
- Solve crime (with particular emphasis on the Big 4)

The 50% time reference is not a meaningless percentage designed to promote meaningless activity. Instead, this expectation was created to enhance accountability to ensure our STAR Teams are focusing their efforts where those efforts are most needed. The goal is effectiveness, not busy work.

STAR Team members must engage all available resources to assist them in accomplishing their mission and objectives.

**Strategic Focus**

The STAR Team is expected to actively work with other PSO members (particularly ACE and ILP) and outside agencies to identify and target prolific offenders. They will also assist in responding to emerging crime patterns and trends. They will regularly develop missions to target the "Top 5" and "Target of the month." Due to the fact that 6% of the criminals commit 60% of the crime, targeting prolific offenders should be an important part of daily crime fighting strategies.

In instances where these missions cause STAR Team members to leave the STAR box, they will check out "Signal 15" and document the top 5, target of the month, and/or emerging crime trend/location they are working on. Occasionally, STAR Team members will assist other Districts with EAPs and special missions. All the above listed activities outside the STAR box will dominate the remaining 50% of the STAR Team's time.


**Assignments outside scope of regular duty**

STAR Units are not the "Fugitive Apprehension Squad" for Property Crimes. However, they can assist with picking up prolific offenders when detectives develop Probable Cause to make an arrest.

**Tip Procedures**

STAR Units will not be assigned random tips/complaints outside the STAR box. However, STAR members should expect that tips outside the STAR box related to the STAR box will be assigned for investigation and clearance. Regardless of the nature of the tip, STAR Team members will act on the tip with an emphasis on preventing and solving Big 4 Crimes.

**Tip Protocol**

STAR Team members are encouraged to access the tip management database for investigative purposes. STAR Team members may conduct a search on tips based on any key word that is listed in the original tip. For example, a search can be performed on the keyword "Spider" and the system will populate all tips where the word spider was mentioned in any way.

STAR Team members will interact with members of the community (to include arrestees, suspects, victims, and witnesses) with a strategic focus on developing actionable intelligence, with particular emphasis on Big 4 crimes inside and around the STAR box area. An example of this type of information would include information received from a citizen about potential offenders of certain crimes in an area, etc.

When appropriate, STAR Team members will document this information via a tip submission. Once tips are submitted, the ILP Section will analyze the tip and the data will be stored in a database for future use. If the tip has current investigative value or relates to a specific investigation, it will be forwarded to the appropriate unit for follow up. The district secretaries, the ILP Section Tip Manager and the Narcotics Section Tip Manager all have access rights to

close tips and it is important that each tip is properly closed when it is no longer immediately actionable.

Tip submissions are only one way to become engaged in Intelligence-Led Policing and the emphasis should remain on quality, not quantity. Tips should not be submitted in place of an incident report or in addition to an FIR. When possible, submitted tips should contain actionable information that can be analyzed to make arrests or prevent crimes. STAR Team members should not use the tip program as a replacement for taking immediate action or completing an offense incident report.

Example of a Good Tip:
"While conducting an enhanced neighborhood check at 123 Elm Street, the resident, James Smith, told me that his neighbor at 125 Elm Street, John Jones, approx age 35, has been bragging about all the stolen Ipads he has. Smith said Jones has even offered to sell him some Ipads a few months ago."

Example of a tip with little value:
"An anonymous subject approached me at 7-11 at Moog and US 19 and told me that a guy named Tommy is dealing drugs in the area."

**STAR "Box"**
The STAR box is developed using crime statistics and hot spot trends and patterns to help identify the area within a specific district that is experiencing consistent, heightened top four UCR crimes (aka Big 4 - robbery, burglary, auto burglary and auto theft). The STAR box area is targeted because crime is persistently dense in this area over an extended period of time. Generally, the STAR box area accounts for 20%-25% of the total amount of Big 4 crimes occurring in our district. The data utilized to determine the STAR Box location is re-evaluated every 90 days to ensure the STAR Team's efforts are consistently focused in the areas that need it most.

**Pro-arrest Philosophy**
When operating in the STAR Box, our philosophy will be pro-arrest in nearly every situation where probable cause exists and will strategically support the mission. Decisions to arrest for crimes not part of the mission will be made on an individual basis.

**Assisting Patrol**
STAR Team members will assist with major events and significant calls for service throughout the district, when needed. This does not apply to standard calls for service. When STAR Team members assist patrol on a call for service, there needs to be exigent circumstances to justify this departure from their primary mission. Immediate officer safety related calls and crimes in progress where STAR Units are close by are examples of calls for service where it is appropriate to assist.

**Crime Experts**

To be effective in your mission and objectives, STAR Team members are expected to know and understand what criminal activity is occurring in the STAR box, with particular emphasis on Big 4 crimes and emerging crime trends. They are also be expected to understand any emerging crime trends occurring outside the STAR box that may impact the STAR box.

STAR Team members should learn as much as possible about prolific offenders, TOP 5, the Target of the Month, (both inside and outside the STAR box, with particular emphasis inside the STAR box) to include their acquaintances, vehicles owned/used, locations frequented, previous M.O. for offenses, etc. Knowledge and understanding of these issues will drive strategies and all activities. There are several ways to obtain this crucial information:

- Review and engage ILP's weekly "Actionable Intelligence" document to understand the issues in our district, with particular emphasis and examination of the Big 4 crimes inside the STAR box. Big 4 crime trends occurring outside the STAR box should also be examined thoroughly.
- Learn and regularly use the Crimereports.com website to assess real time stats regarding STAR Box criminal activity and district wide crime trends.
- Engage ACE, Platoon Commanders, Sergeants, community leaders and others to gain a better understand of the issues within the STAR box.

STAR Team members will use the above noted resources to regularly identify potential prolific offenders that our members need to target. STAR Team members will forward this information up the chain with an explanation as to why the person(s) should be targeted. These individuals will be further vetted by ILP prior to being added to the target list (TOP 5 or Target of the Month).

As STAR Team members examine crime trends, it is important to ask strategic questions to help truly understand the crime problem and the best possible solutions to the problem. STAR Team members should ask:

- "Why is it happening here and not somewhere else?"
- "How long has it been happening and why did it start?"
- "Will the problem recur or return once law enforcement leaves?"

When conducting an analysis, it is essential to clearly and concisely communicate your efforts to other stakeholders to avoid unnecessary duplication of efforts.

**Effective Communication**

Inter-agency and intra-agency communication is a crucial component of the Pasco Sheriff's Office ILP Model. The elimination of "information silos" is an important first step. "Information silo" is a term that refers to people or groups who are incapable of sharing important information. Information silos are counter-productive to ILP and in stark contrast to our operational approach of "We fight as one."

Therefore, it is incumbent for STAR Team members to make a concerted effort to share information regularly with members of other units as part of a formal and informal process. This sharing, at a minimum, should include informative emails to ILP, ACE, PCU, School Resource

Officers and Platoon Commanders to encourage partnership and avoid unnecessary duplication of efforts.

**Effective Communication with ILP Analysts**

This issue is of such extreme importance that it deserves special emphasis. The Pasco Sheriff's Office Criminal Intelligence Analysts are tasked with gathering, analyzing, and interpreting data from a wide array of internal and external sources to create tactical, strategic and operational intelligence products that meet both current and long term planning needs.

Districts will always have at least one criminal intelligence analyst assigned to assist in crime fighting efforts. STAR Team members are encouraged to communicate, share pertinent information and develop a dialogue directly with our criminal intelligence analyst to gain and provide situational awareness for the STAR area and/or emerging crime trend(s).

**Attendance at AIM (Actionable Intelligence Meetings)**

STAR Team members will attend and actively participate in weekly Actionable Intelligence Meetings. The weekly AIM is comprised of at least one representative from every section in the agency. This is by design and is intended to include areas that might not appear (on the surface) to have a role in such a meeting. This includes Court Services, Court Process, Child Protective Investigations, Forensics and School Resource.

These areas can contribute a wealth of valuable information generated from their unique area of operation. Department of Juvenile Justice, Probation and Parole, other state agencies, and law enforcement agencies within and surrounding Pasco County will also be encouraged to attend.

The focus of AIM is on hot spots, trends, prolific offenders, and information sharing. It also serves as de-confliction between units who unknowingly may be working the same target. Each meeting is based on crimes affecting our district.

The intelligence analysts will begin each meeting with offender and trend data for the area in question. Attendees weigh in on the information presented. While this meeting is moderated by a supervisor, it is not a roll call style meeting. It is intended to provide a free flow of information.

In addition to the inherent information sharing, the meetings also serve to eliminate the aforementioned "information silos." With obvious exceptions, all units are required to share the persons and areas of focus to allow for a holistic approach to solving their problems. In other words, we seek to integrate an "all crimes" approach to every case. For example, rather than working a drug dealer for drugs only, we would seek to integrate Economic Crimes, Property Crimes and Major Crimes, when possible, to explore other crimes that may be related to the suspect's drug involvement.

**AIM Expectations**

STAR Team members should prepare to share and seek information related to their mission, goals and objectives. This includes information related to criminal activity within the STAR

Box, identification of prolific offenders, identification of crime trends, TOP 5, Target of the Month and pending investigations and/or persons of interest.

**Strategic Partnerships**
STAR Team members will be expected to attend select community meetings in the STAR box and participate in select meetings with other PSO members and outside agency members to nurture strategic relationships. STAR Team members must understand that these strategic relationships will greatly enhance their ability to accomplish their mission. These outside agencies include, but are not limited to, the following:
- Municipal Law enforcement agencies inside and adjacent to Pasco County.
- Area Sheriff's Offices
- Parole and Probation
- Juvenile Justice (Probation)
- Code Enforcement
- ATF (gun related charges), ICE and other federal agencies
- Alcohol, Beverage and Tobacco
- HOA and other community organizations (in and related to the STAR Box)
- County Attorney
- Building Officials

STAR Team members must explore how these strategic relationships can enhance their crime fighting efforts. For instance, Parole and Probation has the ability to control the actions of prolific offenders under their supervision. Therefore, STAR Team members should regularly consult and plan missions related to probation checks for individuals who reside inside the STAR box. Special attention must be given to foster this relationship.

**Strategic Practices**
Star Team members can and will be creative and flexible in their strategic activities. In addition to what has already been described, the STAR Team will utilize various strategies to accomplish their mission and objectives. This includes, but is not limited to, the following activities:
- Strategic, directed patrol in the STAR box in a marked unit. Traffic stops and citizen contacts should be driven by a desire to prevent crime, reduce the public's fear of crime and solving crime, with particular emphasis on the Big 4.
- Strategic directed patrol and surveillance in unmarked units. Traffic stops and citizen contacts should be driven by a desire to prevent crime, reduce the public's fear of crime and solve crime, with particular emphasis on the Big 4.
- Targeted knock and talks (with emphasis on identifying and targeting Big 4 offenders, even if the location is narcotics related).
- Request a list of recent Big 4 cases in the STAR box that have been recently inactivated. Review cases and consider strategies to develop leads. This will likely include enhanced neighborhood checks. Pathways to and from the incident location should be thoroughly examined for surveillance cameras and other leads that may have been overlooked during the initial LEO response.

- Regularly obtaining lists of active JPOs in and around the STAR box (priority given to Big 4 offenders).  Serve the JPOs and plan sweeps when appropriate.
- Regularly searching for and executing warrants in and around the STAR box (priority given to Big 4 offenders).
- STAR Team members have flexibility in regards to vehicles used, uniforms worn (PSO related or dressed down, when appropriate) and resources needed.  Be creative as you pursue effectiveness.  Some of your strategies will involve trial and error, which is acceptable and expected.
- Consider utilizing strategies that involve resources that are not readily available.  We can explore ways to obtain and/or borrow needed resources, if necessary.  For instance, if we are having problems with vehicle thefts, consider taking steps to find and utilize a bait car with a kill switch.
- Check BWI and research top pawners.  Many of these people live in the STAR Box and are solid targets.  Top pawners who live outside the STAR Box can be documented in an ILP tip for follow up by ACE or others.
- Identify adults on probation in the STAR box (with particular emphasis on Big 4 offenders).  Conduct probation checks (in cooperation with Parole and Probation) to ensure compliance and strict accountability.
- Identify juveniles on probation in the STAR box (with particular emphasis on Big 4 offenders).  Conduct probation checks (in cooperation with JPOs) to ensure compliance and strict accountability.
- STAR Team members should consider using strategic trash pulls on narcotics related residences located in the STAR box.  The emphasis should always be to use our response to narcotics and other criminal activity with a clear motivation and focus on obtaining BIG 4 information as we address the other issues.
- Utilize County Ordinance citations as a strategic tool to target prolific offenders and problem locations within the STAR box.  Coordinate missions with Cpl. Art Madden and Code Enforcement to conduct STAR box Code Enforcement blitzes.
- Explore utilizing Nuisance Abatement and Minimal Housing standards to target prolific offenders and problem locations within the STAR box.  This will require active cooperation with the County Attorney and Building Officials.

Again, the examples listed above have been provided to model practical strategies that show how the principles explained in this document can be put into practice.  Over time, we will add to this list as we explore and discover effective crime fighting strategies.

**Crime Prevention**
A key component of ILP is our agency's effort to reduce and prevent crime from occurring. An important aspect of preventing crime is to provide information to citizens and businesses through a variety of means to create awareness. The goal is to cause self-induced behavior modification to make them less likely to become victims of crime, thus effectively reducing incidents of crime.

Law enforcement agencies have long known the benefits of keeping the public informed about the state of crime in their community, and what LEOs are doing about it. This has historically been conducted via face-to-face meetings with individual citizens or citizen groups.

Modern technology has also increased the capabilities available to law enforcement agencies to educate the public about crime prevention. STAR Team members should consider various ways to disseminate crime prevention information with the goal of creating citizen awareness via the following techniques:

- Online resources such as websites, email distribution groups, social media accounts such as PSO Facebook, PSO Twitter, PSO Pinterest, PSO Instagram and PSO YouTube; PSO cell phone apps., etc.
- Handouts, flyers, door hangers, etc.
- Publicity campaigns such as "Keep What's Yours", Shoplifting PSAs, Don't Drink and Drive.

**Crime Prevention Strategies**
Identifying crime patterns and working to disrupt those patterns though public awareness efforts can occur in many forms. As STAR Team members make contact with citizens and community leaders in the STAR box, they must learn and participate in crime prevention strategies. STAR Team members must understand and take an active role in using crime prevention principles to educate citizens and businesses on how to avoid being a crime target.

Among other benchmarks already listed, the STAR Team's effectiveness will be measured by their engagement in effective crime prevention strategies.

During citizen contacts, community meetings and enhanced neighborhood checks, STAR Team members will utilize crime prevention methods to inform residents of emerging crime trends in their area. STAR Team members will offer tips to these citizens on how they can avoid being victimized (i.e. locking vehicle and home doors, closing unattended garage doors, installing motion lights, installing surveillance cameras, encourage citizens to park in their driveway close to the home, encouraging proper landscape maintenance to discourage concealment opportunities, etc.).

To assist in implementing effective crime prevention strategies, consider the following:

- Examine criminal trends and try to determine what opportunity the criminal is exploiting and plan prevention efforts accordingly. Crime patterns will generally relate to an "offender, place, or victim" problem.
- If it is an offender problem and there are no commonalities among the victims, pursue opportunities to strategically patrol the area during opportune times, visit prolific offenders, etc.
- If it is a place problem, try to identify what about the place is attracting crime and take appropriate measures. For example, if there are numerous foreclosed houses in the area in disrepair, work with Code Enforcement to address. Determine if the crimes are occurring along frequently traveled routes that criminal may use and determine if there are opportunities to alter or impact these paths.

- If it is a victim problem, consider marketing campaigns directed at the residents/businesses outlining what they can do to mitigate their potential for victimization. Examples include flyers (or other crime prevention literature), electronic signage, community meetings, newsletters, etc.
- Always be sure to have a coordinated effort that is approved by your District Commander to guard against duplication of efforts.

**Daily Reports**

The STAR Team Corporal (or designee) will provide the Property Crimes Sergeant, District Investigative Lieutenant, and Captain with a daily email documenting the STAR Team's activity for the day.  This report is not intended to simply document arrests or other law enforcement activity.  Although this activity is important and should be documented, the reason behind the activity should also be included.  In summary, this report should be written in a way that clearly reveals the STAR Team's activity is based upon the principles contained in this manual. This report will be also added to morning report at the conclusion of every shift.

# EXHIBIT L

Reporting Member - JOHN HORNING
Supervisor: JOHN COLLIER JR
Status: CLEARED BY ARREST
Referred to: S.A.O. EAST

CJIS#: 566
CJIS#: 1620

Reporting Date: 06/22/12
Date approved: 06/25/12

| Assignment | | |
|---|---|---|
| Assigned By: | CJIS#: | Date assigned: |
| Assigned To: | CJIS#: | Date assigned: |
| | End Report   12 - 033038 | |

--- STAT DATA ---
Narrative Only
-----------------
VICTIM/WITNESS - DOMESTIC VIOLENCE PACKET ISSUED Y/N: No
SAO INVESTIGATION DATE: N
SUPPORT DOCUMENTS: None

On 06-16-12, at 1716 hours, I was on duty working the 0600
hour, to 1800 hour, shift as a Duly Sworn Deputy for Pasco County.

While on patrol, I received a phone call from the listed
suspect in this case. Joseph advised me he was involved in a verbal
confrontation with a subject named Jerry, at Jerry's Auto Sales.
Joseph said he attempted to call me immediately upon leaving the
incident location, however, I was not available. He said he
continued to try to contact me, which was confirmed by missed calls
recorded on my phone from 1445 hours on 06-16-12. Joseph gave me a

detailed statement regarding the incident. He said he met with
Jerry to inquire about a problem he had with a vehicle that was
purchased from his business one year prior. Joseph said he asked
Jerry if he sold the vehicle a year ago without the check engine
light. Joseph said Jerry became extremely irate regarding the
question. Jerry then began to yell and immediately made a call on
his phone and began yelling into the phone, "There is a man on my
property attacking me and he won't leave." Joseph said he was
standing approximately two feet from Jerry while he was on the
phone, however, Jerry continued to talk into the phone saying, "He
is in my face, he won't leave, he struck me in the chest, etc."
Joseph said at no time did he touch Jerry, not even to push him away
when he tried to provoke him.

    Joseph then entered his vehicle and Jerry followed him,
continuing to yell he was being attacked. Joseph said Jerry walked
behind his vehicle and positioned himself at the right rear corner
of the vehicle. Joseph said there was a vehicle directly in front
of his preventing him from going forward and Jerry was still in his
path behind him. Joseph said Jerry remained at the corner of the
vehicle for 10 or 15 seconds before he moved to his right. Joseph
said he was looking to the rear and when Jerry cleared his path, he
put the vehicle in reverse and very slowly, started to back up.
Joseph emphasized the fact he backed up less then a foot, when Jerry
slammed his forearms and chest onto the rear window. Joseph said he
immediately put the vehicle in park. Joseph said Jerry did not fall
backwards, as he would if he hit Jerry with a vehicle, but rather
turned around and walked approximately five to ten feet to the right
of the car and dove belly down into the gravel driveway. Joseph
said he exited his vehicle as he lost sight of Jerry when Jerry dove
down. Joseph said he walked around the back of his vehicle and
observed Jerry to be seated on the ground screaming into his phone
that he never dropped, saying, "He just hit me with his car."
Joseph said Jerry then began to pick at both of his knees with his
fingernails. Jerry then started to yell to a man that was standing
on the porch of a gift shop saying, "Did you see him hit me?"
Joseph said the man answered Jerry saying, "No, I just came out."
Joseph said Jerry then came back to the rear of the vehicle and
continued to scream into his phone, "He is in my face." Jerry then
turned towards Joseph and started to push him and punch him on his
back and shoulders. Joseph said a vehicle pulled into the gift shop
occupied by two females. At that time Jerry backed up away from the
vehicle. Joseph entered his vehicle and could see Jerry was
standing far enough away to allow him to back up enough to clear the
vehicle in front of his and pull forward. Joseph said he then left
the property and immediately called my phone. Joseph continued to
emphasize he was very cautious to never touch Jerry at any time,
saying he did not even block Jerry when he was hitting him. Joseph
told me his 12 year old daughter, 9 year old son and 7 year old
daughter, were in the vehicle during the incident.

    I spoke to the 12 year old, Charis, on the phone. Charis was

very clear regarding what she had seen. Charis said a man was
yelling at her dad and was pushing him. Charis said that man was
yelling on his phone, but she could not hear what he was saying.
Charis said her dad got back into their car and started to back up.
She said her dad was just starting to move and was moving very
slowly backwards, when the man ran into the back of the car and
smacked it. She said the man then walked off to the side and jumped
on the ground. Charis continued to say her dad exited the car to
see where the man was. She then observed the man approach her dad
and push him. Charis said the man pushed him several times, until
her dad entered the car. She said the man stood off to the left
side of the car and continued to yell. The man then walked back
behind the car and stood over by the passenger side of the car. She
said her dad backed up very slowly, just enough to allow enough room
for him to pull forward and leave. I asked Charis specifically
saying, "Did your dad touch the man or push him, just to keep him
away or anything?" Charis said, "My daddy never touched the man,
even when the man was hitting and pushing him." I asked Charis, "Did
your daddy bump into the man by accident when he was trying to
leave?" Charis said, "My daddy was just starting to barely move,
when the man ran into the car, smashing himself into it."

   I told Joseph I was not working in the district this incident
occurred and I could not get involved directly in the investigation.
I advised Joseph he and Charis need to tell the investigating deputy
about all the details. I told him to mention pulling the 911 tape
so the deputy could hear the man alleging that you were hitting him.
The fact that the man continued to talk to the operator without
interruption while being allegedly punched and attacked will be
inconsistent.

   I then called the investigating deputy and advised him Joseph
called me immediately to report the incident. Deputy J. Cardona
advised he would interview Joseph and his witnesses the next day.

   ICR = .50 hour/s @ $26.00 per hour = $13.00.

   Station 5 / 1712

| Administrative | | |
|---|---|---|
| Reporting Member - JOHN HORNING | CJIS#: 566 | Reporting Date: 06/22/12 |
| Supervisor: JOHN COLLIER JR | CJIS#: 1620 | Date approved: 06/25/12 |
| Status: CLEARED BY ARREST | | |
| Referred to: S.A.O. EAST | | |

| Assignment | | |
|---|---|---|
| Assigned By: | CJIS#: | Date assigned: |
| Assigned To: | CJIS#: | Date assigned: |
| | End Report  12 - 033038 | |